# United States Court of Appeals
# for the District of Columbia Circuit

## No. 21-5045

DAMIEN GUEDES, et al.,

*Plaintiffs-Appellants,*

*v.*

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, et al.,

*Defendants-Appellees.*

*On Appeal from United States District Court for the District of Columbia in No.
1:18-cv-02988-DLF, Honorable Dabney L. Friedrich, U.S. District Judge*

## BRIEF FOR *AMICI CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, BRADY AND EVERYTOWN FOR GUN SAFETY

SHANE A. HUNT
O'MELVENY & MYERS LLP
Times Square Tower
Seven Times Square
New York, New York 10036
(212) 326-2000

ANNA T. PLETCHER
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, California 94111
(415) 984-8700

IAN SIMMONS
ELENA ZARABOZO
RACHEL A. CHUNG
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300

SCOTT A. SNYDER
TYLER HELMS
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, California 90071
(213) 430-6000

*Counsel for Amici Curiae Giffords Law Center to
Prevent Gun Violence, Brady and Everytown for Gun Safety*

*(For Continuation of Appearances See Inside Cover)*

November 8, 2021

HANNAH SHEARER
ESTHER SANCHEZ-GOMEZ
GIFFORDS LAW CENTER TO PREVENT
    GUN VIOLENCE
268 Bush Street, Suite 555
San Francisco, California 94104

J. ADAM SKAGGS
GIFFORDS LAW CENTER TO PREVENT
    GUN VIOLENCE
223 West 38th Street, Suite 90
New York, New York 10018

*Counsel for Amicus Curiae*
    *Giffords Law Center to Prevent*
    *Gun Violence*

JONATHAN LOWY
CHRISTA NICOLS
BRADY
840 First Street NE, Suite 400
Washington DC 20002

*Counsel for Amicus Curiae Brady*

ERIC TIRSCHWELL
AARON ESTY
EVERYTOWN LAW
450 Lexington Avenue
P.O. Box 4184
New York, New York 10017

*Counsel for Amicus Curiae*
    *Everytown for Gun Safety*

**CORPORATE DISCLOSURE STATEMENT**

Giffords Law Center to Prevent Gun Violence is a nonprofit organization. It has no parent corporations. It has no stock, and therefore no publicly held company owns 10% or more of its stock.

Brady United Against Gun Violence is a nonprofit organization. It has no parent corporations. It has no stock, and therefore no publicly held company owns 10% or more of its stock.

Everytown for Gun Safety is a nonprofit organization. It has no parent corporations. It has no stock, and therefore no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ....................................................... I

INTEREST OF *AMICI CURIAE* ............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................2

ARGUMENT ............................................................................5

I.      CONGRESS WROTE ITS MACHINEGUN BAN TO WITHSTAND MANUFACTURERS' EFFORTS TO DEVISE TECHNICAL WORKAROUNDS.........................................5

     A.      1934: Congress First Recognizes That Machineguns Have No Legitimate Civilian Purpose .......................................5

     B.      1968: Congress Reiterates That Machineguns Have No Legitimate Civilian Purpose And Expands Their Regulation To Anticipate Technological Workarounds ...........8

     C.      1986: The Firearm Owners' Protection Act Completes The Ban On Machineguns And Strengthens The Definition Against Technological Manipulation ....................10

II.      BUMP STOCKS TRANSFORM SEMI-AUTOMATIC RIFLES INTO AUTOMATIC RIFLES............................................11

     A.      Attaching A Bump Stock To A Semi-Automatic Rifle Mechanically Transforms It Into An Automatic Rifle.............11

         1.      *Automatic Versus Semi-Automatic Weapons*.................12

         2.      *Bump Stocks* ....................................................17

     B.      Like Other Automatic Weapons, Weapons Equipped With a Bump Stock Have No Legitimate Civilian Purpose....................................................19

         1.      *The Rate of Fire* ............................................19

         2.      *Manufacturer Advertising*...............................21

         3.      *Las Vegas Shooting* .....................................22

CONCLUSION ........................................................................23

CERTIFICATE OF SERVICE ......................................................25

CERTIFICATE OF COMPLIANCE................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*District of Columbia v. Heller*,
554 U.S. 570 (2008)..................................................................2

*Guedes v. ATF*,
920 F.3d 1 (D.C. Cir. 2019)......................................................8

*Shields v. Utah Idaho Cent. R. Co.*,
305 U.S. 177 (1938)..................................................................8

**Statutes**

28 U.S.C. § 5845(b) .............................................................10, 17

1986 Act § 109(a) ......................................................................11

Pub. L. No. 73-474, 48 Stat. 1236 (1934)..................................6

Pub. L. No. 73-474 § 1(b) ..........................................................8

Pub. L. No. 73-474 § 9 ...............................................................8

Pub. L. No. 73-474 § 12 .............................................................8

Pub. L. No. 73-474 § 14 .............................................................8

Pub. L. No. 90-351, 82 Stat. 197, 1231 (June 19, 1968) .........10

Pub. L. No. 90-618, 82 Stat. 1214 § 5845(b) (Oct. 22, 1968) .................11

Pub. L. No. 99-308, 100 Stat. 449 (May 19, 1986) .................10

**Other Authorities**

45Snipers, *How An AR-15 Rifle Works: Part 2, Function*, YouTube
(Jan. 11, 2017)........................................................................14

ArmaLite, Inc., Technical Note 54: Direct Impingement Versus Piston
Drive (July 3, 2010 Rev. 2)....................................................12

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Bills to Assist State and Local Governments in Reducing the Incidence of Crime, To Increase the Effectiveness, Fairness, and Coordination of Law Enforcement and Criminal Justice Systems at All Levels of Government, and for Other Purposes: Hearing Subcomm. No. 5 of the H. Comm. on the Judiciary*, 90th Cong. 779 (1967) ..................................................................................9

*The "bump stocks" used in the Las Vegas shooting may soon be banned*, The Economist (Oct. 6, 2017 .............................................20

David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 Cumb. L. Rev. 585 (1987) ................................11, 12

*Firearms Enforcement Efforts of the Bureau of Alcohol, Tobacco and Firearms: Hearing Before the Subcomm. On Crime of the H. Comm. on the Judiciary*, 96th Cong. 33 (1980) .................................10

Firequest, *Slide Fire SSAR-15 Bump Fire Stock – Right Hand Model*....................21

H.R. Rep. No. 73-1780 (1934)....................................................................6

Hearings Before A Subcommittee of the Committee on Commerce of the United States Senate on S.885, S.2258 And S. 3680 (1934)........................7

Hearings Before The Committee on Ways and Means, House of Representatives on H.R. 9066 (1934)........................................7, 8, 15

James Clark, *These Marines Explain Why They Only Use Fully Automatic Fire During the Most Intense Firefights*, National Interest (Mar. 6, 2020) ........................................................20

John Ellis, *The Social History of the Machine Gun* (1975)...................................5, 6

LVMPD Criminal Investigative Report of the 1 October Mass Casualty Shooting, Joseph Lombardo, Sheriff, August 3, 2018 .......................22

Midsouth Shooters, *Bumpfire Systems*....................................................21

Nicole Chavez, What are the 'bump stocks' on the Las Vegas shooter's guns?, CNN (Oct. 5, 2017) ................................................18

Powerful US gun lobby group backs new curbs on rapid-fire accessories, The Straits Times (Oct. 6, 2017) ....................................18

Robert J. Spitzer, *Gun Law History and Second Amendment Rights*, 80 L. & Contemp. Prob. 55 (2017) ........................................6

S. Rep. No. 73-1444 (1934) ....................................................6

Sen. Comm. on the Judiciary, 97th Cong., Federal Regulation of Firearms (1982)...................................................................9

Shooting Range Industries, LLC, *How Effective is Full Auto? Do Soldiers Use Fully or Semi Automatic Rifles & Weapons?*..............................21

Slide Fire: Bump Fire Stocks ...................................................21

Slide Fire SSAK-47 Bump Fire Stock - Right Hand Model ....................21

Steven Koff, *Assault weapons, semi-automatic rifles and the AR-15: Defining the debate*, Cleveland.com (Jan. 30, 2019)..........................20

Thomas Schwenke, M16 and AR-15 – How firearms work!, YouTube (Feb. 23, 2019)........................................................15, 16, 17

U.S. Dep't of Army, Field Manual 23-9, *Rifle Marksmanship M16A1, M16A2/3, M16A4, and M4 Carbine* (Sep. 13, 2006) ...............13, 14, 15, 16, 19

**Regulations**

83 Fed. Reg. 66,514 (Dec. 26, 2018) ...........................................3

## INTEREST OF *AMICI CURIAE*[1]

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, gun owners, and others who seek to reduce gun violence and improve the safety of their communities.  The organization was founded more than a quarter-century ago, and through key partnerships, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence.  With its partner organization Giffords, Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights have always been consistent with gun safety legislation and community violence prevention strategies.

*Amicus curiae* Brady (formerly the Brady Center to Prevent Gun Violence) is one of the nation's oldest and largest nonpartisan, non-profit organizations dedicated to reducing gun violence through education, research, and direct legal advocacy on behalf of victims and communities affected by gun violence. Brady has a substantial interest in advancing reasonable laws and policies that reduce gun

---

[1] *Amici* submit this brief pursuant to Federal Rule of Appellate Procedure 29(a), and all parties have consented to the filing of this brief.  Undersigned counsel for *amici curiae* certify that this brief was not authored in whole or in part by counsel for any of the parties; no party or a party's counsel contributed money for the brief; and no one other than *amici curiae* has contributed money for this brief.

1

violence. Brady's legal team has filed numerous amicus briefs in cases involving firearms regulations, including *McDonald v. City of Chicago*, 561 U.S. 742 (2010) and *District of Columbia v. Heller*, 554 U.S. 570 (2008).

*Amicus curiae* Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly six million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after 20 children and six adults were murdered in an elementary school in Newtown, Connecticut, by a gunman with an AR-15 rifle. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws. Everytown's mission includes defending common-sense gun safety laws by filing amicus briefs, including in numerous Second Amendment cases.

## INTRODUCTION AND SUMMARY OF ARGUMENT

When Congress banned machineguns, it crafted a broad definition whose ordinary meaning captures efforts to circumvent the ban, including mechanisms that convert semi-automatic weapons into automatic weapons. Taking advantage of a then-unregulated workaround, a gunman used devices known as "bump stocks" to fire over a thousand rounds in just minutes into a crowd of some 20,000

concertgoers from the 32nd floor of a Las Vegas hotel, killing 60 and wounding hundreds more. ATF realized that manufacturers had gotten out ahead of it and initiated a rulemaking that ultimately classified the offending bump stock technology as a banned machinegun. *See* Bump-Stock Type Devices, 83 Fed. Reg. 66,514 (Dec. 26, 2018).

*Amici* agree with the government's statutory analysis in its response brief defending ATF's classification of bump stocks as illegal machineguns. *See generally* Br. for Appellees. They write separately (i) to provide additional insight into the historical context and purpose of Congress's machinegun ban and (ii) to provide additional technical explanation of why a bump stock is properly understood as a fully automatic weapon.

When Congress first decided to regulate machineguns nearly a century ago, it did so based on a policy judgment that machineguns have no legitimate civilian purpose. In that law and its subsequent revisions, Congress crafted an intentionally broad definition to address the legitimate concerns of numerous stakeholders— including the National Rifle Association ("NRA")—that manufacturers would sidestep the regulations through innovative technological workarounds.

Bump stocks are simply one of several recent efforts by manufacturers to do just that. The key distinguishing feature between automatic and semi-automatic weapons is whether the pace of firing is controlled by a "disconnector," which

requires an operator to fire each shot manually, or an "auto-sear," which harnesses internal gun movements from the combustion reaction that fires each round to start the reaction again, allowing a continuous stream of firing until the trigger is released or the ammunition supply is exhausted. Manufacturers designed the bump stock to allow the disconnector to operate like an auto-sear, harnessing movement from the combustion reaction to allow a continuous stream of fire until the trigger is disengaged. In doing so, it converts a semi-automatic weapon into an automatic one.

This Court has already considered and rejected Appellant's arguments on an appeal from a motion for preliminary injunction. Now that the case is back before it on the merits, the Court should do so again and affirm.

**ARGUMENT**

**I. CONGRESS WROTE ITS MACHINEGUN BAN TO WITHSTAND MANUFACTURERS' EFFORTS TO DEVISE TECHNICAL WORKAROUNDS**

Recognizing the unique danger that fully automatic weapons pose, Congress first regulated machineguns nearly a century ago and, in 1986, banned the manufacture of new machineguns outright. Each legislative milestone has reflected three consistent policy judgments: First, machineguns are particularly dangerous and serve no lawful civilian purpose; second, the definition of machineguns should stand up to manufacturers' efforts to innovate their way around that policy judgment; and finally, enforcement of the ban is properly delegated to an agency—now ATF—with principal rulemaking authority to run a complex regulatory regime.

**A. 1934: Congress First Recognizes That Machineguns Have No Legitimate Civilian Purpose**

As the 20th century dawned, breakthroughs in rapid-fire weaponry added a wrinkle to America's long relationship with guns. Technological advances had transformed firearms from unreliable rifles into highly efficient killing machines. *See* John Ellis, *The Social History of the Machine Gun* 17–20 (1975). The first machinegun was created in 1883 by the inventor Hiram Maxim and harnessed a gun's natural recoil to permit continuous, truly automatic fire. *Id.* at 9–14, 16, 33. By the 1920s and '30s, these hyper-destructive firearms had escaped their military

5

origins and were contributing to the rise of armed violence, particularly by organized crime. *See* Robert J. Spitzer, *Gun Law History and Second Amendment Rights*, 80 L. & Contemp. Prob. 55, 68 (2017) (noting gun "ownership spread in the civilian population in the mid-to-late 1920s, and the gun became a preferred weapon for gangsters").

In response to the explosion of armed violence by organized crime, Congress passed one of the first federal gun laws, the National Firearms Act of 1934 ("NFA"), Pub. L. No. 73-474, 48 Stat. 1236 (1934). The NFA imposed a national registration regime and a hefty tax on three firearms that Congress determined were "weapon[s] of choice" among would-be criminals: machineguns, sawed-off shotguns, and silencers. *See, e.g.*, S. Rep. No. 73-1444, at 1–2 (1934) ("[The] law violator must be deprived of his most dangerous weapon, the machine gun."); H.R. Rep. No. 73-1780, at 1 (1934) (same). The NFA reflected Congress's judgment that machineguns have no legitimate civilian purpose, as they were neither useful nor necessary for self-defense or sport. *See* S. Rep. No. 73-1444, at 2 (1934) ("[T]here is no reason why anyone except a law officer should have a machine gun or sawed-off shotgun."); H.R. Rep. No. 73-1780, at 1 (1934) (same).

Congress defined "machinegun" with an eye toward frustrating efforts to circumvent the regulation. The legislation as originally proposed defined "machinegun" as "any weapon designed to shoot automatically or

semiautomatically twelve or more shots without reloading." *See* Hearings Before A Subcommittee of the Committee on Commerce of the United States Senate on S.885, S.2258 And S. 3680, at 75 (1934). But the then-President of the NRA, Karl T. Frederick, worried that the definition was too narrow and that manufacturers could bypass the new restrictions by simply limiting a gun's ammunition-feeding device to hold eleven rounds or fewer. *See* Hearings Before The Committee on Ways and Means, House of Representatives on H.R. 9066, at 39–40 (1934) ("House NFA Hearing") ("A gun which fires automatically or semiautomatically less than 12 shots is not under this definition a machine gun. And yet, in my opinion, it is in fact a machine gun and should be so classified.").

Based on this concern, Frederick proposed a revised definition, which Congress adopted: a weapon that "shoots automatically more than one shot without manual reloading, by a single function of the trigger." *Id.* at 40. Frederick explained that this definition was based on the limiting feature of non-machineguns: how "fast . . . you can pull your trigger." *Id.* at 41. This focus on the human factor—on the need manually to pull a trigger—tracked Congress's intent to distinguish guns used for sport and self-defense from those only useful for crime. *See* Pub. L. No. 73-474 § 1(b).

Finally, in passing the NFA, Congress did not simply criminalize machinegun possession, but rather enacted a regulatory scheme, by which it

delegated to the Internal Revenue Commissioner "discretionary authority" over licensing, with usual recourse to the courts. *See* House NFA Hearing at 131 ("[T]here is, of course, a right of appeal from the decision of the Commissioner in this case, just as there is in any other case where the Commissioner is delegated with a discretionary power."). Thus, machineguns had to be registered with the Commissioner, Pub. L. No. 73-474 § 9, who Congress authorized to "prescribe rules and regulations as may be necessary for carrying the provisions of this Act into effect," *id.* § 12. Criminal penalties resulted only from failing to register a machinegun with the Commissioner. *Id.* § 14. By providing for criminal enforcement, however, Congress did not alter the long-established deferential standard courts used to evaluate delegated authority, as this Court held in *Guedes v. ATF*, 920 F.3d 1, 163-67 (D.C. Cir. 2019). *See, e.g.*, *Shields v. Utah Idaho Cent. R. Co.*, 305 U.S. 177, 187 (1938) (court deferred to agency's classification of a railroad, despite possible criminal implications).

### B. 1968: Congress Reiterates That Machineguns Have No Legitimate Civilian Purpose And Expands Their Regulation To Anticipate Technological Workarounds

With gun violence continuing to plague the nation, Congress looked to tighten its safety measures and took up a bill that would become the Gun Control Act of 1968 ("GCA"). Throughout the legislative hearings, witnesses once again distinguished between weapons useful for self-defense or sport and machineguns

that have no place in civil society. *See Bills to Assist State and Local Governments in Reducing the Incidence of Crime, To Increase the Effectiveness, Fairness, and Coordination of Law Enforcement and Criminal Justice Systems at All Levels of Government, and for Other Purposes: Hearing Subcomm. No. 5 of the H. Comm. on the Judiciary*, 90th Cong. 779 (1967) (statement of Rep. James F. Battin, R-Mont.) (distinguishing "machineguns" that are "only . . . destructive devices" from "sporting and defensive guns"). Consistent with its 1934 position, the NRA reaffirmed that "[m]achine guns . . . hav[e] no place in the sporting world." *Id.* at 666 (statement of John M. Schooley, Chairman, Legislative Committee, NRA).

At the same time—and just as the NRA had predicted three decades earlier—even the NFA's broad machinegun definition did not entirely deter creative circumvention efforts. In particular, some used ingenious means to convert unregulated, semi-automatic weapons to fully automatic machineguns. In the 18 months preceding the GCA's adoption, such converted machineguns accounted for 20 percent of machineguns seized or purchased by ATF. *See* Sen. Comm. on the Judiciary, 97th Cong., Federal Regulation of Firearms, at 26 (1982) (Atty Gen.'s Task Force on Violent Crime: Recommendations Related to Firearms). In response, a governmental task force recommended that Congress authorize ATF to expand its machinegun definition to include these conversion kits. *Id.*

When Congress adopted the GCA, it reaffirmed the NFA's core machinegun definition and adopted the recommended expansion of the term to include "any combination of parts designed and intended for use in converting a weapon into a machinegun." *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197, 1231 (June 19, 1968) *codified* at 28 U.S.C. § 5845(b).

C.    **1986: The Firearm Owners' Protection Act Completes The Ban On Machineguns And Strengthens The Definition Against Technological Manipulation**

In 1986, Congress amended the earlier machinegun registration scheme into a complete ban on civilian ownership of newly manufactured machineguns. Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (May 19, 1986) ("1986 Act").  Hearings leading up to the revision continued to emphasize the lethality of machineguns and their near-exclusive criminal use.  *See Firearms Enforcement Efforts of the Bureau of Alcohol, Tobacco and Firearms: Hearing Before the Subcomm. On Crime of the H. Comm. on the Judiciary*, 96th Cong. 33 (1980) (connecting machineguns to narcotics traffickers).

Once again faced with workarounds, Congress further broadened the definition of machinegun to capture not only "combination[s] of parts" that could convert a weapon into a machinegun, but *any part* used to convert a weapon into a machinegun.  1986 Act § 109(a).  This broadened definition targeted firearms manufacturers who avoided the "combination of parts" definition by designing

individual parts that could themselves convert semi-automatic weapons into automatic weapons. *See* Pub. L. No. 90-618, 82 Stat. 1214 § 5845(b) (Oct. 22, 1968); David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 Cumb. L. Rev. 585, 668 (1987).

## II. BUMP STOCKS TRANSFORM SEMI-AUTOMATIC RIFLES INTO AUTOMATIC RIFLES

Bump stocks exist for a single reason: to convert semi-automatic rifles into machineguns. They are thus conversion kits that fall under the plain meaning of Congress' machinegun definition. This interpretation is confirmed by the fact that bump stocks have no lawful civilian purpose—a fact tragically borne out by the Las Vegas shooter's use of bump stocks to fire over 1,000 rounds in under 10 minutes on a crowd of some 20,000 Las Vegas concertgoers, killing 60 and wounding hundreds more in a matter of minutes.

### A. Attaching A Bump Stock To A Semi-Automatic Rifle Mechanically Transforms It Into An Automatic Rifle.

As described below, automatic and semi-automatic weapons are technologically similar, primarily differing in whether the firing process is controlled by a "disconnector," which requires the operator to fire each shot manually, or an "auto-sear," which harnesses movement from the combustion reaction that fires each round to start the reaction again without additional operator intervention. *See* Hardy, *The Firearms Owners' Protection Act: A Historical and*

11

*Legal Perspective*, 17 Cumb. L. Rev. at 668 n.454 ("[A]n automatic arm, like an internal-combustion engine, is naturally designed to continue its cycle. It is generally necessary in the design to add a part or system . . . to inhibit this and limit it to one shot per trigger squeeze."). A bump stock re-tools the disconnector to act like an auto-sear, harnessing movement from that same combustion reaction to allow a continuous stream of fire until the bump stock is disengaged. In doing so, it "convert[s]" a semi-automatic weapon into an automatic one—exactly what Congress intended to prevent through its statutory definition.

### 1. *Automatic Versus Semi-Automatic Weapons*

Most automatic and semi-automatic guns use an "internal piston" system to eject and reload rounds after firing. ArmaLite, Inc., Technical Note 54: Direct Impingement Versus Piston Drive (July 3, 2010 Rev. 2).[2] Take the military's M16 automatic rifle and its civilian counterpart, the AR-15 semi-automatic rifle:

---

[2] https://wayback.archive-it.org/all/20120905024032/http:/www.armalite.com/images/Tech Notes%5CTech Note 54, Gas vs Op Rod Drive, 020815.pdf.



Figure 1: Diagram of Internal Piston System of M16- and AR-15-style rifles[3]

To prepare one of these guns to fire, a part called the bolt locks a cartridge into firing position. FM 23-9 ¶ 4-2. When the operator pulls the trigger, the hammer strikes the firing pin to ignite the gunpowder housed in the cartridge, and the explosion causes rapidly expanding gas to propel the bullet forward. *Id.* As the bullet leaves the rifle, the gun channels some of that gas back through the gas tube, pushing the bolt carrier—a component that houses the bolt—backwards. *Id.*

---

[3] U.S. Dep't of Army, Field Manual 23-9, *Rifle Marksmanship M16A1, M16A2/3, M16A4, and M4 Carbine*, ¶ 4-2 (Sep. 13, 2006) ("FM 23-9").

Moving the bolt carrier backwards pulls the bolt backwards to eject the spent casing and resets the hammer. *Id.* A buffer spring at the back of the gun then propels the bolt carrier forward again. *Id.* On its way forward, the bolt carrier collects a new cartridge and locks it into firing position. *Id.*



Figure 2: Post-fire forward motion of bolt carrier[4]

The primary difference between automatic and semi-automatic rifles is the firing mechanism. For both rifles, the initial pull of the gun's trigger releases the hammer to fire a round. *See* FM 23-9 ¶¶ 4-2, 4-3. The internal piston system then cocks the hammer back, readying it for the next shot. *See id.* ¶ 4-2. In a semi-automatic rifle, once the hammer is released, a spring pushes a part called the disconnector up to catch the returning hammer to prevent it from releasing until the operator again pulls the trigger. *Id.* In the plain language of the statute, the

---

[4] 45Snipers, *How An AR-15 Rifle Works: Part 2, Function*, YouTube (Jan. 11, 2017), https://youtu.be/wAqE-KLbiYc.

disconnector disrupts the otherwise "automatic[]" cycle of firing brought about by the internal piston system and links the "function of the trigger" to each pull of the trigger by the operator. *See* House NFA Hearing at 39–40 (Frederick using "function" interchangeably with "pull").



Figure 3: Post-Fire Mechanism - M16 In Semi-Automatic Mode[5]

In an automatic gun, by contrast, a post keeps the disconnector spring depressed until the trigger is released, preventing it from catching the hammer after each shot. *See* FM 23-9 ¶ 4-3.

---

[5] Thomas Schwenke, M16 and AR-15 – How firearms work!, YouTube (Feb. 23, 2019), https://youtu.be/wMIBUIN30yU.



Figure 4: Firing Mechanism - M16 in Fully Automatic Mode[6]

The automatic gun instead engages a separate part called the auto-sear. *See* FM 23-9 ¶ 4-3. When the expanding gas sends the bolt carrier backwards to re-cock the hammer, the auto-sear catches the hammer. *Id.* When the bolt carrier rebounds off the buffer spring, it pushes the auto-sear down, releasing the hammer and firing another round. *Id.*

---

[6] Thomas Schwenke, M16 and AR-15 – How firearms work!



Figure 5: Firing in Fully-Automatic Mode-Bolt Carrier Pushing Auto-Sear[7]

Thus, in automatic mode, the auto-sear allows the gun to harness the back-and-forth motion of the bolt carrier caused by the combustion reaction of firing the weapon to fire rounds continuously until the trigger is released or the ammunition supply is exhausted. In the plain language of the statute, the first trigger pull, or "function," in an automatic weapon serves to initiate "automatically" "more than one shot," with each subsequent round triggered not by the operator, but by the previous round. 26 U.S.C. § 5845(b).

2. *Bump Stocks*

A bump stock is a device the operator connects to a semi-automatic gun that

_____

[7] Thomas Schwenke, M16 and AR-15 – How firearms work!

allows the disconnector to operate like an auto sear, channeling the same combustion reaction to re-engage the hammer after each round is fired.  The bump stock takes advantage of the same combustion reaction on which the automatic gun relies:  energy that causes the gun to recoil backwards.  A bump stock acts as a type of buffer spring to propel the gun backward and forward, "bumping" the trigger against the shooter's stationary finger.  This releases the disconnector, permitting the hammer to strike and fire another round.[8]



Figure 6: Bump Stock Firing[9]

Like an automatic gun, the bump stock links the firing of each round to the backward and forward motion caused by the rapidly expanding gas from firing a

[8] Nicole Chavez, What are the 'bump stocks' on the Las Vegas shooter's guns?, CNN (Oct. 5, 2017), https://www.cnn.com/2017/10/04/us/bump-stock-las-vegas-shooting/index.html.
[9] Powerful US gun lobby group backs new curbs on rapid-fire accessories, The Straits Times (Oct. 6, 2017), https://www.straitstimes.com/world/united-states/after-las-vegas-shooting- momentum-builds-for-ban-of-rapid-fire-devices.

round, rather than individual pulls of the trigger by an operator.  The only difference is how the back-and-forth energy is harnessed:  by the bolt carrier (in a traditional automatic weapon) or by the entire gun (in a bump-stock weapon).

Either way, these mechanics allow bump stocks to work around the inherent human limitations in firing a trigger that motivated the NRA to propose—and Congress to adopt—its machinegun definition.  *See supra* at 7.  Or, in the plain language of the statute, a "single function of the trigger" initiates "automatically" "more than one shot," with each subsequent shot triggered by the previous round rather than the shooter.

### B.     Like Other Automatic Weapons, Weapons Equipped With a Bump Stock Have No Legitimate Civilian Purpose

A bump stock mechanically converts a semi-automatic weapon into an automatic one, making it every bit as dangerous the typical machineguns that Congress has long kept out of civilian hands.  This is demonstrated by (i) the weapon's cyclic rate of fire; (ii) manufacturer advertising; and (iii) the Las Vegas shooter's choice of bump stocks.

#### 1.     The Rate of Fire

The cyclic rate of fire is the rate at which a firearm completes the cycle of firing a loaded cartridge to locking a new one into firing position.  *See* FM 23-9 at Glossary-7.  The military's M16A4 machinegun is capable of a cyclic fire rate of 800 rounds per minute.  *Id.* ¶ 2-1.  The limiting factor of a semi-automatic weapon

is the shooter's trigger finger, and estimates place the firing rate of top professional

sport shooting competitors at 180 rounds per minute. Steven Koff, *Assault*

*weapons, semi-automatic rifles and the AR-15: Defining the debate*,

Cleveland.com (Jan. 30, 2019).[10]  Estimates peg the cyclic rate of fire of a bump-

stock-outfitted semi-automatic rifle to be between 400 and 800 rounds per minute.

*See The "bump stocks" used in the Las Vegas shooting may soon be banned*, The

Economist (Oct. 6, 2017).[11]  Thus, the least-skilled gun operator can use bump

stocks to rival military weapon fire rates, 440% faster than even the most skilled

operator of an unmodified semi-automatic rifle.

     The increased firing speed of an automatic weapon is inherently dangerous,

and because it generally comes at the cost of accuracy, it carries no self-defense or

sporting advantage. *See* James Clark, *These Marines Explain Why They Only Use*

*Fully Automatic Fire During the Most Intense Firefights*, National Interest (Mar. 6,

2020).[12]  Bump stocks are no different. Because they rely on the give and take of

the rifle between the shoulder and trigger finger, bump-stock-equipped semi-

automatic firearms are *less* accurate in their simulated automatic fire than the

---

[10] https://www.cleveland.com/nation/2018/04/assault_weapons_semi-automatic_1.html.

[11] https://www.economist.com/graphic-detail/2017/10/06/the-bump-stocks-used-in-the-las- vegas-shooting-may-soon-be-banned.

[12] https://nationalinterest.org/blog/buzz/these-marines-explain-why-they-only-use-fully- automatic-fire-during-most-intense.

automatic weapons used by the military. *See* Shooting Range Industries, LLC, *How Effective is Full Auto? Do Soldiers Use Fully or Semi Automatic Rifles & Weapons?*[13]

## 2. Manufacturer Advertising

The automatic firing capacity of bump-stock-equipped weapons—and their blatant circumvention of federal law—is confirmed by their manufacturers' marketing. As one manufacturer crowed, "Bumpfire Stocks are the closest you can get to full auto and still be legal." *See* Midsouth Shooters, *Bumpfire Systems.*[14] Another manufacturer left behind the pretense of civilian use altogether, marketing its product as "Standard Battle Style." *See* Firequest, *Slide Fire SSAR-15 Bump Fire Stock – Right Hand Model.*[15] All avoid the physical limitations on firing rate created by the shooter's trigger finger.[16] The NRA's 1934 prediction has proved prescient: bump stocks are the latest manufacturer effort to circumvent Congress' repeated efforts to limit machinegun use to military and law enforcement.

---

[13] http://www.shootingrangeindustries.com/how-effective-is-full-auto-do-soldiers-use-fully-or- semi-automatic-rifles-weapons/.

[14] https://www.midsouthshooterssupply.com/b/bumpfire-systems.

[15] https://www.firequest.com/AB227.html.

[16] *See* https://www.youtube.com/watch?v=hCCT8JtwQeI&ab_channel=SlideFire (hailing the Bump Fire Stock's ability to allow gun owners to fire their rifles as "quickly as desired"); https://www.firequest.com/product654.html ("Simple modification for an AK-47 rifle that allows operator to shoot *as quickly as desired"*).

### 3. Las Vegas Shooting

The barrage of bullets that made a killing field of Las Vegas's Route 91 Harvest Festival confirms that bump stocks are a technological innovation used to transform a civilian weapon into a military one. *See* LVMPD Criminal Investigative Report of the 1 October Mass Casualty Shooting, Joseph Lombardo, Sheriff, August 3, 2018.

The Las Vegas assailant wanted to be known for "having the largest casualty count," and he planned for that result, carefully selecting "the hotel, the room, the floor, and the concert venue below." *Id.* at 116-18. His choice of weapon was no different. The police report reveals that the shooter possessed 49 guns, 14 of which were equipped with bump stocks. *Id.* at 96-106. While he left almost half of his guns at home, he brought *all 14 guns equipped with bump stocks* with him. *Id.* at 96–103. That choice was deliberate; of the 1,057 rounds of ammunition he sprayed at the concertgoers over the course of minutes, an astounding 1,049 rounds were fired from rifles *equipped with bump stocks*. *Id.* at 103–06.

This deadly gunfire shows that bump-stock-equipped semi-automatic weapons are indistinguishable from the automatic weapons Congress banned. In fact, several security officers and the police officer responding to the Las Vegas shooting described hearing "automatic" gunfire—a testament to the bump stocks' effectiveness in converting the shooter's semi-automatic guns into machineguns.

*Id.* at 7, 56, 73.  In short, there is simply no legitimate civilian purpose for these devices and, particularly in light of Congress' intent in regulating machineguns, the proper interpretation of the statute is that bump stocks constitute machineguns.

## CONCLUSION

For the reasons explained above, and those set out by the Government in its brief, the district court's decision should be affirmed.

Dated: November 8, 2021          Respectfully submitted,

/s/ Ian Simmons

Shane A. Hunt
O'MELVENY & MYERS LLP
Time Square Tower
7 Times Square
New York, N.Y. 10036

Anna Pletcher
O'MELVENY & MYERS LLP
Two Embarcadero Center
28th Floor
San Francisco, CA 94111

Ian Simmons
Elena Zarabozo
Rachel A. Chung
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006

Scott Snyder
Tyler Helms
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071

*Counsel for Amici Curiae Giffords Law Center to*
*Prevent Gun Violence, Brady and Everytown for Gun Safety*

Hannah Shearer
Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO
   PREVENT GUN VIOLENCE
268 Bush Street, Suite 555
San Francisco, California 94104

Jonathan Lowy
Christa Nicols
BRADY
840 First Street NE, Suite 400
Washington DC 20002
*Counsel for Amicus Curiae Brady*

J. Adam Skaggs
GIFFORDS LAW CENTER TO
   PREVENT GUN VIOLENCE
223 West 38th Street, Suite 90
New York, New York 10018

*Counsel for Amicus Curiae*
   *Giffords Law Center to Prevent*
   *Gun Violence*

Eric Tirschwell
Aaron Esty
EVERYTOWN LAW
450 Lexington Avenue
P.O. Box 4184
New York, New York 10017

*Counsel for Amicus Curiae*
   *Everytown for Gun Safety*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2021, I electronically filed a true and correct copy of the foregoing *Amicus Curiae* Brief with the Clerk of Court by using the appellate CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Ian Simmons*
Ian Simmons

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,228 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

*/s/ Ian Simmons*
Ian Simmons