# SCHAERR
## JAFFE LLP

April 26, 2023

Mark Langer
Clerk of the Court
U.S. Court of Appeals for the DC Circuit
333 Constitution Ave., NW
Washington, DC 20001

      Re:   *Damian Guedes, et al. v. ATF, et al.*
           No. 21-05045
           Opinion Issued August 9, 2022
           Petition for Rehearing En Banc pending

Dear Mr. Langer,

On April 25th, the Sixth Circuit decided *Hardin v. ATF*, No. 20-6380 (Exhibit A), a case raising the issues presented here. *See* Rule 28(j). The Sixth Circuit concluded (1) that "the definition of a machinegun is ambiguous as applied to a bump stock"; (2) that *Chevron* is "inapplicable"; and (3) that lenity applies. Slip op. 4–9.

*First*, the Sixth Circuit concluded that the definition of a machinegun is ambiguous, citing "the myriad and conflicting judicial opinions on this issue" and "ATF's own flip-flop in its position." *Id.* at 4. *Second*, it concluded that *Chevron* was inapplicable because "the statutory scheme is predominantly criminal in scope and because of the nature of the actions that it criminalizes." *Id.* at 7. *Third*, it concluded that, because the "statutory scheme does not clearly and unambiguously prohibit bump stocks," lenity required it to construe the statute in Hardin's favor. *Id.* at 9. Judge Bush separately concluded that, "under the statute as it currently reads, the addition of a bump stock to a rifle clearly does not make it a machinegun." *Id.* at 10 (Bush, J., concurring in judgment).

This Court should also know that ATF sought certiorari in *Garland v. Cargill*, No. 22-976, the topic of Appellants' 28(j) letter of January 9th.

**Erik S. Jaffe** | PARTNER
Office: (202) 787-1060
ejaffe@schaerr-jaffe.com

**SCHAERR | JAFFE** LLP
1717 K St NW, Suite 900
Washington, DC 20006
www.schaerr-jaffe.com

Mark Langer, Clerk of the Court
April 26, 2023
Page 2

*Hardin* strengthens the circuit split on which ATF relies in its petition. *Cargill* Pet. 14, 28 (Exhibit B).

Petitioners' petition has been pending for 8 months, and this case overall has been pending for five years. Given the decisions from two other circuits and the pending petition for certiorari in *Cargill*, a resolution of the petition would benefit the parties and the Supreme Court by either confirming the circuit split and allowing petitioners here to proceed to final resolution of their claims or by helping to eliminate that split. Petitioners, of course, would prefer the latter alternative and urge this Court to grant the petition and follow its sister circuits in concluding that the statutory definition of machinegun does not include bump stocks or, at worst, is ambiguous and that lenity, not *Chevron*, applies to ambiguous criminal statutes.

Respectfully submitted,

*/s/ Erik S. Jaffe*

Erik S. Jaffe

cc's via ECF:
All Counsel of Record

**Exhibit A**

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0086p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

SCOTT A. HARDIN,

               *Plaintiff-Appellant*,

    *v.*

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND
EXPLOSIVES, an agency of the Department of Justice;
STEVEN M. DETTELBACH, Director Bureau of Alcohol,
Tobacco, Firearms, and Explosives; UNITED STATES
OF AMERICA; MERRICK B. GARLAND, Attorney
General, in his official capacity as Attorney General of
the United States,

               *Defendants-Appellees*.

No. 20-6380

———————————

Appeal from the United States District Court for the Western District of Kentucky at Louisville.
No. 3:19-cv-00056—David J. Hale, District Judge.

Argued: January 19, 2023

Decided and Filed: April 25, 2023

Before: GILMAN, McKEAGUE, and BUSH, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Jason Todd Hardin, HARDIN LAW, PLLC, Louisville, Kentucky, for Appellant.
Brad Hinshelwood, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Appellees. **ON BRIEF:** Jason Todd Hardin, HARDIN LAW, PLLC, Louisville, Kentucky,
J. Allan Cobb, COBB LAW PLLC, Louisville, Kentucky, for Appellant. Brad Hinshelwood,
Abby C. Wright, Kyle Edwards, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Appellees.

GILMAN, J., delivered the opinion of the court in which McKEAGUE, J., joined.
BUSH, J. (pp. 10–13), delivered a separate opinion concurring in the judgment.

————————————

## OPINION

————————————

RONALD LEE GILMAN, Circuit Judge.   The placement of a bump stock on a semiautomatic rifle causes the rifle to function essentially like a machinegun by dramatically increasing the rate of fire.   And the possession of a machinegun is a criminal offense under the Gun Control Act of 1968.   This raises the question of whether a bump stock is a machinegun "part" as defined by the National Firearms Act of 1934.   The question is a close one on which reasonable jurists have disagreed, a disagreement caused by ambiguities in how the applicable statute defines the term "machinegun."

An Act of Congress could clear up the ambiguities, but so far Congress has failed to act. The Bureau of Alcohol, Tobacco, Firearms and Explosives (the ATF) has been on both sides of this issue, with its current regulation (the Rule) banning bump stocks as a machinegun part.   In this situation, the rule of lenity that is applicable to criminal offenses requires us to rule in favor of Hardin.   We therefore **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

## I.  BACKGROUND

The Gun Control Act provides that "it shall be unlawful for any person to transfer or possess a machinegun."   18 U.S.C. § 922(o)(1).   It incorporates by reference (*see id.* § 921(a)(24)) the definition of a machinegun as set forth in the National Firearms Act, which reads as follows:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.   The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b).

For over a decade, the ATF, to which Congress has delegated the authority to administer the National Firearms Act and the Gun Control Act, maintained that a bump stock is not a machinegun part. But in 2018, after a gunman in Las Vegas, Nevada used bump stocks attached to semiautomatic rifles to kill 58 people and injure roughly 500 more in the span of approximately 10 minutes, the ATF reversed its position by promulgating the Rule. The Rule gave possessors of bump stocks 90 days from its effective date during which to destroy or abandon their bump stocks, after which they would be in violation of the Gun Control Act's prohibition on machineguns and their parts. *See* Bump-Stock-Type Devices, 83 Fed. Reg. 66,514 (Dec. 26, 2018).

The appellant in this case, Scott Hardin, owned several bump stocks. Following the ATF's promulgation of the Rule, Hardin brought an action in the Western District of Kentucky, challenging the Rule as exceeding the ATF's statutory authority. The district court granted the ATF's motion for judgment on the administrative record. Hardin now appeals.

## II. ANALYSIS

Whether a bump stock is a machinegun part depends on how one interprets the definition of a machinegun as set forth in the National Firearms Act. In particular, the dispute focuses on the words "automatically" and "a single function of the trigger." Those courts of appeals that have faced the issue are divided on the answer, and the Supreme Court has not weighed in. On one side, saying that a bump stock is included within the definition of a machinegun, are the Tenth Circuit and the D.C. Circuit. *See Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020), *aff'g* 374 F. Supp. 3d 1145 (D. Utah 2019), *en banc reh'g order vacated as improvidently granted*, 989 F.3d 890 (10th Cir. 2021) (en banc), *cert. denied*, 143 S. Ct. 84 (2022); *Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1 (D.C. Cir. 2019) (per curiam), *aff'g* 356 F. Supp. 3d 109 (D.D.C. 2019), *cert. denied*, 140 S. Ct. 789 (2020). The opposite view is taken by the Fifth Circuit. *See Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) (en banc), *rev'g* 20 F.4th 1004 (5th Cir. 2021), *and Cargill v. Barr*, 502 F. Supp. 3d 1163 (W.D. Tex. 2020), *petition for cert. filed* (Apr. 7, 2023). And our own circuit is split down the middle, with eight judges voting to uphold the Rule and eight judges voting to strike it down. *See Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890 (6th Cir. 2021) (en banc), *vacating by an equally divided*

*court* 992 F.3d 446 (6th Cir. 2021), *and aff'g by an equally divided court Gun Owners of Am., Inc. v. Barr*, 363 F. Supp. 3d 823 (W.D. Mich. 2019), *cert. denied*, 143 S. Ct. 83 (2022).

A total of 22 opinions are set forth in the above-cited cases, which fully explore all aspects of the issue in nearly 350 pages of text. We therefore have the benefit of being able to draw our own conclusions from these erudite opinions without having to repeat them verbatim.

## A.   The weight of authority concludes that the definition of a machinegun is ambiguous as applied to a bump stock

Hardin argues that the statutory definition of a machinegun unambiguously excludes bump stocks, whereas the ATF argues that the best reading of the statute compels the opposite conclusion. Without repeating the intricacies of those positions here, there can be no doubt that a significant number of reasonable jurists have reached diametrically opposed conclusions as to whether the definition of a machinegun includes a bump stock.

The viability of competing interpretations is exemplified not only by the myriad and conflicting judicial opinions on this issue, but also by the ATF's own flip-flop in its position. And because the statute is "subject to more than one reasonable interpretation," it is ambiguous. *See Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 256 (6th Cir. 2020) (quoting *N. Fork Coal Corp. v. Fed. Mine Safety & Health Comm'n*, 691 F.3d 735, 740 (6th Cir. 2012)); *see also N. Fork Coal Corp.*, 691 F.3d at 740 ("Although both parties argue that the statutory language is plain and unambiguous, both also argue that the plain meaning supports their interpretation. This indicates ambiguity. Furthermore, the existence of divergent court opinions also suggests ambiguity." (quoting *Pugliese v. Pukka Dev., Inc.*, 550 F.3d 1299, 1304 (11th Cir. 2008))).

## B.   The *Chevron* doctrine is inapplicable in the present case

Under what has become known as *Chevron* deference, "a court review[ing] an agency's construction of the statute which it administers . . . is confronted with two questions." *Chevron, USA, Inc. v. NRDC*, 467 U.S. 837, 842 (1984):

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not

USCA Case #21-5045      Document #1996541           Filed: 04/26/2023      Page 8 of 214

> directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842-43. Having determined that the statutory language is ambiguous, we would typically apply *Chevron* deference to uphold the Rule so long as it was not "arbitrary, capricious, or manifestly contrary to the statute." *See id.* at 844.

But both parties urge us to determine the legality of the Rule without relying on *Chevron* deference. The government has not invoked *Chevron* deference, believing that "it is unnecessary to consider what level of deference, if any, the rule should be accorded." And Hardin's view is, first, that the government has waived the application of *Chevron* deference and, alternatively, that *Chevron* deference is inapplicable when the underlying statute carries the possibility of criminal sanctions. We need not resolve the question of whether the government can waive the application of *Chevron* deference because we conclude that the statutory scheme before us is one that does not warrant the application of such deference.

The Supreme Court has not clearly identified the bounds of *Chevron* deference with respect to an agency's construction of a statute with criminal applications. To be sure, *Chevron* itself involved a statute whose violation could incur criminal penalties. *See id.* at 840; 42 U.S.C. § 7413(c)(1) (1982). And in *Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, 515 U.S. 687 (1995), the Supreme Court applied *Chevron* deference to the agency's statutory interpretation notwithstanding the challengers' argument that such deference was inappropriate because the statute included criminal penalties for certain violations. *See id.* at 703-704 & 704 n.18.

The Supreme Court, however, has "never held that the Government's reading of a criminal statute is entitled to any deference." *United States v. Apel*, 571 U.S. 359, 369 (2014). This language was repeated in *Abramski v. United States*, 573 U.S. 169, 191 (2014), where the Supreme Court further noted that "criminal laws are for courts, not for the Government, to construe."

The reasons to exercise caution in applying *Chevron* deference to an agency's construction of a statute with criminal applications are persuasive. Among the primary rationales for *Chevron* deference are: (1) "that agencies are more likely to get the answer right, given their expertise," *Arangure v. Whitaker*, 911 F.3d 333, 341 (6th Cir. 2018), and (2) "that 'policy choices' should be left to Executive Branch officials 'directly accountable to the people,'" *Epic Sys. Corp. v Lewis*, 138 S. Ct. 1612, 1630 (2018) (quoting *Chevron*, 467 U.S. at 865).

These rationales, however, have less force in the context of laws imposing criminal sanctions. "[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures . . . should define criminal activity." *United States v. Bass*, 404 U.S. 336, 348 (1971). Moreover, we "feel deep discomfort at allowing an agency to define the very criminal rules it will enforce." *Aposhian v. Wilkinson*, 989 F.3d 890, 900 (10th Cir. 2021) (Tymkovich, J., dissenting from the denial of rehearing en banc). Such a scheme "raises serious constitutional concerns by making [the] ATF the expositor, executor, *and* interpreter of criminal laws." *Id.* (emphasis in original).

On the other hand, "we must interpret [a] statute consistently, whether we encounter its application in a criminal or noncriminal context." *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004); *see also, e.g.*, *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517-18 (1992) (applying a rule of statutory construction that is ordinarily applicable only in criminal cases to a tax statute because the statute, which also had criminal applications, had to be interpreted consistently across both the civil and criminal domains). A bright-line rule that *Chevron* deference cannot be applied to agency constructions of statutes with criminal consequences would therefore preclude the application of *Chevron* deference to "statutes that bear both civil and criminal applications," "[a] category that covers a great many (most?) federal statutes today." *See Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1156 (10th Cir. 2016) (Gorsuch, J., concurring); *see also Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 924-25 (6th Cir. 2021) (en banc) (Murphy, J., in support of striking down the Rule) ("[A]ny distinction between 'pure' criminal laws and 'hybrid' civil-criminal laws is a mirage."). In light of the "one statute, one interpretation rule" gleaned from *Leocal* and *Thompson*, as well as the Supreme Court's lack of

clarity with respect to the application of *Chevron* deference to statutes that carry criminal penalties, we decline to adopt such bright-line rules in either direction.

Instead, we conclude that the particular statutory scheme before us is not an appropriate one to apply *Chevron* deference. We so hold because the statutory scheme is predominantly criminal in scope and because of the nature of the actions that it criminalizes.

First, the Gun Control Act prohibits anyone from transferring or possessing a machinegun. 18 U.S.C. § 922(o)(1). A knowing violation of this provision is punishable by up to 10 years of imprisonment. *Id.* § 924(a)(2). The civil implications of the Rule are, by contrast, "quite limited." *Aposhian*, 989 F.3d at 905 (Eid, J., dissenting from the denial of rehearing en banc):

> The [Gun Control Act's] prohibition on "machineguns" is subject to only two extremely limited exceptions, for "machineguns" (1) "transfer[red] to or by, or possess[ed] by or under the authority of" the federal or a state government, [18 U.S.C.] § 922(o)(2)(A), or (2) lawfully possessed before the prohibition went into effect, *id.* § 922(o)(2)(B). Only "machineguns" that fall within these narrow exceptions are subject to civil consequences, and even then, the civil consequences are limited—the chief consequence is a registration requirement. *See* 26 U.S.C. §§ 5841, 5845(a), (b).

*Id.* (second and third alterations in original). Thus, "[g]iven the breadth of the criminal prohibition and the limited nature of the exceptions giving rise to civil ramifications," *id.*, we conclude that the statutory scheme has a predominantly criminal scope.

Second, we perceive of no special expertise possessed by the ATF with respect to the construction of this statutory scheme that the judiciary lacks:

> The special deference required by *Chevron* is based on the expertise of an administrative agency in a complex field of regulation with nuances perhaps unfamiliar to the federal courts. Unlike environmental regulation or occupational safety, criminal law and the interpretation of criminal statutes is the bread and butter of the work of federal courts.

*Dolfi v. Pontesso*, 156 F.3d 696, 700 (6th Cir. 1998) (citation omitted). As noted by our colleague Judge White, "we have highly technical and complex securities, tax, workplace safety, and environmental-law regimes in which the applicable agency exercises delegated authority to

promulgate regulations fleshing out statutory provisions—regulations that have both civil and criminal applications." *Gun Owners of Am., Inc.*, 19 F.4th at 902 (White, J., in support of upholding the Rule). But unlike securities, tax, workplace safety, and environmental-law regimes, which include criminal penalties for uniquely regulatory crimes, there is nothing highly technical or complex about condemning, for example, the distribution of dangerous drugs, the commission of violent acts, or, as relevant here, the possession of deadly weapons. These are areas in which the courts are well-equipped to operate, and we see no reason why we should abdicate our interpretive responsibility in such instances. We therefore decline to afford *Chevron* deference to the ATF's construction of the term "machinegun."

## C.    The rule of lenity requires us to rule in Hardin's favor

This brings us to the rule of lenity, under which "penal statutes are to be construed strictly." *FCC v. Am. Broad. Co.*, 347 U.S. 284, 296 (1954). Therefore, when *Chevron* deference is not warranted and standard principles of statutory interpretation "fail to establish that the Government's position is unambiguously correct[,] we apply the rule of lenity and resolve the ambiguity in [the criminal defendant's] favor." *United States v. Granderson*, 511 U.S. 39, 54 (1994). "In sum, it is not enough to conclude that a criminal statute *should* cover a particular act. The statute must *clearly* and *unambiguously* cover the act." *Cargill v. Garland*, 57 F.4th 447, 473 (5th Cir. 2023) (en banc) (Ho, J., concurring) (emphases in original).

Judge Ho's concurrence in *Cargill* directs our attention to two persuasive analogies. *See id.* at 473-74, 478. The first concerns designer drugs, which, although "just as lethal" as drugs prohibited by the Controlled Substances Act of 1970, "differed in chemical composition." *Id.* at 473. "Yet all three branches agreed that existing law did not ban designer drugs," requiring Congress to enact the Controlled Substance Analogue Enforcement Act of 1986. *Id.* at 473-74. The second analogy concerns the facts of *United States v. Wiltberger*, 18 U.S. 76 (1820). *See Cargill*, 57 F.4th at 478 (Ho, J., concurring). In that case, the Supreme Court "unanimously construed a statute that punished manslaughter on the 'high seas' not to apply to an identical act on a river. The Court noted that it was 'extremely improbable' Congress would want to treat upstream manslaughter differently from manslaughter committed downstream, past the river's mouth." *Id.* (quoting *Wiltberger*, 18 U.S. at 103-06). Even so, the Supreme Court ruled in the

criminal defendant's favor on the basis that "probability is not a guide which a court, in construing a penal statute, can safely take." *Wiltberger*, 18 U.S. at 105.

"Bump stocks may well be indistinguishable from automatic weapons for all practical purposes. But . . . '[i]t would be dangerous . . . to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with those which are enumerated.'" *Cargill*, 57 F.4th at 478 (Ho, J., concurring) (second ellipses in original) (quoting *Wiltberger*, 18 U.S. at 96). Because the relevant statutory scheme does not clearly and unambiguously prohibit bump stocks, we are bound to construe the statute in Hardin's favor.

### III. CONCLUSION

For all of the foregoing reasons, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

---

### CONCURRING IN THE JUDGMENT

---

JOHN K. BUSH, Circuit Judge, concurring in the judgment.  I agree that the district court's judgment should be reversed.  At a minimum, as the majority opinion holds, the National Firearms Act of 1934 admits of an interpretation that excludes a bump stock from the definition of a "part" of a "machinegun" under that statute.  Indeed, this is the *original* interpretation that the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) gave to the statute.  *See* ATF Rule 2006-2 at 2; 27 C.F.R. §§ 478.11 (2014), 479.11 (2016).  That ATF later changed its views in order to ban bump stocks does not render unreasonable the ATF's first reading of the statute.  Indeed, the ATF's first take aligns with the views of numerous judges on this court and elsewhere who have considered the relevant statutory text.  *See, e.g.*, *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 910 (6th Cir. 2021) (Murphy, J., dissenting), *cert. denied*, 143 S. Ct. 83 (2022); *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) (en banc), *petition for cert. filed* (April 7, 2023).  Therefore, even accepting (as does the majority opinion) that the statute could reasonably be read either way as to the legality of bump stocks, the statute *must* be read under the rule of lenity to exclude a bump-stock rifle from the definition of a machinegun.  *See United States v. Granderson*, 511 U.S. 39, 54 (1994); *Jones v. United States*, 529 U.S. 848, 858 (2000)  (if there are two possible "readings of what conduct Congress has made a crime," the "harsher alternative" reading should be rejected because "Congress should have spoken in language that is clear and definite") (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221–22 (1952)).   That is the import of the majority's reasoning.

But I would go further.  As explained by Judge Murphy in *Gun Owners of America, Inc. v. Garland*, the best reading of the statute is that Congress never gave the ATF "the power to expand the law banning machine guns through [the] legislative shortcut" of the ATF's rule at issue in this appeal, *see* Bump-Stock-Type Devices, 83 Fed. Reg. 66,514 (Dec. 26, 2018) (the Rule).  *See* 19 F.4th at 910 (Murphy, J., dissenting).  Simply put, under the statute as it currently reads, the addition of a bump stock to a rifle clearly does not make it a machinegun.

Though my reasoning differs somewhat from the majority opinion, all judges on this panel agree on this point: it is up to Congress, not the ATF, to change the law if bump stocks are to be made illegal.

## I.

This case turns on whether a bump stock is a "part" of a "machinegun" as used in the National Firearms Act. The relevant statutory provision reads:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b). Under this definition, a bump stock cannot be a machinegun part because a bump stock by itself cannot increase the rate of fire of a rifle, nor does it change the mechanics of a "single function of the trigger."

The ATF's brief provides clarity on how bump stocks operate. A "bump stock channels the recoil from the first shot into a defined path, allowing the contained weapon to slide back a short distance . . . shifting the trigger away from the shooter's trigger finger." Appellee's Br. at 18 (citing 83 Fed. Reg. at 66,532 (Dec. 26, 2018)). "This separation allows the firing mechanism to reset." *Id.* The shooter must also "maintain constant forward pressure on the weapon's barrel-shroud or fore-grip . . . causing the trigger to 'bump' the shooter's stationary finger and fire another bullet." *Id.* This explanation reveals a couple of reasons why a bump stock does not transform a rifle into a machinegun.

First, a bump stock does not create all of the above-described effects itself—one still needs to maintain constant forward pressure on the weapon's barrel-shroud or fore-grip. Thus, a semiautomatic rifle does not shoot automatically and thereby become a machinegun, simply by having a bump stock. When the National Firearms Act was enacted, the word "automatically" meant "[h]aving a self-acting or self-regulating mechanism that performs a required act at a

predetermined point in an operation[.]" *Webster's New International Dictionary* (2d ed. 1934). While the bump stock might be a self-acting mechanism to allow the rifle to slide back, it is not a self-acting mechanism to maintain the forward pressure. Without that added technique, the bump stock would not increase the rate of fire, and the rifle therefore cannot be considered a machinegun because of the addition of a bump stock.

Second, the "single function of a trigger" on a rifle with a bump stock engages the internal firing mechanism to shoot only one shot, in contrast with the definition of a machinegun "automatically [shooting] more than one shot." 26 U.S.C. § 5845(b). Once a trigger is pulled, the hammer strikes the firing pin to shoot one bullet. *See Cargill v. Garland*, 57 F.4th at 452. Then, the hammer is thrusted backward by the bolt into the disconnector. *Id.* The hammer will stay in the disconnector until the trigger is reset to its original position. *Id.* This means that the "single function of the trigger" will only release one bullet because the trigger must reset each time before it can engage the hammer to strike the firing pin to release another bullet. In contrast, an automatic gun will continue to reset the hammer and release the hammer without the trigger resetting to its original position, so a "single function of a trigger" can lead to the shooting of multiple shots. *See id.* A bump stock does nothing to impact the internal mechanics of a rifle to circumvent the need for the trigger to reset between every shot, so a bump-stock-equipped rifle is still capable of shooting only one shot with each function of the trigger.

## II.

The ATF attempts to replace "single function of the trigger," as the definition reads in the National Firearms Act, with "single pull of the trigger." 83 Fed. Reg. at 66,518. This new agency-created definition, announced after high-profile statements from President Trump and others in response to the Las Vegas shooting,[1] is an about-face from the ATF's original interpretation of the statute. ATF Rule 2006-2 at 2; 27 C.F.R. §§ 478.11 (2014), 479.11 (2016).

---

[1] Presidential Memorandum on the Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices, President Donald Trump (Feb. 20, 2018) (on file with the White House Archives); Lindsey McPherson, *Pelosi Optimistic About Gun Control Bill Short of Assault Weapons Ban*, ROLL CALL, Mar. 1, 2018; Statement on Regulation to Ban Bump Stocks, Senator Dianne Feinstein (Dec. 18, 2018); Department of Justice Announces Bump-Stock-Type Devices Final Rule Press Release, Department of Justice Office of Public Affairs (Dec. 18, 2018).

There were no changes in the relevant facts or law that led to the ATF making a 180-degree change of statutory interpretation to ban what once was legal. There was only a profound change in political pressure.

Even if the ATF had adopted its current view from the get-go, that interpretation fits poorly with the statutory text. The ATF substitutes "pull" for "function" to argue that there is a single "pull" from the shooter's perspective. But the statutory definition defines "function" not with reference to the shooter but to the firearm, given the use of the word "trigger," which is a mechanical feature. From the firearm's mechanical perspective, the trigger must fully reset and be "pulled" every single time another shot is fired, so substitution of the ATF's new word, "pull" for "function," does not make a bump-stock rifle a machinegun. Even with the bump stock, the trigger of the rifle still must be pulled—that is, the trigger finger must move against the trigger while the shooter maintains forward pressure on the weapon's barrel-shroud or fore-grip—for each shot the weapon fires. *See Gun Owners of Am., Inc.*, 19 F.4th at 913–14, 926–27 (Murphy, J., dissenting). To be sure, the bump stock allows for multiple shots to occur more rapidly, but that consequence does not change the dispositive fact that each pull of the trigger fires only one shot. Because a single function of the trigger using a bump stock cannot fire more than one bullet, a bump-stock rifle is not a machinegun.

I therefore concur in reversing the district court judgment because the best reading of the statute is that bump stocks are legal. The statutory text confirms that the ATF correctly interpreted the statute the first time. It is the job of Congress, not the ATF, to decide whether the law should change in this area.

**Exhibit B**

**No.**

# In the Supreme Court of the United States

---

MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL.,
PETITIONERS

*v.*

MICHAEL CARGILL

---

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT*

---

**PETITION FOR A WRIT OF CERTIORARI**

---

ELIZABETH B. PRELOGAR
  *Solicitor General*
    *Counsel of Record*
BRIAN M. BOYNTON
  *Principal Deputy Assistant*
    *Attorney General*
BRIAN H. FLETCHER
  *Deputy Solicitor General*
MATTHEW GUARNIERI
  *Assistant to the Solicitor*
    *General*
MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
BRAD HINSHELWOOD
  *Attorneys*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

### QUESTION PRESENTED

Since 1986, Congress has prohibited the transfer or possession of any new "machinegun." 18 U.S.C. 922(*o*)(1). The National Firearms Act, 26 U.S.C. 5801 *et seq.*, defines a "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. 5845(b). The statutory definition also encompasses "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun." *Ibid.*

A "bump stock" is a device designed and intended to permit users to convert a semiautomatic rifle so that the rifle can be fired continuously with a single pull of the trigger, discharging potentially hundreds of bullets per minute. In 2018, after a mass shooting in Las Vegas carried out using bump stocks, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) published an interpretive rule concluding that bump stocks are machineguns as defined in Section 5845(b). In the decision below, the en banc Fifth Circuit held that the ATF rule was unlawful because the statutory definition of "machinegun" does not encompass bump stocks. The question presented is as follows:

Whether a bump stock device is a "machinegun" as defined in 26 U.S.C. 5845(b) because it is designed and intended for use in converting a rifle into a machinegun, *i.e.*, into a weapon that fires "automatically more than one shot  * * *  by a single function of the trigger."

(I)

## PARTIES TO THE PROCEEDING

Petitioners (defendants-appellees below) are Merrick B. Garland in his official capacity as Attorney General; Steven Dettelbach, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; the Department of Justice; and the Bureau of Alcohol, Tobacco, Firearms and Explosives. Petitioners Garland and Dettelbach were substituted for their predecessors in office, former Attorney General William Barr and former Acting Director Regina Lombardo, during the proceedings below.

Respondent (plaintiff-appellant below) is Michael Cargill.

## RELATED PROCEEDINGS

United States District Court (W.D. Tex.):

    *Cargill* v. *Barr*, No. 19-cv-349 (Nov. 23, 2020)

United States Court of Appeals (5th Cir.):

    *Cargill* v. *Garland*, No. 20-51016 (Jan. 6, 2023)

(II)

# TABLE OF CONTENTS

Page

Opinions below ................................................................ 1
Jurisdiction .................................................................... 1
Statutory and regulatory provisions involved ......................... 2
Statement:
    A.   Legal background ................................................ 2
    B.   Bump stock devices ............................................. 4
    C.   The present controversy ...................................... 9
Reasons for granting the petition ...................................... 14
    A.   Bump stocks are "machineguns" as Congress
          defined that term in the National Firearms Act ...... 15
        1.   Bump stocks create a continuous firing cycle
              that is initiated by a "single function of the
              trigger" .................................................... 15
        2.   Rifles equipped with bump stocks fire more
              than one shot "automatically" after a single
              trigger pull .............................................. 19
        3.   The court of appeals erred in deeming bump
              stocks to be beyond the reach of the statutory
              definition ................................................ 21
    B.   The decision below creates an acknowledged
          circuit conflict ................................................ 26
    C.   The question presented is exceptionally important,
          and this case is a suitable vehicle ....................... 29
Conclusion ................................................................... 30
Appendix A — Court of appeals en banc opinion
                 (Jan. 6, 2023) ............................... 1a
Appendix B — Court of appeals panel opinion
                 (Dec. 14, 2021) ............................ 72a
Appendix C — District court findings of fact and
                 conclusions of law (Nov. 23, 2020)........... 92a
Appendix D — Court of appeals order granting
                 rehearing (June 23, 2022) .................... 154a
Appendix E — Statutory and regulatory provisions ........ 156a

(III)

IV

## TABLE OF AUTHORITIES

Cases:                                                                      Page

*Akins* v. *United States*, 312 Fed. Appx. 197
(11th Cir.), cert. denied, 557 U.S. 942 (2009) .......... 5, 7, 17

*Aposhian* v. *Barr*, 958 F.3d 969 (10th Cir.),
vacated on reh'g, 973 F.3d 1151 (10th Cir. 2020),
reinstated, 989 F.3d 890 (10th Cir. 2021),
cert. denied, 143 S. Ct. 84 (2022) .................................. 26, 27

*Aposhian* v. *Garland*, 143 S. Ct. 84 (2022) .......................... 28

*Barber* v. *Thomas*, 560 U.S. 474 (2010) .............................. 26

*Chevron U.S.A. Inc.* v. *NRDC, Inc.*, 467 U.S. 837
(1984) ................................................................................. 27

*Guedes* v. *ATF*:
   920 F.3d 1 (D.C. Cir. 2019), cert. denied,
      140 S. Ct. 789 (2020) .................................................. 27
   140 S. Ct. 789 (2020) .................................................. 28, 30
   45 F.4th 306 (D.C. Cir. 2022) .............................. 23, 27, 29

*Gun Owners of Am., Inc.* v. *Garland*:
   19 F.4th 890 (6th Cir. 2021), cert. denied,
      143 S. Ct. 83 (2022) .............................................. 25, 26
   143 S. Ct. 83 (2022) ...................................................... 28

*Liparota* v. *United States*, 471 U.S. 419 (1985) .................. 26

*Maracich* v. *Spears*, 570 U.S. 48 (2013) .............................. 26

*Staples* v. *United States*, 511 U.S. 600 (1994) .............. 18, 19

*United States* v. *Alkazahg*, 81 M.J. 764
(N-M. Ct. Crim. App. 2021) .............................................. 28

*United States* v. *Camp*, 343 F.3d 743 (5th Cir. 2003) ......... 18

*United States* v. *Carter*, 465 F.3d 658 (6th Cir. 2006),
cert. denied, 550 U.S. 964 (2007) ...................................... 18

*United States* v. *Evans*, 978 F.2d 1112
(9th Cir. 1992), cert. denied, 510 U.S. 821 (1993) ............. 23

V

Cases—Continued:                                                  Page

*United States* v. *Fleischli*, 305 F.3d 643
   (7th Cir. 2002), cert. denied, 538 U.S. 1001 (2003)........... 18
*United States* v. *Jokel*, 969 F.2d 132 (5th Cir. 1992).......... 18

Statutes:

Firearms Owners' Protection Act, Pub. L. No. 99-308,
   100 Stat. 449:
      § 101(6), 100 Stat. 450 (18 U.S.C. 921(a)(23))................. 3
      § 102(9), 100 Stat. 452-453 (18 U.S.C. 922(*o*))....... 3, 156a
Gun Control Act of 1968, Pub. L. No. 90-618,
   Tit. II, sec. 201, § 5845(b), 82 Stat. 1231 ........................... 2
National Firearms Act, 26 U.S.C. 5801 *et seq.* ................... 2
      26 U.S.C. 5801-5802........................................................ 29
      26 U.S.C. 5822................................................................ 29
      26 U.S.C. 5841(c) ............................................................ 4
      26 U.S.C. 5842(a) .......................................................... 29
      26 U.S.C. 5845(b) ........... 2-5, 8, 10, 12, 14-22, 24, 28, 156a
National Firearms Act of 1934, ch. 757, 48 Stat. 1236 ........ 3
Public Safety and Recreational Firearms Use
   Protection Act, Pub. L. No. 103-322, Tit. XI,
   Subtit. A, 108 Stat. 1996:
      § 110102, 108 Stat. 1996-1998 ......................................... 4
      § 110105, 108 Stat. 2000 .................................................. 4
18 U.S.C. 921(a)(30) (2000) .................................................. 4
18 U.S.C. 922(v) (2000) ........................................................ 4

Miscellaneous:

ATF, U.S. Dep't of Justice, *National Firearms Act
   Handbook* (rev. Apr. 2009) ............................................. 3, 4
ATF Ruling 2006-2 (Dec. 13, 2006) ................................. 6, 17
82 Fed. Reg. 60,929 (Dec. 26, 2017) ...................................... 7
83 Fed. Reg. 7949 (Feb. 23, 2018) ....................................... 14

VI

Miscellaneous—Continued:                                              Page

83 Fed. Reg. 13,442 (Mar. 29, 2018)......................................7

83 Fed. Reg. 66,514 (Dec. 26, 2018) .............. 4-10, 14, 16, 17,
20-22, 25, 29

H.R. Rep. No. 1780, 73d Cong., 2d Sess. (1934) ................ 19

H.R. Rep. No. 495, 99th Cong., 2d Sess. (1986)...................3

*National Firearms Act: Hearings Before the House
Comm. on Ways and Means on H.R. 9066*, 73d
Cong., 2d Sess. (1934).........................................................19

*Webster's New International Dictionary*
(2d ed. 1934).......................................................................20

# In the Supreme Court of the United States

———

No.

MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL.,
PETITIONERS

*v.*

MICHAEL CARGILL

———

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT*

———

**PETITION FOR A WRIT OF CERTIORARI**

———

The Solicitor General, on behalf of the Attorney General et al., respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Fifth Circuit in this case.

**OPINIONS BELOW**

The opinion of the en banc court of appeals (App., *infra*, 1a-71a) is reported at 57 F.4th 447. An earlier panel opinion (App., *infra*, 72a-91a) is reported at 20 F.4th 1004. The opinion of the district court (App., *infra*, 92a-153a) is reported at 502 F. Supp. 3d 1163.

**JURISDICTION**

The judgment of the court of appeals was entered on January 6, 2023. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

(1)

2

**STATUTORY AND REGULATORY
PROVISIONS INVOLVED**

The National Firearms Act, 26 U.S.C. 5801 *et seq.*, provides in relevant part:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. 5845(b).

Other pertinent statutory and regulatory provisions are reproduced in the appendix to this petition.  App., *infra*, 156a-159a.

**STATEMENT**

**A.  Legal Background**

The National Firearms Act, 26 U.S.C. 5801 *et seq.*, defines a "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. 5845(b).  Since 1968, the definition has also encompassed parts that can be used to convert a weapon into a machinegun.  See Gun Control Act of 1968, Pub. L. No. 90-618, Tit. II, sec. 201, § 5845(b), 82 Stat. 1231.  A "machinegun" thus includes "the frame or receiver of any such weapon, any part designed and intended solely and

3

exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. 5845(b).

Congress first regulated the sale and possession of machineguns in the National Firearms Act of 1934, ch. 757, 48 Stat. 1236. In 1986, Congress amended Title 18 of the U.S. Code to prohibit the sale and possession of new machineguns, making it a crime "to transfer or possess a machinegun" unless a governmental entity is involved in the transfer or possession. Firearms Owners' Protection Act (FOPA), Pub. L. No. 99-308, § 102(9), 100 Stat. 452-453 (18 U.S.C. 922(*o*)). In enacting that criminal prohibition, Congress incorporated the definition of "machinegun" from the National Firearms Act. FOPA § 101(6), 100 Stat. 450 (18 U.S.C. 921(a)(23)). The 1986 amendments responded in part to evidence before Congress of "the need for more effective protection for law enforcement officers from the proliferation of machine guns." H.R. Rep. No. 495, 99th Cong., 2d Sess. 7 (1986).

The Department of Justice regularly issues guidance concerning whether specific weapons or devices constitute machineguns. In particular, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) encourages manufacturers to submit novel weapons or devices to the agency, on a voluntary basis, for ATF to assess whether the weapon or device should be classified as a machinegun or other registered firearm under the National Firearms Act. See ATF, U.S. Dep't of Justice, *National Firearms Act Handbook* 41 (rev. Apr. 2009) (*NFA Handbook*). The classification process enables ATF to provide manufacturers with "the agency's offi-

4

cial position concerning the status of the firearms under Federal firearms laws" and thus to assist manufacturers in "avoid[ing] an unintended classification and violations of the law" before a manufacturer "go[es] to the trouble and expense of producing" the weapon or device. *Ibid.*; cf. 26 U.S.C. 5841(c) (requiring manufacturers to "obtain authorization" before making a covered firearm and to register "the manufacture of a firearm"). ATF has made clear, however, that "classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulations." *NFA Handbook* 41.

### B. Bump Stock Devices

1. In 2004, a federal ban on certain semiautomatic "assault weapons" expired.[1] Since that time, ATF has received a growing number of classification requests from inventors and manufacturers seeking to produce "devices that permit shooters to use semiautomatic rifles to replicate automatic fire," but "without converting these rifles into 'machineguns.'" 83 Fed. Reg. 66,514, 66,515-66,516 (Dec. 26, 2018). Whether such devices fall within the statutory definition of a "machinegun" turns on whether they allow a shooter to fire "automatically more than one shot * * * by a single function of the trigger." 26 U.S.C. 5845(b).

One such type of device is generally referred to as a "bump stock." ATF first encountered bump stocks in 2002, when it received a classification request for the "Akins Accelerator." 83 Fed. Reg. at 66,517. The Akins

---

[1] 18 U.S.C. 921(a)(30), 922(v) (2000). Those provisions had been enacted in 1994 with a ten-year sunset provision. See Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, Tit. XI, Subtit. A, §§ 110102, 110105, 108 Stat. 1996-1998, 2000.

5

Accelerator, which attached to a standard semiautomatic rifle, used a spring to harness the recoil energy of each shot, causing "the firearm to cycle back and forth, impacting the trigger finger" repeatedly after the first pull of the trigger. *Ibid.* Thus, by pulling the trigger once, the shooter "initiated an automatic firing sequence" that was advertised as firing "approximately 650 rounds per minute." *Ibid.*

ATF initially declined to classify the Akins Accelerator as a machinegun because the agency "interpreted the statutory term 'single function of the trigger' to refer to a single movement of the trigger." 83 Fed. Reg. at 66,517. In 2006, however, ATF revisited that determination and concluded that "the best interpretation of the phrase 'single function of the trigger' includes a 'single pull of the trigger.'" *Ibid.* The agency explained that the Akins Accelerator created "a weapon that 'with a single pull of the trigger initiates an automatic firing cycle that continues until the finger is released, the weapon malfunctions, or the ammunition supply is exhausted.'" *Ibid.* (brackets and citation omitted). Accordingly, ATF reclassified the device as a machinegun under the statute. See *ibid.*

When the inventor of the Akins Accelerator challenged ATF's classification, the Eleventh Circuit upheld the determination. The court explained that interpreting the phrase "'single function of the trigger'" in Section 5845(b) to mean "'single pull of the trigger' is consonant with the statute and its legislative history," and that "[t]he plain language of the statute defines a machinegun as any part or device that allows a gunman to pull the trigger once and thereby discharge the firearm repeatedly." *Akins* v. *United States*, 312 Fed.

6

Appx. 197, 200-201 (11th Cir.) (per curiam), cert. denied, 557 U.S. 942 (2009).

In 2006, in anticipation of similar future classification requests, ATF issued a public ruling announcing its interpretation of "single function of the trigger." ATF Ruling 2006-2, at 1 (Dec. 13, 2006). ATF explained that, after reviewing the text of the National Firearms Act and its legislative history, the agency had concluded that the phrase "single function of the trigger" includes a "single pull of the trigger." *Id.* at 2. When ATF reclassified the Akins Accelerator, however, it also advised owners of the device that "removal and disposal of the internal spring * * * would render the device a non-machinegun under the statutory definition," 83 Fed. Reg. at 66,517, on the theory that, without the spring, the device would no longer operate "automatically."

ATF soon received classification requests for bump stock devices that did not include internal springs. Those bump stocks replace the standard stock on an ordinary semiautomatic firearm. Unlike a regular stock, a bump stock channels the recoil from the first shot into a defined path, allowing the weapon contained within the stock to slide back a short distance—approximately an inch and a half—and shifting the trigger away from the shooter's trigger finger. 83 Fed. Reg. at 66,532. This separation allows the firing mechanism to reset. *Ibid.* When the shooter maintains constant forward pressure on the weapon's barrel-shroud or fore-grip, the weapon slides back along the bump stock, causing the trigger to "bump" the shooter's stationary finger and fire another bullet. *Ibid.* In a series of classification letters between 2008 and 2017, ATF concluded that such devices did not enable a gun to fire "'automatically'" and were therefore not "machineguns." *Id.* at 66,517.

7

2. In 2017, a shooter used semiautomatic weapons equipped with bump stock devices to murder 58 people and wound 500 more in Las Vegas. 83 Fed. Reg. at 66,516. The bump stock devices allowed the shooter to rapidly fire "several hundred rounds of ammunition" into a large crowd attending an outdoor concert. *Ibid.* The Las Vegas mass shooting led ATF to review its prior classifications of bump stock devices. *Ibid.* In December 2017, ATF published an advance notice of proposed rulemaking, seeking public comment on "the scope and nature of the market for bump stock type devices." 82 Fed. Reg. 60,929, 60,930 (Dec. 26, 2017).

On March 29, 2018, ATF published a notice of proposed rulemaking regarding amendments to the definition of "machinegun" in three ATF regulations. See 83 Fed. Reg. 13,442, 13,457 (Mar. 29, 2018). The notice stated that ATF's post-2006 classification letters addressing bump stocks without internal springs did "not reflect the best interpretation of the term 'machinegun.'" *Id.* at 13,443. The notice further stated that ATF had "applied different understandings of the term 'automatically'" over time in reviewing bump stocks and that the agency had "authority to 'reconsider and rectify' potential classification errors." *Id.* at 13,445-13,446 (quoting *Akins*, 312 Fed. Appx. at 200). The notice proposed to "clarify that all bump-stock-type devices are 'machineguns'" under the statutory definition. *Id.* at 13,443. The notice elicited more than 186,000 comments. See 83 Fed. Reg. at 66,519.

ATF published a final rule on December 26, 2018. 83 Fed. Reg. at 66,514. The final rule amended ATF's regulations to address the terms "single function of the trigger" and "automatically" as used in the definition of "machinegun" in order to clarify that bump stock de-

8

vices are machineguns under Section 5845(b). *Id.* at 66,553-66,554. In the preamble to the rule, the agency stated that it continued to adhere to its previous understanding that the phrase "'single function of the trigger'" includes a "'single pull of the trigger,'" while clarifying that the phrase also includes motions "analogous" to a single pull. *Id.* at 66,515. ATF also determined that, under the "best interpretation of the statute," *id.* at 65,521, the term "automatically" includes functioning "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger," *id.* at 66,519.

ATF further explained that, notwithstanding its prior classification letters, the agency had concluded that bump stocks "are machineguns" as defined by Congress in Section 5845(b). 83 Fed. Reg. at 66,515. Bump stocks enable a shooter to engage in a continuous firing sequence that occurs "automatically." *Id.* at 66,531. As the shooter's trigger finger remains stationary on the ledge provided by the design of the device and the shooter applies constant forward pressure with the non-trigger hand on the barrel or fore-grip of the weapon, the firearm's recoil energy is directed into a continuous back-and-forth cycle without "the need for the shooter to manually capture, harness, or otherwise utilize this energy to fire additional rounds." *Id.* at 66,532. A bump stock thus constitutes a "self-regulating" or "self-acting" mechanism that allows the shooter to attain continuous firing after a single pull of the trigger and, accordingly, is a machinegun. *Ibid.*; see *id.* at 66,514, 66,518.

ATF rescinded its prior letters concluding that certain bump stocks were not machineguns. See 83 Fed. Reg. at 66,530-66,531. The agency also provided instructions for "[c]urrent possessors" of bump stocks "to

9

undertake destruction of the devices" or to "abandon [them] at the nearest ATF office" to avoid liability under the statute. *Id.* at 66,530.

### C. The Present Controversy

1. Respondent purchased two bump stocks in April 2018, during the rulemaking process. App., *infra*, 117a. After ATF adopted the final rule, respondent "surrendered [his bump stocks] to ATF on March 25, 2019." *Id.* at 118a. On the same day, respondent brought this action in the Western District of Texas challenging the rule on various grounds. *Id.* at 93a. The case proceeded to a bench trial, after which the district court entered judgment for the government. *Id.* at 92a-153a.

In its post-trial findings of fact, the district court credited the testimony of an ATF expert who explained how bump stocks operate to create a continuous "firing cycle." App., *infra*, 106a (citation omitted). The type of bump stock at issue here is manufactured with a "sliding shoulder stock" and "a 'trigger ledge,' on which the shooter places his finger." *Id.* at 103a. The ATF expert explained that, to initiate the firing sequence, the shooter puts his trigger finger on the ledge and "presses forward on the firearm" with his non-trigger hand, causing the trigger to slide forward in the sliding shoulder stock. *Ibid.* Once the trigger engages with the stationary trigger finger, the bump stock device harnesses the "recoil energy" from each fired bullet to cause the rifle to "slide[] back and forth" in the sliding stock, "bump[ing] the trigger finger into the trigger to continue firing until the shooter stops pushing forward with his non-shooting hand or the weapon runs out of ammunition or malfunctions." *Ibid.*

The district court agreed with ATF's view that the statutory term "single function of the trigger" includes

10

"a single pull of the trigger and analogous motions."
App., *infra*, 139a (citation omitted).  And the court de-
termined that bump stocks enable firing more than one
shot by a single pull of the trigger "from the perspective
of the shooter," who initiates the continuous firing se-
quence by pushing the trigger into contact with his sta-
tionary finger a single time, after which the device itself
harnesses recoil energy to create a back-and-forth cycle
of continuously bumping and resetting the trigger
against the shooter's finger.  *Id.* at 145a (citation omit-
ted).  Although the shooter must continue to exert "for-
ward pressure on the fore-end of the gun" with his non-
trigger hand in order to continue firing, the court ob-
served that such pressure is no different than "continu-
ing to hold the trigger of a fully automatic weapon."
*Ibid.*  The court also found that a bump stock creates a
weapon that fires more than one shot "automatically,"
26 U.S.C. 5845(b), because the device—with its exten-
sion ledge and recoil channeling—is a "self-acting or
self-regulating mechanism" that enables continuous
fire. App., *infra*, 141a (citation omitted).

2. A unanimous panel of the court of appeals af-
firmed.  App., *infra*, 72a-91a.  The panel "agree[d] with
the district court that bump stocks qualify as machine
guns under the best interpretation of the statute."  *Id.*
at 73a.  The panel found "compelling" ATF's interpre-
tation in the final rule that the statutory phrase "'single
function of the trigger'" encompasses a "'single pull of
the trigger and analogous motions.'"  *Id.* at 80a (quoting
83 Fed. Reg. at 66,553).  The panel observed that, "at
the time the [definition] was enacted," the terms "'func-
tion'" and "'pull'" were "used almost interchangeably in
the context of firearms."  *Id.* at 80a-81a.  The panel also
observed that, "in ordinary English, firearm triggers

11

typically 'function' by means of a shooter's 'pull.'" *Id.*
at 81a. And the panel determined that a rifle modified
with a bump stock satisfies the statutory definition be-
cause "a single trigger pull * * * initiates a firing se-
quence that continues to fire as long as the shooter con-
tinues to push forward" on the front of the weapon with
his non-shooting hand. *Id.* at 84a (citation omitted).

The panel thus rejected respondent's argument that
a bump stock does not fire multiple rounds by a "single
function of the trigger" because the trigger resets be-
fore each round. App., *infra*, 80a (citation omitted).
The panel explained that respondent's interpretation
would "effectively rewrit[e] the statute" so that it de-
fines a machinegun as "a weapon which shoots more
than one shot 'every time the trigger functions' rather
than 'by a single function of the trigger.'" *Id.* at 83a.

The panel likewise rejected respondent's contention
that a rifle equipped with a bump stock does not fire
more than one shot "automatically." App., *infra*, 85a.
The panel emphasized that the final rule's definition of
"'automatically'" is based on "a nearly word-for-word
copy of the dictionary definition," *id.* at 86a, and that
the term as used here "'delineates how the discharge of
multiple rounds from a weapon occurs: as the result of
a self-acting mechanism' which 'is set in motion by a sin-
gle function of the trigger,'" *ibid.* (citation omitted).
The panel concluded that a weapon modified with a
bump stock fires multiple shots as the result of a self-
regulating mechanism because the weapon "continue[s]
firing until the shooter stops pushing forward with his
non-shooting hand or the weapon runs out of ammuni-
tion or malfunctions." *Id.* at 88a (quoting the district
court's findings).

12

3. The court of appeals granted rehearing en banc, which had the effect of vacating the panel opinion. App., *infra*, 154a-155a. After additional briefing and argument, the en banc court reversed and remanded. *Id.* at 1a-71a. Thirteen of the 16 participating judges voted to reverse. *Id.* at 2a n.\*. But the only ground for reversal on which a majority agreed was the proposition that "lenity" requires interpreting the statutory definition of machinegun not to encompass bump stocks. *Ibid.*

a. Judge Elrod authored the lead opinion. App., *infra*, 1a-49a. In the portion of that opinion joined by a majority, the court of appeals assumed *arguendo* that Section 5845(b) is ambiguous in two respects: "whether 'a single function of the trigger' refers to the firearm's mechanics or to the shooter's pulling of the trigger," and whether "the process of engaging the trigger and maintaining forward pressure on the gun's forebody produces 'automatic' fire." *Id.* at 43a-44a. The court further stated that the "rule of lenity demands that [the court] resolve that ambiguity in favor of [respondent], and in turn conclude that a non-mechanical bump stock is not a machinegun." *Id.* at 45a. The court recognized, however, that "three of [its] sister circuits" had rejected challenges seeking to enjoin the same rule. *Id.* at 16a.

Judge Elrod and a plurality of seven other members of the court of appeals also took the view that the statutory phrase "single function of the trigger" unambiguously refers to a single mechanical "action" of the trigger, and that a bump stock does not "fire[] more than one shot each time the trigger 'acts.'" App., *infra*, 20a; see *id.* at 20a-27a. The plurality further concluded that a bump stock does not permit firing more than one shot "automatically" because, "to continue the firing after the shooter pulls the trigger, he or she must maintain

13

manual, forward pressure on the barrel and manual, backward pressure on the trigger ledge." *Id.* at 29a.

Having found the rule inconsistent with the statute, the court of appeals remanded to the district court. App., *infra*, 49a. Judge Elrod's opinion instructed the district court to enter judgment for respondent and to "determine what remedy—injunctive, declarative, or otherwise—is appropriate." *Id.* at 47a.

b. Judge Haynes, joined by Chief Judge Richman, concurred in the judgment, explaining that she had "reluctantly conclude[d] that the relevant statute is ambiguous such that the rule of lenity favors the citizen in this case." App., *infra*, 49a.

c. Judge Ho, joined by Chief Judge Richman and Judge Southwick, concurred in part and concurred in the judgment. App., *infra*, 49a-62a. Judge Ho acknowledged that bump stocks allow a shooter with a semiautomatic rifle to "simulate the experience of firing an automatic machinegun" and "achieve the same lethality as fully automatic machineguns." *Id.* at 52a. He also rejected the plurality's conclusion that the statutory definition of machinegun unambiguously excludes bump stocks. *Id.* at 57a-58a nn.1-2. But he concluded that the competing interpretive arguments stand in "equipoise," and he therefore invoked the rule of lenity. *Id.* at 58a.

d. Judge Higginson, joined by Judges Dennis and Graves, dissented "[f]or the reasons stated in the panel opinion." App., *infra*, 63a; see *id.* at 63a-71a. In their view, the majority had improperly invoked the rule of "lenity to rewrite a vital public safety statute" and to "legalize an instrument of mass murder" that Congress had prohibited. *Id.* at 71a. The dissenting judges also observed that the majority had adopted a reading that

14

"conflicts with how every other circuit has interpreted" the statute. *Id.* at 68a.

4. On remand, the district court entered judgment for respondent. D. Ct. Doc. 65, at 1 (Mar. 6, 2023). Respondent then filed a motion requesting that the court grant additional relief, including nationwide vacatur of the final rule. D. Ct. Doc. 68, at 1 (Mar. 28, 2023); see *id.* at 5-7. The court has not acted on that motion as of the filing of this petition.

### REASONS FOR GRANTING THE PETITION

In the wake of a horrific mass shooting in Las Vegas, in which bump stocks enabled a gunman to fire hundreds of bullets into a crowd in a matter of minutes, then-President Trump ordered ATF to reevaluate whether bump stocks satisfy the definition of "machinegun" in the National Firearms Act. 26 U.S.C. 5845(b); see 83 Fed. Reg. 7949, 7949 (Feb. 23, 2018). ATF solicited public comment and ultimately concluded that bump stocks are machineguns under the "best interpretation" of the statute. 83 Fed. Reg. at 66,521. ATF therefore rescinded its erroneous prior classification letters and published an interpretive rule recognizing that bump stocks are, in fact, machineguns. See *id.* at 66,553-66,554. The interpretive rule did not alter or enlarge the scope of the statutory prohibition on possessing or transferring new machineguns. The rule instead merely served to inform the public of ATF's considered view that bump stocks are "machineguns" as Congress defined that term.

Before the decision below, the Sixth, Tenth, and D.C. Circuits had all rejected challenges to ATF's final rule, and this Court had declined to grant further review in those cases. See pp. 26-27, *infra.* Here, however, the Fifth Circuit held in a fractured en banc decision that

15

bump stocks do not satisfy the statutory definition of "machinegun." Eight members of the court would have held that the definition "unambiguously" excludes bump stocks, but eight other members disagreed. App., *infra*, 2a n.\*. The only ground for reversal that commanded a majority was "lenity." *Ibid.*

Lenity has no role to play here because the traditional tools of statutory interpretation demonstrate that bump stocks are "machinegun[s]" under the best reading of the statutory definition. Bump stocks allow a shooter to fire hundreds of bullets a minute by a single pull of the trigger. Like other machineguns, rifles modified with bump stocks are exceedingly dangerous; Congress prohibited the possession of such weapons for good reason. The decision below contradicts the best interpretation of the statute, creates an acknowledged circuit conflict, and threatens significant harm to public safety. This Court should grant the petition for a writ of certiorari and reverse.

### A. Bump Stocks Are "Machineguns" As Congress Defined That Term In The National Firearms Act

Bump stocks are machineguns because they allow a shooter to fire "automatically more than one shot * * * by a single function of the trigger." 26 U.S.C. 5845(b). That conclusion follows directly from the statutory text, and the court of appeals erred in invoking the rule of lenity to conclude otherwise.

#### 1. Bump stocks create a continuous firing cycle that is initiated by a "single function of the trigger"

In order to constitute a "machinegun" under the National Firearms Act, a weapon must be capable of firing more than one shot "by a single function of the trigger." 26 U.S.C. 5845(b). Rifles modified with bump stocks

16

satisfy that requirement because they enable the
shooter to initiate a continuous firing cycle in response
to a "single pull of the trigger" or an analogous motion.
83 Fed. Reg. at 66,534.[2]

On a typical semiautomatic rifle, the shooter initiates
the firing sequence by pulling backwards on a curved
trigger to fire a single shot.  For each subsequent shot,
the shooter must release his pull on the trigger, so that
the internal hammer mechanism can reset, before pull-
ing the trigger again.  See App., *infra*, 6a (diagram).  On
a typical machinegun, by contrast, the shooter initiates
a continuous firing cycle by pulling backwards on the
trigger and maintaining pressure on it; while the
shooter holds the trigger down, the weapon continues to
fire until all the ammunition is exhausted.

As explained above (at pp. 4-6), a bump stock re-
places the standard stationary stock on a semiautomatic
rifle with a sliding stock, which is attached to a grip with
an "extension ledge" where the shooter rests his trigger
finger.  83 Fed. Reg. at 66,516.  The shooter activates
the trigger either by pulling back on it or by sliding the
trigger forward to make contact with the shooter's sta-
tionary finger on the trigger ledge.  App., *infra*, 103a.
In either design, the bump stock "harnesses and directs
the firearm's recoil energy to slide the firearm back and
forth so that the trigger automatically re-engages by
'bumping' the shooter's stationary finger without addi-
tional physical manipulation of the trigger by the
shooter."  83 Fed. Reg. at 66,516.  This creates a contin-

---

[2] The statutory definition also encompasses "any part designed
and intended solely and exclusively * * * for use in converting a
weapon into a machinegun."  26 U.S.C. 5845(b).  Accordingly, if a
rifle modified with a bump stock constitutes a "machinegun," then
the bump stock device itself is also a "machinegun."  *Ibid.*

17

uous fire-recoil-bump-fire sequence that converts a semiautomatic rifle into a weapon capable of firing hundreds of rounds per minute.

The continuous firing sequence enabled by a bump stock is initiated by a "single function of the trigger." 26 U.S.C. 5845(b). As ATF explained in the final rule, a single function of the trigger includes, at a minimum, a "single pull of the trigger." 83 Fed. Reg. at 66,553-66,554. ATF first recognized as much in 2006, when it reclassified the Akins Accelerator. See ATF Ruling 2006-2, at 1 (discussed at p. 6, *supra*). Like the bump stocks at issue here, the Akins Accelerator enabled the weapon to recoil within the stock, "permitting the trigger to lose contact with the finger" and reset itself. 83 Fed. Reg. at 66,517. "Springs in the Akins Accelerator then forced the rifle forward, forcing the trigger against the finger" in a back-and-forth cycle that enabled continuous firing. *Ibid.* In *Akins* v. *United States*, 312 Fed. Appx. 197 (per curiam), cert. denied, 557 U.S. 942 (2009), the Eleventh Circuit upheld ATF's "'single pull of the trigger'" interpretation, explaining that the "plain language of the statute defines a machinegun as any part or device that allows a gunman to pull the trigger once and thereby discharge the firearm repeatedly." *Id.* at 200-201.

The rule at issue here reiterates the same interpretation upheld in *Akins*. See 83 Fed. Reg. at 66,534-66,535. Once the trigger has performed its function of initiating the firing sequence, a bump stock ensures that the sequence will continue as long as the shooter maintains forward pressure on the front of the weapon with his non-trigger hand. See App., *infra*, 103a-104a. The trigger mechanism itself resets before each additional shot, but that process happens automatically by design.

18

And the fact that bump stocks automate the back-and-forth movement of the trigger rather than the internal movement of the hammer does not take them outside the statutory definition of a "machinegun." Either way, the shooter initiates the continuous firing of more than one shot by a single pull of the trigger and hence "by a single function of the trigger." 26 U.S.C. 5845(b).

ATF's interpretation accords with the ordinary meaning of the term "trigger." As the Fifth Circuit itself has previously explained, the "trigger" of a firearm is the "mechanism that is used to initiate the firing sequence." *United States* v. *Jokel*, 969 F.2d 132, 135 (1992) (per curiam). And the courts of appeals have uniformly recognized that the term "trigger" encompasses buttons, switches, or other devices for initiating the firing sequence—not just the typical curved metal lever used in most firearms. See *ibid.*; see also, *e.g.*, *United States* v. *Carter*, 465 F.3d 658, 665 (6th Cir. 2006) (per curiam), cert. denied, 550 U.S. 964 (2007); *United States* v. *Camp*, 343 F.3d 743, 745 (5th Cir. 2003); *United States* v. *Fleischli*, 305 F.3d 643, 655 (7th Cir. 2002), cert. denied, 538 U.S. 1001 (2003). The "trigger" is thus defined by its function of initiating the firing sequence, not by its precise form. And with a bump stock, the shooter need only pull the trigger a single time for the trigger to perform its function of initiating the continuous firing cycle.

ATF's interpretation also accords with how courts have paraphrased the scope of Section 5845(b) in plain English. In most firearms, the shooter initiates the firing sequence by pulling a trigger, which is why courts have "instinctively reached for the word 'pull' when discussing the statutory definition of machinegun." App., *infra*, 138a (citation omitted). In *Staples* v. *United*

19

*States*, 511 U.S. 600 (1994), for example, this Court observed that a "machinegun" under the National Firearms Act is a weapon that "fires repeatedly with a single *pull* of the trigger." *Id.* at 602 n.1 (emphasis added).

The same usage is reflected in the legislative record preceding Congress's original adoption of the statutory definition. The relevant committee report noted that the bill "contain[ed] the usual definition of machine gun as a weapon designed to shoot more than one shot without reloading and by a single pull of the trigger." H.R. Rep. No. 1780, 73d Cong., 2d Sess. 2 (1934). And the then-president of the National Rifle Association had proposed during earlier hearings that a machinegun should be defined as a weapon "which shoots automatically more than one shot without manual reloading, by a single function of the trigger." *National Firearms Act: Hearings Before the House Comm. on Ways and Means on H.R. 9066*, 73d Cong., 2d Sess. 40 (1934) (statement of Karl T. Frederick, President, National Rifle Association of America). Explaining that proposal, he stated that "[t]he distinguishing feature of a machine gun is that by a single pull of the trigger the gun continues to fire as long as there is any ammunition," and that any weapon "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun." *Ibid.*

### 2. *Rifles equipped with bump stocks fire more than one shot "automatically" after a single trigger pull*

The statutory definition of "machinegun" requires not only that the firing of more than one shot be initiated by a single function of the trigger but also that it occur "automatically." 26 U.S.C. 5845(b). ATF's final rule marked a departure in the agency's understanding

20

of that term as applied to bump stocks, which the
agency acknowledged and fully explained. In previous
classification letters, ATF had concluded that certain
bump stocks were not machineguns because they lacked
"automatically functioning mechanical parts or springs"
of the kind found in the original Akins Accelerator. 83
Fed. Reg. at 66,518. But ATF had issued those letters
without any "substantial or consistent legal analysis" of
the term "'automatically.'" *Ibid.* The agency undertook
such an analysis in the wake of the Las Vegas shooting
and concluded that the term "automatically" is best un-
derstood to mean "as the result of a self-acting or self-
regulating mechanism." *Id.* at 66,519. That definition
was drawn "nearly word-for-word" from contemporane-
ous dictionaries. App., *infra*, 86a (panel opinion); see 83
Fed. Reg. at 66,519 ("The word 'automatically' is the
adverbial form of 'automatic,' meaning 'having a self-
acting or self-regulating mechanism that performs a re-
quired act at a predetermined point in an operation.")
(quoting *Webster's New International Dictionary* 187
(2d ed. 1934)) (brackets omitted).

ATF also correctly determined that bump stocks en-
able firing more than one shot as a result of a self-acting
or self-regulating mechanism (*i.e.*, automatically), even
in designs lacking mechanical springs. The firing se-
quence of a rifle modified with a bump stock is "'auto-
matic' because the device harnesses the firearm's recoil
energy in a continuous back-and-forth cycle" initiated
by a single trigger pull. 83 Fed. Reg. at 66,519. Indeed,
the entire point of a bump stock is to permit a semiau-
tomatic rifle to fire "automatically," 26 U.S.C. 5845(b),
through the self-acting mechanism of the device itself.
After a single trigger pull, the bump stock "direct[s] the
recoil energy of the discharged rounds into the space

21

created by the sliding stock (approximately 1.5 inches) in constrained linear rearward and forward paths." 83 Fed. Reg. at 66,532 (citation omitted). The trigger mechanism resets before bouncing back into contact with the shooter's stationary finger, at which point another shot is fired and the recoil energy is again harnessed to continue the fire-recoil-bump-fire sequence. See *ibid.*

That process is "[s]elf-acting under conditions fixed for it" and therefore automatic, 83 Fed. Reg. at 66,519 (citation omitted), even in bump stock designs where the shooter must maintain forward pressure on the front of the weapon with the non-trigger hand in order to continue firing—as both the panel and the district court correctly concluded here. See App., *infra*, 85a-88a, 140a-145a. The pressure that the shooter must maintain on the front of a weapon modified with such a bump stock is no different than the pressure a shooter must maintain on the trigger of a conventional machinegun to engage in continuous fire. That some human input is required does not mean the device ceases to function "automatically." An automatic sewing machine, for example, may still require manually feeding fabric into the machine, and an automatic teller machine may still require manually selecting how much money to withdraw. So too here: The user must maintain forward pressure on the front of the weapon, but the bump stock device itself still automates the firing sequence, harnessing the recoil energy from each shot to create a self-acting cycle initiated by a single pull of the trigger.

### 3. The court of appeals erred in deeming bump stocks to be beyond the reach of the statutory definition

The court of appeals erred in holding that bump stock devices are not "machinegun[s]." 26 U.S.C.

22

5845(b).  Neither the plurality nor the majority identified any persuasive reason for disregarding the interpretation ATF adopted in its final rule.

a. An eight-judge plurality reasoned that bump stocks do not qualify as machineguns even if the statutory phrase "single function of the trigger" is interpreted to include a "single pull of the trigger," App., *infra*, 20a (quoting 83 Fed. Reg. at 66,553), on the theory that the shooter operating a rifle with a bump stock still "pulls the trigger * * * each time he or she fires a bullet," *ibid.*  The plurality thus would have treated each instance in which the trigger slides forward and bumps the shooter's finger as a separate "pull of the trigger." *Ibid.*  That theory has no basis in any recognized understanding of the term "pull," particularly in the context of firearms.  In ordinary English, no one would say that a shooter pulled the trigger when an automated device caused the trigger to be engaged against the shooter's stationary finger.

The plurality also endorsed respondent's alternative theory, under which "function of the trigger" refers to "the movement of the trigger itself."  App., *infra*, 21a-22a.  The plurality stated that the continuous fire-recoil-bump-fire cycle created by bump stocks involves more than a single function of the trigger because Congress wrote the statutory definition "from a mechanical perspective," rather than "based on the shooter's perspective." *Id.* at 23a.  On that view, the relevant question is how many times the trigger itself "function[s]" mechanically in the firing sequence, 26 U.S.C. 5845(b), not how many times the shooter pulls the trigger.

The plurality's view that the statutory definition focuses exclusively on mechanical functioning, without regard to actions of the shooter, is mistaken.  The imme-

23

diately adjacent clause refers to "manual" reloading, *i.e.*, reloading by hand. See 26 U.S.C. 5845(b) ("automatically more than one shot, *without manual reloading*, by a single function of the trigger") (emphasis added). That is a textual reference to the human being operating the weapon, not simply the mechanics of the weapon itself. Even focusing only on the phrase "by a single function of the trigger," *ibid.*, the plurality's view fails to take account of the preposition "by" and thus overlooks the function of the prepositional clause in the definition read as a whole. The clause specifies that the automatic firing of more than one shot must occur "'by,'" *i.e.*, "'through the means of' or 'in consequence of,'" a single function of the trigger. *Guedes* v. *ATF*, 45 F.4th 306, 316 (D.C. Cir. 2022) (*Guedes II*) (citation omitted). Bump stocks satisfy that requirement. The shooter's single pull of the trigger is the means of initiating a continuous cycle of firing more than one shot. *Ibid.*; see *United States* v. *Evans*, 978 F.2d 1112, 1113 n.2 (9th Cir. 1992) ("As used in § 5845(b), 'by a single function of the trigger' describes the action that enables the weapon to 'shoot ... automatically ... without manual reloading,' not the 'trigger' mechanism."), cert. denied, 510 U.S. 821 (1993).

If the plurality's reading were correct, then even the original Akins Accelerator was not a machinegun. Yet the plurality was unwilling to embrace that logical consequence of its interpretation, stating in a footnote that its rationale "would not apply to an Akins Accelerator" because "a shooter using an Akins Accelerator need only pull the trigger once to activate the firing sequence." App., *infra*, 27a n.8. That distinction is illusory. As explained above, the bump stock designs at issue here *also* require only a single "pull [of] the trigger"

24

to activate the continuous firing sequence. *Ibid.* The only arguable difference is that the Akins Accelerator contained a mechanical spring that obviated any need for the shooter to maintain forward pressure on the front of the gun with the non-shooting hand—a distinction that ATF previously found relevant to assessing whether a device enables firing multiple shots "automatically," but one that has nothing to do with how many times the trigger mechanically resets during the continuous firing cycle.

b. The plurality's treatment of "automatically" was similarly flawed. See App., *infra*, 28a-31a. The plurality accepted that "automatically" means "'self-acting,'" *id.* at 28a, but reasoned that a bump stock does not enable continuous firing through a self-acting mechanism because the shooter must "maintain manual, forward pressure on the barrel" with the non-trigger hand, *id.* at 29a. The plurality acknowledged that a conventional machinegun also "requires sustained input" (holding down the trigger) in order to fire automatically. *Id.* at 30a. But it viewed the forward pressure required with bump stocks as different because the pressure is not exerted on the trigger itself. See *ibid.* (stating that "the act of pulling and holding the trigger is one function").

Accepting that distinction would create an enormous and implausible loophole in the statute. On the plurality's view, a fully automatic rifle would cease to be a statutory "machinegun" if it were modified to require the shooter to also press and hold a button with his non-trigger hand in order to fire continuously. 26 U.S.C. 5845(b). So modified, the weapon would not fire more than one shot "automatically," under the plurality's approach, because the continuous firing sequence would require sustained input from the shooter beyond merely

25

holding the trigger. The plurality's view would thus "allow gun manufacturers to circumvent Congress's longtime ban on machineguns by designing parts specifically intended to achieve machinegun functionality with a single pull of the trigger so long as the part also requires some minutia of human involvement" beyond holding the trigger. *Gun Owners of Am., Inc.* v. *Garland*, 19 F.4th 890, 910 (6th Cir. 2021) (opinion of Gibbons, J.), cert. denied, 143 S. Ct. 83 (2022).

That cannot be correct. Congress did not ban all new machineguns only to allow the ban to be circumvented by a trivial shift in the locus of the shooter's pressure from the trigger to the fore-grip, the barrel, a button, or any other similar contrivance. Instead, the modified automatic weapon described above would qualify as a machinegun for precisely the same reason as a rifle with a bump stock: A single function of the trigger initiates an automatic sequence of firing more than one shot, even though one condition for that firing sequence to continue is sustained pressure by the shooter's other hand. The discharge of multiple shots after a single trigger pull occurs as the result of the "self-acting" mechanism of the device itself and therefore happens "automatically." 83 Fed. Reg. at 66,519.

c. A majority of the en banc court did not endorse the plurality's understanding of "single function of the trigger" and "automatically," but nonetheless concluded that "lenity" requires reading those terms not to encompass bump stocks. App., *infra*, 2a n*. The majority stated that "assuming *arguendo* that those two provisions [in the statutory definition] are indeed ambiguous," the rule of lenity applied because the majority was "unable to resolve either of the ties" that it perceived in evaluating the parties' competing interpreta-

26

tions. *Id.* at 43a. The majority further stated that its inability to "resolve * * * the ties" was a sufficient basis "to conclude that this statute—and for purposes of this case, only this statute—is grievously ambiguous." *Ibid.*

The court of appeals' inability to form a majority endorsing a particular reading of the statutory definition is not itself a sound basis for applying lenity. This Court has explained that the rule of lenity comes into play when interpreting a criminal statute only when, "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Maracich* v. *Spears*, 570 U.S. 48, 76 (2013) (quoting *Barber* v. *Thomas*, 560 U.S. 474, 488 (2010)); accord *Liparota* v. *United States*, 471 U.S. 419, 427 (1985). That standard is not met here. To the contrary, as demonstrated above, application of the ordinary tools of statutory construction yields a firm conclusion that bump stocks are "machineguns."

### B. The Decision Below Creates An Acknowledged Circuit Conflict

In holding that lenity compels reading the definition of "machinegun" not to encompass bump stocks, the Fifth Circuit acknowledged that three other federal circuits had rejected analogous challenges to the same ATF rule. App., *infra*, 16a-17a; cf. *id.* at 71a (Higginson, J., dissenting) (noting the same conflict). Those decisions rested on a variety of grounds, but they all reached the same bottom-line conclusion of declining to invalidate or enjoin the rule. See *Gun Owners of Am., Inc.*, 19 F.4th at 896 (6th Cir.) (affirming, by an equally divided vote of the en banc court, district court's order denying preliminary injunction); *Aposhian* v. *Barr*, 958 F.3d 969, 984-989 (10th Cir.) (affirming denial of prelim-

27

inary injunction), vacated on reh'g, 973 F.3d 1151 (10th Cir. 2020), reinstated, 989 F.3d 890 (10th Cir. 2021), cert. denied, 143 S. Ct. 84 (2022); *Guedes* v. *ATF*, 920 F.3d 1, 28-32 (D.C. Cir. 2019) (per curiam) (*Guedes I*) (affirming denial of preliminary injunction), cert. denied, 140 S. Ct. 789 (2020).

In addition to the decisions identified by the Fifth Circuit, the D.C. Circuit also held that ATF's final rule "is consistent with the best interpretation of 'machine gun' under the governing statutes" in *Guedes II*, which involved an appeal from a final judgment in the same litigation in which the D.C. Circuit had previously affirmed the denial of a preliminary injunction. See *Guedes II*, 45 F.4th at 310. Notably, the D.C. Circuit reached that conclusion without relying on "the *Chevron* framework," *id.* at 313, which had been applied in earlier challenges. See *Guedes I*, 920 F.3d at 28; *Aposhian*, 958 F.3d at 984; see also *Chevron U.S.A. Inc.* v. *NRDC, Inc.*, 467 U.S. 837, 842-845 (1984). The D.C. Circuit instead recognized that ATF had identified "the best reading" of the definition "in light of the plain language and purpose of the statute." *Guedes II*, 45 F.4th at 314. The D.C. Circuit also rejected the same interpretation of "single function of the trigger" that the plurality endorsed here, explaining that reading that phrase to "refer[] to the mechanical action of the trigger" would be "unworkable, internally inconsistent, and counterintuitive." *Id.* at 319-320. And the D.C. Circuit declined to apply lenity for reasons that should have foreclosed resorting to lenity here as well. See *id.* at 322 (observing that the statute contains no grievous am-

28

biguity given the "array of tools" supporting ATF's in-terpretation).[3]

The government previously urged this Court to deny petitions for writs of certiorari seeking further review of judgments upholding ATF's final rule, and the Court did so. See *Aposhian* v. *Garland*, 143 S. Ct. 84 (2022) (No. 21-159); *Gun Owners of Am., Inc.* v. *Garland*, 143 S. Ct. 83 (2022) (No. 21-1215); *Guedes* v. *ATF*, 140 S. Ct. 789 (2020) (No. 19-296). But the Fifth Circuit's decision materially alters the legal landscape by creating an acknowledged circuit split. And the precedential effect of the decision below is likely to effectively "legalize" bump stocks in a large portion of the United States. App., *infra*, 71a (Higginson, J., dissenting). Even if the interpretive rule itself is not enjoined or vacated, any future criminal prosecution brought within the Fifth Circuit on the theory that bump stocks are machineguns would be fatally undercut by the holding of the decision below. This Court's review is therefore necessary to restore uniformity to federal law.

---

[3] By contrast, the U.S. Navy-Marine Corps Court of Criminal Appeals held in *United States* v. *Alkazahg*, 81 M.J. 764 (2021), that bump stocks do not satisfy the definition of "machinegun" in Section 5845(b) and that a servicemember's possession of such a device therefore did not violate the Uniform Code of Military Justice, see *id.* at 784. In addition, the question whether bump stocks are machineguns is currently pending before a panel of the Sixth Circuit. See *Hardin* v. *ATF*, No. 20-6380 (argued Jan. 19, 2023). The question is also implicated by an appeal that is currently stayed in the Federal Circuit, *Codrea* v. *Garland*, No. 21-1707, which arises from the same consolidated proceedings as the appeal to the D.C. Circuit in *Guedes II*. See Br. in Opp. at 20 & n.3, *McCutchen* v. *United States*, 143 S. Ct. 422 (2022) (No. 22-25).

29

### C. The Question Presented Is Exceptionally Important, And This Case Is A Suitable Vehicle

The question presented is exceptionally important for federal law enforcement and public safety. Congress has long regulated machineguns because of their "destructive potential and exacerbation of serious crime." *Guedes II*, 45 F.4th at 316. Rifles equipped with bump stocks not only satisfy the statutory definition of "machinegun" but also, as a practical matter, present the same "heightened capacity for lethality." *Ibid.* Like other machineguns, rifles modified with bump stocks are capable of firing hundreds of bullets per minute. The Las Vegas mass shooter, for example, "was able to fire several hundred rounds of ammunition in a short period of time" using bump stocks, "killing 58 people and wounding approximately 500" in a matter of minutes. 83 Fed. Reg. at 66,516.

If the decision below is allowed to stand, its consequences are likely to reverberate nationwide. Under the National Firearms Act, persons engaged in the manufacture of machineguns (*e.g.*, for lawful sales to governmental entities, including the armed forces) are required to register and pay a special tax, 26 U.S.C. 5801-5802; to register the making of each machinegun, 26 U.S.C. 5822; and to assign each machinegun a unique serial number, 26 U.S.C. 5842(a). Serializing the weapons assists in tracing them in the event one is used in a crime. The decision below, however, is likely to mean that manufacturers within the Fifth Circuit will be able to make and sell bump stocks to individuals without background checks and without registering or serializing the devices. Given the nationwide traffic in firearms, there is little reason to believe that such devices will remain confined to the Fifth Circuit.

30

Finally, this case is an appropriate vehicle. The case arises from a final judgment after a bench trial, and it squarely presents a question of statutory interpretation. Prior petitions addressing ATF's final rule have asked the Court to resolve various matters of administrative law, such as whether *Chevron* may be "waived." See *Guedes*, 140 S. Ct. at 789-791 (statement of Gorsuch, J.). Those ancillary matters are not at issue here. The government maintains only that bump stocks are machineguns under the best interpretation of the statute. The Fifth Circuit erred in holding otherwise, and this Court should grant review and reverse.

**CONCLUSION**

The petition for a writ of certiorari should be granted.

Respectfully submitted.

ELIZABETH B. PRELOGAR
  *Solicitor General*
BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*
BRIAN H. FLETCHER
  *Deputy Solicitor General*
MATTHEW GUARNIERI
  *Assistant to the Solicitor*
  *General*
MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
BRAD HINSHELWOOD
  *Attorneys*

APRIL 2023

# APPENDIX

## TABLE OF CONTENTS

Page

Appendix A   —   Court of appeals en banc opinion
(Jan. 6, 2023) ................................................1a

Appendix B   —   Court of appeals panel opinion
(Dec. 14, 2021)...........................................72a

Appendix C   —   District court findings of fact and
conclusions of law (Nov. 23, 2020)...........92a

Appendix D   —   Court of appeals order granting
rehearing (June 23, 2022) .....................154a

Appendix E   —   Statutory and regulatory provisions:

18 U.S.C. 921(a)(24)........................................156a

18 U.S.C. 922(*o*) .............................................156a

26 U.S.C. 5845(b) ............................................156a

27 C.F.R. 447.11 ..............................................157a

27 C.F.R. 478.11 ..............................................158a

27 C.F.R. 479.11 ..............................................159a

# APPENDIX A

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———

No. 20-51016

MICHAEL CARGILL, PLAINTIFF-APPELLANT

*v.*

MERRICK GARLAND, IN HIS OFFICIAL CAPACITY AS
U.S. ATTORNEY GENERAL; UNITED STATES
DEPARTMENT OF JUSTICE; STEVEN DETTELBACH,
IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE
BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND
EXPLOSIVES; BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES,
DEFENDANTS-APPELLEES

———

[Filed:   Jan. 6, 2023]

———

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:19-CV-349

———

Before:   RICHMAN, *Chief Judge*, and JONES, SMITH,
STEWART, DENNIS, ELROD, SOUTHWICK, HAYNES,
GRAVES, HIGGINSON, WILLETT, HO, DUNCAN, ENGEL-
HARDT, OLDHAM, and WILSON, *Circuit Judges*.

JENNIFER WALKER ELROD, *Circuit Judge*, joined by
RICHMAN, *Chief Judge*, and JONES, SMITH, STEWART,

(1a)

2a

SOUTHWICK, HAYNES, WILLETT, HO, DUNCAN, ENGEL-
HARDT, OLDHAM, and WILSON, *Circuit Judges*:[*]

Since the National Firearms Act of 1934, federal law
has heavily regulated machineguns.  Indeed, as pro-
posed, that law was known to many as "the Anti-
Machine Gun Bill."   The possession or transfer of a ma-
chinegun was eventually banned through the Gun Con-
trol Act of 1968 and the Firearms Owners' Protection
Act of 1986.   Today, possession of a machinegun is a
federal crime, carrying a penalty of up to ten years' in-
carceration.

This appeal concerns a regulation promulgated by
the federal Bureau of Alcohol, Tobacco, Firearms, and
Explosives, purporting to interpret the federal prohibi-
tion on machineguns as extending to bump stocks.   A
bump stock is a firearm attachment that allows a shooter
to harness the natural recoil of a semi-automatic weapon
to quickly re-engage the trigger after firing, enabling
him to shoot at an increased rate of speed.   When ATF
first considered the type of bump stocks at issue here, it

---

[*] Of the sixteen members of our court, thirteen of us agree that an
act of Congress is required to prohibit bump stocks, and that we
therefore must reverse.   Twelve members (CHIEF JUDGE RICH-
MAN and JUDGES JONES, SMITH, STEWART, ELROD, SOUTHWICK,
HAYNES, WILLETT, HO, DUNCAN, ENGELHARDT, and WILSON) re-
verse on lenity grounds.   Eight members (JUDGES JONES, SMITH,
ELROD, WILLETT, DUNCAN, ENGELHARDT, OLDHAM, and WILSON)
reverse on the ground that federal law unambiguously fails to cover
non-mechanical bump stocks.

CHIEF JUDGE RICHMAN, JUDGE STEWART, and JUDGE SOUTH-
WICK concur in the judgment and join in Part V, as does JUDGE HO,
who also writes separately.   JUDGE OLDHAM concurs in the judg-
ment and joins in Parts I-IV.A.   JUDGE HAYNES only concurs in the
judgment and writes separately.

3a

understood that they were *not* machineguns. ATF maintained this position for over a decade, issuing many interpretation letters to that effect to members of the public.

But ATF reversed its longstanding position in 2018, subjecting anyone who possessed a bump stock to criminal liability. ATF reversed its position to a great extent in response to the tragic events that occurred in Las Vegas on October 1, 2017. On that day, a deranged gunman murdered dozens of innocent men and women, and injured hundreds more. To carry out this appalling crime, the gunman used many weapons and utilized many accessories—including bump stocks.

Public pressure to ban bump stocks was tremendous. Multiple bills to that effect were introduced in both houses of Congress. But before they could be considered in earnest, ATF published the regulation at issue here, short-circuiting the legislative process. Appellant Michael Cargill surrendered several bump stocks to the Government following publication of the regulation at issue. He now challenges the legality of that regulation, arguing that a bump stock does not fall within the definition of "machinegun" as set forth in federal law, and thus that ATF lacked the authority to issue a regulation purporting to define the term as such.

Cargill is correct. A plain reading of the statutory language, paired with close consideration of the mechanics of a semi-automatic firearm, reveals that a bump stock is excluded from the technical definition of "machinegun" set forth in the Gun Control Act and National Firearms Act.

4a

But even if that conclusion were incorrect, the rule of lenity would still require us to interpret the statute against imposing criminal liability. A rich legal tradition supports the "well known rule" that "penal laws are to be construed strictly." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 94-95 (1820). As Chief Justice Marshall explained long ago, the rule "is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment." *Id.* at 95.

The Government's regulation violates these principles. As an initial matter, it purports to allow ATF—rather than Congress—to set forth the scope of criminal prohibitions. Indeed, the Government would outlaw bump stocks by administrative fiat even though the very same agency routinely interpreted the ban on machineguns as not applying to the type of bump stocks at issue here. Nor can we say that the statutory definition *unambiguously* supports the Government's interpretation. As noted above, we conclude that it unambiguously does not. But even if we are wrong, the statute is at least ambiguous in this regard. And if the statute is ambiguous, Congress must cure that ambiguity, not the federal courts.

The definition of "machinegun" as set forth in the National Firearms Act and Gun Control Act does not apply to bump stocks. And if there were any doubt as to this conclusion, we conclude that the statutory definition is ambiguous, at the very least. The rule of lenity therefore compels us to construe the statute in Cargill's favor. Either way, we must REVERSE.

5a

I

A

The Gun Control Act of 1968 provides that "it shall be unlawful for any person to transfer or possess a machinegun." 18 U.S.C. § 922(o)(1). The Act defines machinegun as follows:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b); *see* 18 U.S.C. § 921(a)(24) (incorporating the definition in the National Firearms Act).

The traditional example of a machinegun[1] is a rifle capable of automatic fire, like the M-16. Semi-automatic rifles like the AR-15 are not machineguns. *See Hollins* v. *Lynch*, 827 F.3d 436, 440 n.2 (5th Cir. 2016) (The M-16 "is capable of automatic fire, that is to say, firing more than one round per trigger-action. . . . The AR-15 is essentially a semi-automatic version of the M-16, that is to say, it fires only one round per trigger-action.").

---

[1] We spell machinegun as being one word because that is how Congress has defined the term in the statutes at issue here.

6a

B

To understand what a machinegun is, it is helpful to understand what a machinegun *is not*. To that end, the firing mechanism of a semi-automatic weapon is especially important. The relevant parts are as follows:



The trigger is the interface between the gun's internal mechanism and the human finger. The sear is the trigger's top-forward geometric plane, which locks snugly into a groove near the spring of the hammer. The hammer is the spring-loaded element that strikes the firing pin, causing ignition of the charge and propulsion of the bullet. The disconnector is a part that sits on top of the trigger and serves to reset the hammer after a round is fired; this resetting is what makes a semi-automatic weapon semi-automatic.

The mechanics of the firing process are as follows. First, the user pulls the trigger. Doing so disengages

7a

the hammer from the sear, allowing the spring to swing the hammer to strike the firing pin, which causes the charge to combust and propel the bullet. The firing of the bullet thrusts the bolt backward, which kicks the hammer into the disconnector on top of the still-depressed trigger. When the trigger is reset, the hammer is pulled back into the cocked position and secured by the trigger's sear as it slips off the disconnector. The user may then fire again by pulling the trigger, without having to manually re-cock the hammer. The mechanics are viewed below:[2]



The end result is that the user of a semi-automatic firearm can fire rapidly by means of repeated use of the trigger. Critically, use of the trigger necessarily cor-

---

[2]  This figure is a stationary image taken from an animated graphic that moves to display the relevant motion. The moving image may be found here: https://www.ca5.uscourts.gov/opinions/pub/20/20-51016_ar15.gif

8a

responds one-to-one with bullets fired. That is, a single pull of the trigger results in a single bullet fired. Without resetting the trigger, the disconnector cannot reset the hammer to the fully cocked position. And unless the hammer is fully cocked, it will not be able to strike the firing pin with sufficient force to discharge the weapon a second time. (When a weapon fails to fire for this reason, it is said to experience a "hammer follow" malfunction.) In sum, both the hammer and the trigger-disconnector must invariably return full circle before another round can be dispatched.

This process may be contrasted with a fully automatic gun, which is equipped with something called an "auto sear"—a device that serves to re-cock and release the hammer in tandem with the motion of the bolt for so long as the trigger remains depressed. In other words, the auto sear enables a pendulum swing of the hammer in sync with the bolt without any further input from the user; with one pull of the trigger, an automatic weapon can shoot continuously until ammunition is depleted.

C

The statutory definition of a machinegun also includes devices that convert an ordinary firearm into a machinegun. *See United States v. Camp*, 343 F.3d 743 (5th Cir. 2003) (holding that a switch—which, if flipped, would cause a semi-automatic rifle to fire continuously—is a device that turns an ordinary firearm into a machinegun). The issue presented here is whether a bump stock is such a device.

A bump stock is an accessory that attaches to a semi-automatic weapon and assists the shooter to engage in bump firing. Bump firing, in turn, is a technique

9a

whereby a shooter uses a firearm's natural recoil to quickly reengage the trigger, resulting in an increased rate of fire.   It is possible to bump fire an ordinary



semi-automatic rifle without any assisting device, but a bump stock makes the technique easier.

A typical bump stock consists of a sliding shoulder stock molded to a grip, a trigger ledge where the shooter places his finger, and a detachable rectangular receiver module that goes into the receiver well of the bump stock's handle to guide the recoil of the weapon when fired.   To begin bump firing, the shooter presses forward on the firearm's forebody to bump into the trigger finger.   The gun then slides back and forth, and the recoil energy forces the gun backward, re-engaging the trigger.   The shooter maintains forward pressure on the gun's forebody, again causing the trigger to bump

10a

into the trigger finger, maintaining fire.   The firing process may be viewed as follows:[3]

In summary, a bump stock combines with a semi-automatic weapon to facilitate the repeated function of the trigger.    To be sure, it makes the process faster and easier.    But the mechanics remain exactly the same: the firing of each and every round requires an intervening function of the trigger.   This does not alter the form of manual input that the user must provide to discharge the weapon.   Without a bump stock or the use of an alternative bump technique, the user must provide manual input by pulling the trigger with the muscles of his trigger finger.   With a bump stock, the shooter need not pull and release his trigger finger.   But the shooter must still apply forward pressure to the weapon's forebody in order to maintain the shooting mechanism. Again, the manual input remains, even though its form changes.

We note one important distinction.   Some bump stocks—called mechanical bump stocks—are equipped with springs or other internal mechanical devices that automatically assist the shooter to engage in bump firing.   For such a bump stock, the shooter does not have to maintain pressure on the barrel and trigger ledge in order to maintain this firing sequence.   Only non-mechanical bump stocks are at issue in this case.

--------

[3] This figure is a stationary image taken from an animated graphic that moves to display the relevant motion.   The moving image may be found here: https://www.ca5.uscourts.gov/opinions/pub/20/20-51016_bump_fire_animation.gif

11a

D

Bump stocks were first invented in the early 2000s. Historically, ATF distinguished between mechanical and non-mechanical bump stocks in categorizing a particular accessory as a machinegun.  This categorization is done through ATF's Firearms Technology Branch, which is authorized to issue classification letters upon request from members of the public.  *See* 26 U.S.C. § 5841(c) (requiring firearm manufacturers and possessor to receive "authorization"); Bureau of Alcohol, Tobacco, Firearms and Explosives, *National Firearms Handbook* § 7.2.4 (setting forth the classification process).  When ATF first considered mechanical bump stocks in 2006, it categorized them as machineguns: "[A] device attached to a semiautomatic firearm that uses an internal spring to harness the force of a firearm's recoil so that the firearm shoots more than one shot with a single pull of the trigger is a machinegun." 83 Fed. Reg. at 66514.  ATF maintains that categorization.

But from the time ATF first considered non-mechanical bump stocks to 2017, it categorized that type of bump stock as not being a machinegun.  In that time, the Firearms Technology Branch issued dozens of classification letters regarding non-mechanical bump stocks, each time arriving at the same conclusion.  One letter from 2010 is illustrative:

Dear [Applicant], This is in reference to your submission  . . .  asking for an evaluation of a replacement shoulder stock for an AR-15 type rifle.  Your letter advises that the stock (referenced in this reply as a "bump-stock") is intended to assist persons whose hands have limited mobility to "bump-fire" an

12a

AR-15 type rifle.  . . .   The stock has no automatically functioning mechanical parts or springs and performs no automatic mechanical function when installed.   In order to use the installed device, the shooter must apply constant forward pressure with the non-shooting hand and constant rearward pressure with the shooting hand.   Accordingly, we find that the "bump-stock" is a firearm part and is not regulated as a firearm under the Gun Control Act or the National Firearms Act.

However, bump-stock classification reached a point of inflection on October 1, 2017.   On that day, a gunman murdered over 50 innocent men and women in Las Vegas, and injured 500 more.   He used several weapons, many of which were equipped with extended magazines and bump stocks.   These tragic events thrust bump stocks into the center of national attention.

Within ten days of the shooting, two bills prohibiting bump-stock devices were proposed in Congress.   *See Automatic Gunfire Prevention Act*, H.R. 3947, 115th Cong. (2017)[4]; *To Amend Title 18, United States Code, To Prohibit the Manufacture, Possession, or Transfer of Any Part or Combination of Parts That is Designed and Functions to Increase the Rate of Fire of a Semi-automatic Rifle*, H.R. 3999, 115th Cong. (2017).   While Congress debated the bills, ATF published a notice of proposed rulemaking, intending to reverse its previous interpretation that non-mechanical bump stocks are not machineguns for purposes of the National Firearms Act and Gun Control Act.   Notice of Proposed Rulemaking, *Bump-Stock-Type Devices*, 83 Fed. Reg. 13442 (Mar. 29,

---

[4]  An identical bill was proposed in the Senate.   *Automatic Gunfire Prevention Act*, S. 1916, 115th Cong. (2017).

13a

2018).   Senator Diane Feinstein—who sponsored one of the bills mentioned above—expressed concern with the proposed rule:

> Until today, the ATF has consistently stated that bump stocks could not be banned through regulation because they do not fall under the legal definition of a machine gun.

> Now, the department has done an about face, claiming that bump stocks do fall under the legal definition of a machine gun and it can ban them through regulations.   The fact that ATF said as recently as April 2017 that it lacks this authority gives the gun lobby and its allies even more reason to file a lawsuit to block the regulations.

> Unbelievably, the regulation hinges on a dubious analysis claiming that bumping the trigger is not the same as pulling it.   The gun lobby and manufacturers will have a field day with this reasoning.   What's more, the regulation does not ban all devices that accelerate a semi-automatic weapon[']s rate of fire to that of a machine gun.

> Both Justice Department and ATF lawyers know that legislation is the only way to ban bump stocks. The law has not changed since 1986, and it must be amended to cover bump stocks and other dangerous devices like trigger cranks.   Our bill does this—the regulation does not.

Press Release, Sen. Dianne Feinstein, *Feinstein Statement on Regulation to Ban Bump Stocks* (Mar. 23, 2018).   ATF continued with the rulemaking process, publishing the final rule later that year.   Final Rule, *Bump-Stock-Type Devices*, 83 Fed. Reg. 66514 (Dec. 26,

14a

2018).[5]   The Final Rule purported to modify the definition of machinegun as follows:

> A "machinegun," "machine pistol," "submachinegun," or "automatic rifle" is a firearm which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.   The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.   For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions.   The term "machinegun" includes a bump-stock-type device, *i.e.*, a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the

---

[5]  Acting Attorney General Matthew Whitaker initially signed the Final Rule, but some questioned his authority to do so.   In response, Attorney General William Barr ratified the Final Rule upon his being sworn into office.   84 Fed. Reg. 9239 (Mar. 14, 2019).

15a

trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

83 Fed. Reg. at 66553-54.

E

Plaintiff Michael Cargill lawfully acquired two non-mechanical bump stocks but surrendered them to ATF after passage of the Final Rule. He then sued ATF and other federal defendants, bringing several claims under the Administrative Procedure Act. First, he contends that ATF lacked authority to promulgate the Final Rule because its interpretation of machinegun conflicts with the unambiguous statutory definition. And even if the statute is ambiguous, Cargill says, it should be construed in his favor because of the rule of lenity. And because the statute concerns criminal penalties, the Government's interpretation is not entitled to deference under *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Cargill also argues that the Final Rule constitutes an unconstitutional exercise of legislative power by an administrative agency.

After a one-day bench trial, the district court entered judgment for the Government. *Cargill v. Barr*, 502 F. Supp. 3d 1163 (W.D. Tex. 2020). It declined to apply *Chevron* but found that the Government's new interpretation of machinegun is the best reading of the relevant statute. The district court also rejected Cargill's nondelegation claim. A panel of this court affirmed, concluding that the Final Rule's interpretation of machinegun is the best reading of the statute, and declining to reach *Chevron* or the nondelegation question. *Cargill v. Garland*, 20 F.4th 1004 (5th Cir. 2021). We

16a

granted rehearing *en banc*, vacating the panel opinion. 37 F.4th 1091.

## II

Three of our sister circuits have reviewed preliminary-injunction motions relating to the Final Rule. The issues engendered great disagreement, but each circuit that has addressed them agrees that the definition of machinegun within the National Firearms Act and Gun Control Act does not unambiguously mean what the Government says it means. Each circuit ultimately denied preliminary injunctive relief, and the Supreme Court denied each of the certiorari petitions. *See, e.g.*, *Guedes v. ATF*, 140 S. Ct. 789, 791 (2020) (Gorsuch, J., statement respecting denial of certiorari) ("Despite these concerns, I agree with my colleagues that the interlocutory petition before us does not merit review.").

A divided D.C. Circuit panel determined that the Final Rule is ambiguous, but applied *Chevron* deference to the Government's statutory interpretation. *Guedes v. ATF*, 920 F.3d 1 (D.C. Cir. 2019). The dissent contended that the Final Rule contradicts the statute's plain meaning. *Id.* at 35 (Henderson, J., concurring in part and dissenting in part). Although the Supreme Court denied certiorari, 140 S. Ct. 789 (2020), one Justice wrote separately to explain his view that *Chevron* does not apply because (i) the Government had expressly waived its application, (ii) it does not apply to regulations bearing criminal sanctions, and (iii) the Final Rule directly contradicts the Government's previous interpretation. *Id.* at 789-91 (Gorsuch, J., statement respecting denial of certiorari).

17a

In another divided opinion, the Tenth Circuit reached the same conclusion as the D.C. Circuit:   that the Final Rule was ambiguous and entitled to *Chevron* deference. *Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020); *see id.* at 991 (Carson, J., dissenting).   The court initially granted rehearing *en banc*, vacating the panel decision, 973 F.3d 1151 (10th Cir. 2020) (en banc), but later vacated the order as improvidently granted, reinstating the former opinion.   *Aposhian v. Wilkinson*, 989 F.3d 890 (10th Cir. 2021) (en banc), *cert denied sub nom. Aposhian v. Garland*, 143 S. Ct. 83 (2022).   Three dissents were written, each of which was joined by five of the eleven participating judges.   The first dissent would have held that (i) the statute unambiguously does not apply to bump stocks, (ii) *Chevron* does not apply either because the Government waived it or because it does not apply in the criminal context, and (iii) the Final Rule may violate nondelegation principles.   *Id.* at 891-903 (Tymkovich, C.J., dissenting); *see also id.* at 903-04 (Hartz, J., dissenting); *id.* at 904-06 (Eid, J., dissenting); *id.* at 906-08 (Carson, J., dissenting).

Finally, in yet another divided opinion, a Sixth Circuit panel ruled against the Government, declining to apply *Chevron* deference and holding the statutory definition of machinegun does not include bump stocks. *Gun Owners of America, Inc. v. Garland*, 992 F.3d 446, 450 (6th Cir. 2021); *but see id.* at 475-92 (White, J., dissenting) (arguing that *Chevron* applies and that the Government's interpretation is reasonable).   The court granted rehearing *en banc*, 2 F.4th 576 (6th Cir. 2021) (en banc), and an evenly-divided court affirmed the district court's denial of the preliminary injunction.   19 F.4th 890 (6th Cir. 2020), *cert denied*, 143 S. Ct. 83 (2022).

18a

In addition to these circuit decisions, the Navy-Marine Corps Court of Criminal Appeals considered the Final Rule in the context of a criminal prosecution for possession of a machinegun. *See United States v. Alkazahg*, 81 M.J. 764, 780-81 (N-M. Ct. Crim. App. 2021). That court determined that, under the best reading of the statutory language, a bump stock is not a machinegun. But it ultimately found that the statute is ambiguous and applied the rule of lenity to construe the statute against imposing criminal liability. It dismissed the charge for possession of a machinegun.

III

Our primary task is to interpret the meaning of machinegun as defined in 26 U.S.C. § 5845(b). Of course, the Government has sponsored its own interpretation, as expressed in the Final Rule. Ordinarily, that action would invoke the two-step *Chevron* framework. As we recently summarized, "[a]t step one, we ask whether Congress has directly spoken to the precise question at issue, in which case we must give effect to the unambiguously expressed intent of Congress and reverse an agency's interpretation that fails to conform to the statutory text." *Huawei Technologies USA, Inc. v. FCC*, 2 F.4th 421, 433 (5th Cir. 2021) (quotations omitted).

But here, the Government has declined to invoke *Chevron* in any of the lawsuits challenging the Final Rule. Nonetheless, several circuits have applied *Chevron* deference to challenges of the Final Rule, and so we will consider *Chevron*'s applicability below. But before we do, we determine the statute's meaning using traditional statutory-interpretation tools. That is, "the old-fashioned way." *Guedes*, 140 S. Ct. at 790 (Gorsuch, J., statement respecting denial of certiorari); *see also*

19a

*Guedes*, 920 F.3d at 42 (Henderson, J., concurring in part and dissenting in part); *Aposhian*, 989 F.3d at 898 (Tymkovich, C.J., dissenting).   If the statute is unambiguous, it does not matter whether *Chevron* applies. *See, e.g.*, *Western Refining Southwest, Inc. v. FERC*, 636 F.3d 719, 727 (5th Cir. 2011) ("[If] the statute's text is unambiguous, we need not proceed to Step Two of *Chevron*.").

Recall that in this circumstance, Congress has defined machinegun to mean "any weapon which shoots . . .  automatically more than one shot  . . .  by a single function of the trigger," or any accessory that allows a firearm to shoot in that manner.   26 U.S.C. § 5845(b).   The parties dispute whether the fire created by a semi-automatic rifle equipped with a non-mechanical bump stock is produced both "automatically" and "by single function of the trigger."   We address those components in reverse order.[6]

---

[6]  Cargill also argues that the Final Rule is void because it is a legislative rule—as opposed to an interpretive rule—and because relevant federal law does not authorize ATF to issue such a rule.   We assume *arguendo* that the Final Rule is legislative in nature and that ATF is authorized to issue such a rule.   First, if the rule were interpretive in nature, it would not be eligible for *Chevron* deference. *United States v. Mead Corp.*, 533 U.S. 218, 232 (2001).   But as explained *infra*, three independent reasons demand that we not defer to the Government here.   Second, if ATF were not authorized to promulgate legislative rules, the rule at issue would be void.   Ultimately, however, we conclude that the Government's interpretation is inconsistent with the statutory definition, so ATF lacked authority to issue the Final Rule.   We therefore need not consider Cargill's additional argument that the Final Rule is a legislative rule.

20a

A

The first phrase we consider is "by a single function of the trigger." At the time the statute was passed, "function" meant "action." *Webster's New International Dictionary* 1019 (2d ed. 1934); *see Guedes*, 920 F.3d at 43 (Henderson, J., concurring in part and dissenting in part); *Aposhian*, 989 F.3d at 895 (Tymkovich, C.J., dissenting). Thus, the relevant question is whether a semi-automatic rifle equipped with a non-mechanical bump stock fires more than one shot each time the trigger "acts."

It does not. As illustrated above, a semi-automatic weapon utilizes a simple mechanical process: the trigger disengages the hammer from the sear, the hammer strikes the firing pin, the bullet fires, and the recoil pushes the hammer against the disconnector, which resets the trigger. This process happens every single time one bullet is fired. To be sure, a non-mechanical bump stock increases the rate at which the process occurs. But the fact remains that only one bullet is fired each time the shooter pulls the trigger.

The Government contends that "single function of the trigger" means "a single pull of the trigger and analogous movements." 83 Fed. Reg. at 66553. That is, according to the Government, "function" means "pull." But that argument fails on its face because a shooter still pulls the trigger of a semi-automatic weapon equipped with a non-mechanical bump stock each time he or she fires a bullet. Without a bump stock, the trigger activates because the shooter flexes his or her finger; with a bump stock, the trigger activates because the recoil of the previous shot re-engages the trigger and the shooter's maintained force on the gun's forebody bumps

21a

the trigger against the shooter's finger. This is a distinction without a difference—the end result in both cases is that the trigger is pulled. *See Guedes*, 920 F.3d at 48 (Henderson, J., concurring in part and dissenting in part) ("A semiautomatic rifle shoots a single round per pull of the trigger and the bump stock changes only *how* the pull is accomplished."); *Gun Owners of America*, 992 F.3d at 469-73, *vacated*, 2 F.4th 576. Even if "single function" meant "single pull," the definition would still not include a non-mechanical bump stock. Moreover, even though pulling the trigger can sometimes begin the bump firing sequence, the process is more typically begun by pushing forward on the forebody of the firearm.

For several of our sister circuits, however, the plain language is not so plain. They reason that single function of the trigger "could mean 'a single pull of the trigger from the perspective of the shooter.'" *Guedes*, 920 F.3d at 29; *see also Gun Owners of America*, 19 F.4th at 905 (White, J., in support of affirmance). Considering the definition of "function," one court understood the issue as such: "[T]hat definition begs the question of whether 'function' requires our focus upon the movement of the trigger, or the movement of the trigger finger. The statute is silent in this regard." *Aposhian*, 958 F.3d at 986. According to that logic, for a semiautomatic rifle equipped with a non-mechanical bump stock, the act of pulling the trigger—which begins the bump firing sequence—is a single pull for purposes of the Gun Control Act and National Firearms Act.

The problem with that interpretation is that it is based on words that do not exist in the statute. The statute "uses 'single function of the trigger,' not single

22a

function of the shooter's trigger finger." *Guedes*, 920 F.3d at 48 (Henderson, J., concurring in part and dissenting in part); *see also Aposhian*, 989 F.3d at 895 (Tymkovich, C.J., dissenting) ("The statute speaks only to how the trigger acts, making no mention of the shooter."). The Navy-Marine Corps Court of Appeals likewise refused to read words into the statute:

> The best read implies that the shooter initiates the trigger function by some action, such as pulling the trigger—or it could be by just pushing a button—and it is the follow-on action where the trigger acts out its mechanical design or purpose that speaks to the "function of the trigger." The statute does not say "by a single function of the trigger finger" nor does it say "by a single pull of the trigger in addition to external pressure from the shooter's non-firing hand." . . . . Had Congress wanted to use the phrase "by a single pull of the trigger" for *machine guns*, it could have. But it did not.

*Alkazahg*, 81 M.J. at 780-81.

We agree. The statutory definition of machinegun utilizes a grammatical construction that ties the definition to the movement of the trigger itself, and not the movement of a trigger finger. Nor do we rely on grammar alone. Context firmly corroborates what grammar initially suggests by demonstrating that Congress knew how to write a definition that is keyed to the movement of the trigger finger if it wanted to. But it did not. The Government offers nothing to overcome this plain reading, so that we are obliged to conclude that the statutory definition of machinegun unambiguously turns on the movement of the trigger and not a trigger finger.

23a

Grammar rejects a reading based on the shooter's perspective. Each component of the statutory definition supports the mechanical perspective, not a shooter's perspective. Again, the definition reads as follows: "[M]achinegun means . . . any weapon which shoots . . . automatically more than one shot . . . by a single function of the trigger." 26 U.S.C. § 5845(b). The subject of the sentence, of course, is *machinegun*. The linking verb *means* connects the subject to the subject complement—*weapon*. Next, the adjectival phrase *which shoots* modifies *weapon*. The adverbial phrase *automatically more than one shot* then modifies *shoots*. Finally, two prepositional phrases follow. The first, *by a single function*, modifies the adverbial phrase. The second, *of the trigger*, modifies the first prepositional phrase. *See also Guedes*, 920 F.3d at 44 n.13 (Henderson, J., concurring in part and dissenting in part) (diagramming the statutory definition).

The first thing to note is that the ultimate subject is *machinegun*, and the subject complement is *weapon*. In other words, a machinegun is defined by reference to what kind of weapon it is. But identifying the subject of the sentence is only our first step. We next look, second, to the fact that the term *weapon* is defined by how it *shoots*. So, again, the definition refers to the device being made to shoot, not the person or thing doing the shooting. Third, the manner of shooting must be automatic. Fourth—and critically—the prepositional phrases define the firing process's requirements from a mechanical perspective. The process must occur by a *single function*, and the single act must be *by the trigger*. In short, there is no mention of a shooter. The grammatical structure continuously points the reader

24a

back to the mechanics of the firearm. The statute does not care what human input is required to activate the trigger—it cares only whether more than one shot is fired each time the trigger acts.

We do not stop with the grammar. With statutes, "[c]ontext is a primary determinant of meaning. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012). So, we look next to context for further clues. And context confirms that the statute must be read from the mechanical perspective. Specifically, context tells us that Congress knew how to write a definition that explicitly turns on the action of a shooter rather than the action of a trigger, but chose not to do so here. Immediately following the definition of machinegun provided in 26 U.S.C. § 5845(b), Congress defined the term "rifle" to mean a weapon designed "to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore *for each single pull of the trigger*." § 5845(c) (emphasis added). The statute next defines "shotgun" to mean a weapon designed "to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile *for each pull of the trigger*." *Id.* § 5845(d) (emphases added). "[W]here the document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea." *Reading Law* at 170.

To summarize, the definition of machinegun must turn on the action (or "function") of the trigger because no other actor is mentioned or implied. This conclusion is only strengthened by the fact that other definitions

25a

within the same statutory provision explicitly turn on the action of a shooter, showing that Congress knew how to write a definition that proceeds from a shooter's perspective, rather than a mechanical one, if it had wanted to. The notion that the definition turns on the action of an unnamed shooter is inconsistent with both the grammatical and statutory contexts.

The Government says that this straightforward interpretation defies common sense. It would not have been prudent for Congress to "zero[] in on the mechanistic movement of the trigger," the Government says, because the problem sought to be remedied was "the ability to drastically increase a weapon's rate of fire." *Aposhian v. Barr*, 374 F. Supp. 3d 1145, 1152 (D. Utah 2019)). Perhaps Congress's choice of words was prudent, or perhaps it was not. That is not for us to decide. But the Government's objection only accentuates the fact that Congress did not use words describing the shooter's perspective or the weapon's rate of fire. *See Alkazahg*, 81 M.J. at 781 ("Congress could have suggested that a shooter-focused approach or even a rate-of-fire approach was the way to read the statute by enacting those words. Even the term 'machine gun' suggests a mechanical approach where the shooter interaction is extremely limited."). Instead, it made up an entirely new phrase—by a single function of the trigger—that specifically pertains to the mechanics of a firearm. Prudent or not, Congress defined the term "machinegun" by reference to the trigger's mechanics. We are bound to apply that definition as written.[7]

--------

[7] Although our reasoning is independently sufficient to support our conclusion, the application of corpus linguistics only provides further support. A search in the Corpus of Historical American

26a

The Government also points to our decision in *United States v. Camp*, arguing that it controls here.    343 F.3d 734.    It does not.    But to the extent *Camp* applies, it supports Cargill's position.    The issue presented in *Camp* was whether something other than the metal lever that ordinarily begins the firing process can be a "trigger" for purposes of the Gun Control Act and National Firearms Act.    The defendant there modified a semi-automatic rifle, building a switch behind the original trigger that, when pulled, "supplied electrical power to a motor connected to the bottom of a fishing reel that had been placed inside the weapon's trigger guard; the motor caused the reel to rotate; and that rotation caused the original trigger to function in rapid succession." 343 F.3d at 744.    We held that the weapon was a machinegun even though the gun's original trigger activated each time a bullet was fired.    That was so because the gun had been modified such that it had a new trig-

---

English, which contains more than 100,000 individual texts from the 1820s-2010s and more than 475 million words, shows zero usage of the phrase "function of the trigger," "function of a trigger," "function of triggers," or "function of the triggers."    Corpus of Historical American English, English Corpora, https://www.english-corpora.org/coha/.    Similarly, a search in the News on the Web Corpus (NOW Corpus), which contains more than 16 billion words from more than 27 million online texts from 2010 to present day, shows only 24 uses of the phrase "function of the trigger"—all of which are from news sources directly quoting a firearm statute; there were zero uses of the phrase "function of a trigger," "function of triggers," or "function of the triggers."    NOW Corpus, English Corpora, https://www.english-corpora.org/now/.    The upshot is that the phrase "by a single function of the trigger" is a novel phrase created by Congress specifically to be used in these firearm statutes. The Government stresses the existence of other ordinary phrases, like "pull of the trigger."    Perhaps these ordinary phrases exist, but Congress did not use them here.

27a

ger.    As we held in *United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992), a trigger is just the "mechanism . . . used to initiate the firing sequence."    The mechanism used to initiate the firing sequence in *Camp* was the new switch.    That switch operated by a single function, and so the firearm met the statutory definition of a machinegun.    *Camp*, 343 F.3d at 745.

Here, no party cites *Camp* for the proposition that the legally relevant trigger is anything other than the traditional trigger.    And for good reason.    All a non-mechanical bump stock does is allow the shooter to fire at an increased rate by harnessing a weapon's natural recoil to re-engage the trigger, and by using the shooter's maintained forward force.    The case might well be different if we were considering a semi-automatic weapon equipped with a *mechanical* bump stock.    It could be the case that a switch activating a mechanical bump stock would be the legal trigger.    But we are not considering that case.[8]    Here, the definition of "trigger" is not in dispute.    If anything, *Camp* supports our conclusion because the trigger at issue in this case is different in kind from the trigger at issue there.

---

[8] The Government points to an unpublished Eleventh Circuit case—which held that a mechanical bump stock called the Akins Accelerator is a machinegun for purposes of federal law—as support for its argument that non-mechanical bump stocks operate by a single function of the trigger.    *See Akins v. United States*, 312 F. App'x 197, 200 (11th Cir. 2009).    But that evidence cuts in the other direction.    Unlike non-mechanical bump stocks, a shooter using an Akins Accelerator need only pull the trigger once to activate the firing sequence.    The mechanical bump stock then maintained the bump fire of its own accord.    *See* 83 Fed. Reg. at 66517.    Precisely for that reason, our decision today would not apply to an Akins Accelerator.

28a

B

Even if a non-mechanical bump stock caused a semi-automatic rifle to operate by a single function of the trigger, the rifle would still need to operate automatically in order to be a machinegun.[9]   All generally agree that here, automatically means "self-acting."   *Oxford English Dictionary* at 574 (1933) ("[s]elf-acting under conditions fixed for it, going of itself"); *see also Cargill*, 20 F.4th at 1012; *Guedes*, 920 F.3d at 30; *id.* at 43 (Henderson, J. concurring in part and dissenting in part); *Aposhian*, 958 F.3d at 986; *Aposhian*, 989 F.3d at 895 (Tymkovich, C.J., dissenting); *Gun Owners of America*, 19 F.4th at 905-06 (White, J., in support of affirmance); *id.* at 912-13 (Murphy, J., in opposition to affirmance). But the parties dispute whether the firing process enabled by a non-mechanical bump stock is self-acting.

It is not.   As an initial matter, we must remember that the phrase "by a single function of the trigger" modifies the adverb "automatically."   Thus, the condition is satisfied only if it is the trigger that causes the firearm to shoot automatically.   *See Guedes*, 920 F.3d at 43 (Henderson, J., concurring in part and dissenting in part) ("'Automatically' cannot be read in isolation. On the contrary, it is modified—that is, limited—by the clause 'by a single function of the trigger.'"); *Aposhian*,

---

[9]  As explained above, because a semi-automatic firearm equipped with a non-mechanical bump stock does not operate "by a single function of the trigger," such a weapon is not a machinegun, and we must render judgment for Cargill.   Our conclusions in Parts III.B and V are each independent, alternative holdings.   In the Fifth Circuit, "alternative holdings are binding precedent and not *obiter dictum*."   *Jarkesy v. SEC*, 34 F.4th 446, 459 n.9 (5th Cir. 2022) (quotation omitted).

29a

989 F.3d at 896 (Tymkovich, C.J., dissenting).   That is
not how a bump stock works.   Bump firing does not
maintain if all a shooter does is initially pull the trigger.
Rather, to continue the firing after the shooter pulls the
trigger, he or she must maintain manual, forward pres-
sure on the barrel and manual, backward pressure on
the trigger ledge.

The Government argues that, taken together, those
actions create automatic fire.   But Cargill would pre-
vail even if that were true because those actions are not
"a single function of the trigger."   For example, the
ATF's treatment of the Ithaca Model 37 "slam fire"
shotgun confirms that bump stocks do not enable auto-
matic fire.   With the Model 37, a shooter can pull the
trigger once and hold it.   Then, after each pump with
the shooter's non-trigger hand, a new shell is loaded and
immediately discharged.   According to the ATF, the
Model 37 fires multiple shots by a single function of the
trigger, but it does not do so automatically because the
shooter must manually pump the shotgun with his non-
trigger hand.   *See* 83 Fed. Reg. at 66,534.   By this
same logic, a rifle equipped with a non-mechanical bump
stock does not fire automatically because the shooter
must manually apply forward pressure on the barrel
with his or her non-trigger hand.

The Government recognizes this logic but argues
that it proves too much.   After all, the Government
says, to operate a traditional automatic rifle, the shooter
must pull *and hold* the trigger to fire more than one
round.   No one doubts that a traditional automatic
weapon is a machinegun for purposes of federal law.
And so it cannot be that a process is not automatic

30a

simply because it requires sustained input.   *See Guedes*, 920 F.3d at 31; *Aposhian*, 958 F.3d at 987.

That argument makes the same mistake as before: it untethers "single function of the trigger" from "automatically."   Restated, the statute requires that a machinegun be capable of firing automatically once the *trigger* performs a single function.   An automatic weapon satisfies this requirement because the act of pulling and holding the trigger is one function, and that function produces more than one shot.   That force must be maintained on the trigger does not change this conclusion.   Stated succinctly:

> [A] gun shoots automatically by a single function of the trigger as long as the shooter need only manually cause the trigger to engage in a "single" function in order to fire multiple shots  . . .  So a typical machine gun qualifies even though the shooter pulls the trigger *and* keeps it pressed down because that combined external influence still does no more than result in one action of the trigger.

*Gun Owners of America*, 19 F.4th at 915 (Murphy, J., in opposition to affirmance); *see also Guedes*, 920 F.3d at 44 (Henderson, J., concurring in part and dissenting in part) ("The statutory definition of machinegun does not include a firearm that shoots more than one round automatically by a single pull of the trigger and then some (that is, by constant forward pressure with the nontrigger hand).") (internal quotation marks omitted and emphasis omitted).   As understood by the Navy-Marine Corps Court of Appeals:

> It is incorrect to equate the holding of the trigger in an automatic weapon with the holding of the trigger

31a

and the forward motion in a semi-automatic weapon
equipped with a bump stock.   That is because the
former is shooting automatically *by a single function
of the trigger*, while the latter is relying on an addi-
tional human action beyond the mechanical self-act-
ing and impersonal trigger function.

*Alkazahg*, 81 M.J. at 782-83.

We reiterate that a shooter can bump fire an ordinary
semi-automatic rifle even without a bump stock.   But
nobody, not even the Government, contends that semi-
automatic rifles are machineguns.   That concession
damns the Government's position.   As Cargill recog-
nizes, if ordinary bump firing constituted automatic fire,
the Final Rule would "convert a semiautomatic weapon
into a machinegun simply by how a marksman used the
weapon."   That absurd result reveals the flaw in the
Government's line of reasoning.

In addition to implying absurd results, the Govern-
ment's position is quite telling.   It would allow the use
of semi-automatic rifles, which can bump fire, but pro-
hibit the use of non-mechanical bump stocks, even
though there is no mechanical difference between the
two forms of gunfire.   Rather, the meaningful differ-
ence is that, with a non-mechanical bump stock, bump
firing is easier and can occur at a faster rate.   That is a
distinction Congress certainly could have addressed in
the National Firearms Act and Gun Control Act.   But
Congress did not prohibit machineguns according to
how quickly they fire.   It prohibited machineguns ac-
cording to *the way* that they fire.   And semiautomatic
weapons do not fire "automatically," even when
equipped with a non-mechanical bump stock.

32a

\*   \*   \*

The definition of machinegun as set forth in the Gun Control Act and National Firearms Act establishes two conditions that must obtain in order for a weapon to qualify. The weapon must operate "automatically" and "by single function of the trigger." According to the statute's unambiguous language, neither condition obtains as applied to a semi-automatic rifle equipped with a non-mechanical bump stock. The failure of either condition is sufficient to entitle Cargill to judgment.

## IV

As introduced above, several of our sister circuits applied *Chevron* to challenges to this Final Rule, even though no party requested its application. Because we hold that the statute is unambiguous, *Chevron* deference does not apply even if the *Chevron* framework does. *See Western Refining Southwest*, 636 F.3d at 727. But if the statute were ambiguous, *Chevron* would not apply for any of the three reasons explained below.

### A

First, *Chevron* does not apply for the simple reason that the Government does not ask us to apply it. Indeed, the Government affirmatively argued in the district court that *Chevron* deference is unwarranted. As other jurists have recognized in this context, that means that the *Chevron* argument has been waived—not merely forfeited. *United States v. Olano*, 507 U.S. 725, 733 (1993) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is 'the intentional relinquishment or abandonment of a known right.'") (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)); *Guedes*, 920 F.3d at 21 ("To the extent *Chevron* treat-

33a

ment can be waived, we assume that the government's posture in this litigation would amount to a waiver rather than only a forfeiture."); *Aposhian*, 989 F.3d at 897 ("[W]hen a party chooses not to pursue a legal theory potentially available to it, we generally take the view that it is 'inappropriate' to pursue that theory in our opinions.") (internal citation and quotation marks omitted) (Tymkovich, C.J., dissenting).

That would seem to be the end of the inquiry, but we recognize that one of our sister circuits has held that *Chevron* cannot be waived. *Guedes*, 920 F.3d at 21-23; *see also Gun Owners of America*, 19 F.4th at 899 n.5 (White, J., in support of affirmance). To be sure, we have never held in a published case that *Chevron* must be raised by the Government in order to apply. *See Albanil v. Coast 2 Coast, Inc.*, 444 F. App'x 788, 796 (5th Cir. 2011). But the conclusion is obvious, and flows from well-settled waiver principles. After all, that a court should defer to the Government's expressed interpretation is just a legal argument, and a party waives a legal argument if it fails to raise the argument when presented with the opportunity. *See, e.g.*, *Sindhi v. Raina*, 905 F.3d 327, 334 (5th Cir. 2018); *Fruge v. Amerisure Mut. Ins. Co.*, 663 F.3d 743, 747 (5th Cir. 2011).

As explained in the Tenth Circuit's consideration of the Final Rule, "We refuse to consider arguments a party fails to make because we 'depend on the adversarial process to test the issues for our decision' and are concerned 'for the affected parties to whom we traditionally extend notice and an opportunity to be heard on issues that affect them.'" *Aposhian*, 989 F.3d at 897 (Tymkovich, C.J., dissenting) (quoting *Hydro Resources, Inc. v. EPA*, 608 F.3d 1131, 1146 n.10 (10th Cir.

34a

2010) (en banc)); *see also Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them."). We must not defer to the Government's interpretation here for the simple reason that no party argues that we should.

If ordinary waiver principles were not enough, we note also that it would contradict *Chevron*'s central justification to defer to the Government's interpretation without its urging us to do so. The justification is that "'policy choices' should be left to executive branch officials 'directly accountable to the people.'" *Guedes*, 140 S. Ct. at 790 (Gorsuch, J., statement respecting denial of certiorari) (quoting *Epic Systems v. Lewis*, 138 S. Ct. 1612, 1630 (2018) and *Chevron*, 467 U.S. at 865)). Here, the Government made a clear policy choice by declining to seek *Chevron* deference. The very interest underlying *Chevron* demands that we respect the Government's choice and interpret the statute according to traditional principles of statutory interpretation. *See Aposhian*, 989 F.3d at 898 ("If the agency disavows any reliance on *Chevron*, who are we to second-guess it?") (Tymkovich, C.J., dissenting); *Guedes*, 140 S. Ct. at 790 (Gorsuch, J., statement respecting denial of certiorari) ("[C]ourts must equally respect the Executive's decision *not* to make policy choices in the interpretation of Congress's handiwork.").

Raising the issue *sua sponte*, the D.C. Circuit assumed that the Government's actions were consistent with waiver, but held that *Chevron* cannot be waived. As an initial matter, that conclusion is likely inconsistent

35a

with Supreme Court precedent. Our highest Court "has often declined to apply *Chevron* deference when the government fails to invoke it." *Guedes*, 140 S. Ct. at 790 (Gorsuch, J., statement respecting denial of certiorari) (collecting cases); *see, e.g.*, *HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2180 (2021) ("[T]he government is not invoking *Chevron*. We therefore decline to consider whether any deference might be due its regulation.") (quotation omitted).

The argument against waiver is based on the premise that *Chevron* is a standard of review. *Guedes*, 920 F.3d at 163; *see also Gun Owners of America*, 992 F.3d at 477-78, *vacated*, 2 F.4th 576. It is certainly true that parties in litigation cannot waive the applicable standard of review. *E.g.*, *United States v. Escobar*, 866 F.3d 333, 339 n.13 (5th Cir. 2017) (quotation omitted). But *Chevron* is not a standard of review. The APA specifically sets forth standards by which courts must review agency actions—arbitrary and capricious, abuse of discretion, in excess of statutory authority, and so on. *See* 5 U.S.C. § 706. *Chevron* is merely a legal argument that the Government can make to contend that its interpretation satisfies the relevant standard of review.[10]

---

[10] The Tenth Circuit has also held that a plaintiff's invocation of *Chevron*—even if made for the purpose of disputing the Government's interpretation of a statute, and absent argument from the Government that *Chevron* should apply—is sufficient to require a court to apply the framework. *Aposhian*, 958 F.3d at 981-82. We respectfully disagree with that conclusion. *Chevron's* purpose is to recognize the institutional competence of executive agencies and to defer to their expertise where appropriate. It would be inconsistent with that purpose to apply *Chevron* over the Government's objection just because a plaintiff preemptively addresses the frame-

36a

B

The *Chevron* framework does not apply for a second, independent reason:   the statute which the Final Rule interprets imposes criminal penalties.   As noted above, the primary reason for *Chevron* is that it allows the executive branch to make policy decisions through the accrued expertise of administrative agencies.   But in exchange, *Chevron* deference shifts the responsibility for lawmaking from the Congress to the Executive, at least in part.   That tradeoff cannot be justified for criminal statutes, in which the public's entitlement to clarity in the law is at its highest.   *See Guedes*, 140 S. Ct. at 790 (Gorsuch, J., statement respecting denial of writ of certiorari) ("Before courts may send people to prison, we owe them an independent determination that the law actually forbids their conduct."); *Esquivel-Quintana v. Lynch*, 810 F.3d 1019, 1027 (6th Cir. 2016) (Sutton, J., concurring in part and dissenting in part) (Applying *Chevron* to criminal statutes would "permit the aggregation" of executive and legislative power "in the one area where its division matters most:   the removal of citizens from society.").

No precedent compels *Chevron*'s application here. To the contrary, the Supreme Court has "never held that the Government's reading of a criminal statute is entitled to any deference."   *United States v. Apel*, 571

---

work in an attempt to defend against the Government's sponsored interpretation.   See *Aposhian*, 989 F.3d at 896 (Tymkovich, C.J., dissenting) ("This theory of waiver is untenable.   Under the panel majority's theory, a party that challenges an agency's interpretation of a rule is forced to dance around *Chevron*, even where the government has not invoked it.   *Chevron* becomes the Lord Voldemort of administrative law, 'the-case-which-must-not-be-named.'").

37a

U.S. 359, 369 (2014); *see also Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1155 (10th Cir. 2016) ("The Supreme Court has expressly instructed us *not* to apply *Chevron* deference when an agency seeks to interpret a criminal statute.") (Gorsuch, J., concurring). That is so because "criminal laws are for the courts, not for the Government, to construe." *Abramski v. United States*, 573 U.S. 169, 191 (2014). For this reason, when "the Government interprets a criminal statute too broadly . . . or too narrowly . . . a court has an obligation to correct its error." *Id.* We must not apply *Chevron* where, as here, the Government seeks to define the scope of activities that subject the public to criminal penalties. This is precisely the position we have taken before, in an unpublished decision. *United States v. Garcia*, 707 F. App'x 231, 234 (5th Cir. 2017) ("The Supreme Court has now resolved this uncertainty, instructing that no deference is owed to agency interpretations of criminal statutes.").

Several of our sister circuits disagree, however. *See Guedes*, 920 F.3d at 163-67; *Aposhian*, 958 F.3d at 982-84. The disagreement stems from one paragraph in the decision *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687 (1995). There, the Supreme Court considered a Department of the Interior regulation that interpreted the Endangered Species Act's criminal prohibition on "taking" an endangered species as including modification of the species's habitat. The Court did not conduct a *Chevron* analysis, but upheld the regulation, concluding that it "owe[d] some degree of deference [to] the [DOI's] reasonable interpretation," in part because of the "latitude the ESA gives to [DOI] in enforcing the statute." *Id.* at 703. It also declined to apply the rule of lenity, reasoning that

38a

an administrative regulation does not necessarily invoke the rule just because "the governing statute authorizes criminal enforcement." *Id.* at 704 n.18.

Several courts cite *Babbitt* for the proposition that the *Chevron* framework applies with equal force to criminal regulations and displaces the rule of lenity, but it does not support that conclusion. "While *Babbitt* certainly cited *Chevron* and used the word deference with regard to the DOI's interpretation, *Babbitt* did not discuss or decide whether *Chevron* applied nor did it analyze the challenge using *Chevron*, just as it did not decide whether the rule of lenity applied or analyze the challenge using the rule of lenity." *Gun Owners of America*, 992 F.3d at 457, *vacated*, 2 F.4th 576. As explained by two members of the Supreme Court, *Babbitt* did not purport to set forth a general rule respecting the interpretation of criminal regulations: "The best that one can say . . . is that in *Babbitt*[] [the Court] deferred, with scarcely any explanation, to an agency's interpretation of a law that carried criminal penalties. . . . *Babbitt*'s drive-by ruling, in short, deserves little weight." *Whitman v. United States*, 574 U.S. 1003, 135 S. Ct. 352, 353 (Scalia, J., joined by Thomas, J., respecting the denial of certiorari).

This is confirmed by subsequent Supreme Court precedent, addressing the rule of lenity in relation to *Chevron* and declining to defer to agency interpretations of criminal statutes. *See Aposhian*, 989 F.3d at 901 (Tymkovich, C.J., dissenting) (collecting cases). *Babbitt* does not require us to apply *Chevron* in these circumstances. Indeed, most proximate sources suggest otherwise. *See Guedes*, 140 S. Ct. at 790 (Gorsuch, J., statement respecting denial of certiorari) ("[W]hat-

39a

ever else one thinks about *Chevron*, it has no role to play when liberty is at stake.").   As such, *Chevron* does not apply here because the statutory language at issue implicates criminal penalties.

C

Finally, we note a third reason why *Chevron* deference does not apply in these circumstances:   that ATF has adopted an interpretive position that is inconsistent with its prior position.   To apply *Chevron* here would contravene one of the rule's central purposes:   "to promote fair notice to those subject to criminal laws." *United States v. Kozminski*, 487 U.S. 931, 952 (1988); *see also United States v. Kaluza*, 780 F.3d 647, 669 (5th Cir. 2015) ("The rule 'vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed.'") (quoting *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality op.)).[11]

If we were required to defer to the Government's position, the Government could change the scope of criminal liability at any time.   Indeed, that is exactly what it has done here.   Until 2017, the ATF had never classified non-mechanical bump stocks as machineguns.   But now the interpretation is reversed, and the Government would criminalize behavior that it long recognized was

---

[11] These fair-notice issues accentuate why *Babbitt* does not bar us from applying the rule of lenity.   In *Babbitt*, the Supreme Court expressly contemplated cases where it would be appropriate to apply the rule of lenity.   515 U.S. at 704 n.18 ("Even if there exist regulations whose interpretations of statutory criminal penalties provide such inadequate notice of potential liability as to offend the rule of lenity, the [regulation at issue here] cannot be one of them.").

40a

lawful.    In considering one of the other cases involving
the regulation, one member of the Supreme Court ex-
plained the problem as such:

> *Chevron*'s application in this case may be doubtful for
> other reasons too.    The agency used to tell everyone
> that bump stocks don't qualify as 'machineguns.'
> Now it says the opposite.    The law hasn't changed,
> only an agency's interpretation of it.    How, in all
> this, can ordinary citizens be expected to keep up?
> .  .  .    And why should courts, charged with the inde-
> pendent and neutral interpretation of the laws Con-
> gress has enacted, defer to such bureaucratic pirou-
> etting?

*Guedes*, 140 S. Ct. at 790 (Gorsuch, J., statement re-
specting denial of certiorari); *see also Aposhian*, 989
F.3d at 900 ("When an agency plays pinball with a stat-
ute's interpretation, as the ATF has here, fair notice
cannot be said to exist.") (Tymkovich, C.J., dissenting);
*Guedes*, 920 F.3d at 181 ("The ATF's interpretation of
'machinegun' gives anything but fair warning—instead,
it does a *volte-face* of its almost eleven years' treatment
of a non-mechanical bump stock as not constituting a
'machinegun.'") (Henderson, J., concurring in part and
dissenting in part).[12]

The concern respecting the consistency of agency
regulations is nothing new.    Indeed, the Supreme
Court has long recognized that an agency interpretation
that "conflicts with the agency's earlier interpretation is
entitled to considerably less deference than a consist-

---

[12] *See also* Thomas Z. Horton, *Lenity Before* Kisor*:    Due Process,
Agency Deference, and the Interpretation of Ambiguous Penal Reg-
ulations*, 54 Colum. J.L. & Soc. Probs. 629, 647-49 (2021).

41a

ently held agency view." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) (internal quotations omitted); *see also Cargill*, 502 F. Supp. 3d at 1189 (quoting *Cardoza-Fonseza*). The concern is only magnified where, as here, the Government's interpretation of the underlying statute carries implications for criminal liability. As such, *Chevron* does not apply because the Government has construed the same statute in two, inconsistent ways at different points in time.

V

Turning to the rule of lenity, and assuming *arguendo* that the relevant statute is ambiguous, we now consider whether that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812 (1971) (citation omitted). We conclude that the rule of lenity applies if the statute is ambiguous.

We recognize that courts have considered two standards for whether a statute is sufficiently ambiguous to trigger the rule of lenity. One standard asks whether there is a "reasonable doubt" as to the statute's meaning. *See Reading Law* at 299 (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). The other inquires whether there is a "grievous ambiguity" in the statute. *See, e.g.*, *Chapman v. United States*, 500 U.S. 453, 463 (1991) (quoting *Huddleston v. United States*, 415 U.S. 814, 831 (1974)). The Supreme Court does not appear to have decided which of these standards governs the rule of lenity. *See Wooden v. United States*, 142 S. Ct. 1063, 1075 (2022) (Kavanaugh, J., concurring) (arguing in favor of the grievous-ambiguity standard); *id.* at 142 S. Ct. at 1084 (Gorsuch, J., concurring in the

42a

judgment) (arguing in favor of the reasonable-doubt standard).

But it does not matter which standard applies because the rule of lenity applies even under the more stringent "grievously ambiguous" condition. One formulation of that standard provides that lenity applies if a court cannot discern the statute's meaning even "after seizing everything from which aid can be derived." *Wooden*, 142 S. Ct. at 1075 (Kavanaugh, J., concurring) (quoting *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016)). Assuming that the statute at issue here is ambiguous, we can only "guess" at its definitive meaning. *Suchowolski*, 838 F.3d at 534. We have availed ourselves of all traditional tools of statutory construction, and in this circumstance, they fail to provide meaningful guidance. That is sufficient to require application of the rule of lenity irrespective of whether the reasonable doubt or grievous ambiguity standard applies.

The dissenting opinion objects to our application of lenity, arguing that we fail to explain why the statute at issue here is grievously ambiguous. With this understanding, it concludes that our holding implies that "ambiguous statutes are always grievously ambiguous." *Post* at 57. This criticism misunderstands our holding. We do not conclude that all ambiguous statutes are grievously ambiguous—only that this one is.

Our conclusion fits comfortably into the dissenting opinion's own conceptualization of the grievous-ambiguity standard. At the very least, lenity is appropriate, the dissenting opinion concedes, if after "having tried to make sense of a statute using every other tool, we face an unbreakable tie between different interpretations." *Post* at 56. That is the case here in two respects.

43a

First, the parties argue whether "a single function of the trigger" refers to the firearm's mechanics or to the shooter's pulling of the trigger.    Second, the parties argue if the process of engaging the trigger and maintaining forward pressure on the gun's forebody produces "automatic" fire.

True, the precise meaning of "grievously ambiguous" is not entirely clear.    *See Shular v. United States*, 140 S. Ct. 779, 788 (2020) (Kavanaugh, J., concurring) (noting that "the Court has not always been perfectly consistent in its formulations [of grievous ambiguity]); *Reading Law* at 299 (arguing that the term grievous ambiguity "provides little more than atmospherics, since it leaves open the crucial question—almost invariably present—of how much ambiguousness constitutes an ambiguity") (quoting *United States v. Hansen*, 772 F.2d 940, 948 (D.C. Cir. 1985)).    But having utilized all available tools of statutory interpretation, and assuming *arguendo* that those two provisions are indeed ambiguous, we are unable to resolve either of the ties.    *See Alkazahg*, 81 M.J. at 784 (expressing "genuine confusion as to what the statute means").    That is sufficient to conclude that this statute—and for purposes of this case, only this statute—is grievously ambiguous.

The dissenting opinion also objects that applying lenity in this case wrongfully takes Congress's prerogative to establish federal crimes and transfers that power to the Judiciary, violating the separation of powers.    But this is really just a repetition of the dissenting opinion's disagreement regarding the correct interpretation of the statute at issue here.    As we understand it, the National Firearms Act and Gun Control Act do not unambiguously criminalize the possession of a non-

44a

mechanical bump stock.   To apply lenity in this case
*preserves* the separation of powers "by maintaining the
legislature as the creator of crimes."   *Esquivel-Quin-
tana*, 810 F.3d at 1019.   If ATF could change the scope
of criminal liability by issuing a regulation—free from
the taxing obligations of bicameralism and presentment
—the Executive could wield power that our Constitution
reserves to the Legislature.

The rule of lenity also prevents the possibility
whereby Congress passes an ambiguous criminal stat-
ute, only to be interpreted later by a federal agency.
*See id.* ("By applying lenity in this setting, last of all,
courts would avoid *incentivizing* Congress to enact hy-
brid statutes that duck under lenity's imperatives, to say
nothing of other imperatives in construing criminal
laws.").   To be sure, it would be inconsistent with our
constitutional structure to apply lenity in an unprinci-
pled manner to statutes that are not really ambiguous.
But here, we are wholly persuaded that if the definition
of "machinegun" does not unambiguously exclude non-
mechanical bump stocks, its inclusion of the latter is at
the very least ambiguous.   Given that conclusion, our
separation of powers is aided, rather than impeded, by
applying the rule of lenity.

The rule of lenity is a "time-honored interpretive
guideline."   *Liparota v. United States*, 471 U.S. 419,
429 (1985).   We have applied it many times to construe
ambiguous statutes against imposing criminal liability.
*See e.g.*, *United States v. Cooper*, 38 F.4th 428, 434 (5th
Cir. 2022); *Kaluza*, 780 F.3d at 669; *United State v. Orel-
lano*, 405 F.3d 360, 370 (5th Cir. 2005).   This case is no
different:   assuming the definition of machinegun is
ambiguous, we are bound to apply the rule of lenity.

45a

That is, we are bound to construe the definition of machinegun to exclude a semi-automatic weapon equipped with a non-mechanical bump stock. *See Alkazahg*, 81 M.J. at 784 ("We decline to step into the role of the legislature when the legislature has not been clear about whether Appellant's conduct was criminal. Judge Henry Friendly described the rule of lenity as 'the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should.' Here, we express that distaste.") (quoting *United States v. Bass*, 404 U.S. 336, 348 (1971)). Therefore, assuming *arguendo* that the statute is ambiguous, we conclude that the rule of lenity demands that we resolve that ambiguity in favor of Cargill, and in turn conclude that a non-mechanical bump stock is not a machinegun for purposes of the National Firearms Act and Gun Control Act.

## VI

Cargill also argues that the passage of the Final Rule is an exercise of legislative power, in violation of the Constitution's vesting all such power in Congress. U.S. Const. art. I, § 1. Some have expressed serious concern at the ATF's lack of explicit authorization to interpret criminal statutes as such.

> [W]e should feel deep discomfort at allowing an agency to define the very criminal rules it will enforce by implicit delegation. Such a delegation "turn[s] the normal construction of criminal statutes upside down, replacing the doctrine of lenity with a doctrine of severity." *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 730 (6th Cir. 2013) (Sutton, J., concurring). The delegation raises serious constitutional

46a

concerns by making ATF the expositor, executor, *and* interpreter of criminal laws.

*Aposhian*, 989 F.3d at 900 (Tymkovich, C.J., dissenting).

We acknowledge this concern, especially in light of statements made by several members the Supreme Court calling into question the relevant standards for legislative-power-delegation issues. *See Gundy v. United States*, 139 S. Ct. 2116, 2131-42 (2019) (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.); *id.* at 2130-31 (Alito, J., concurring in the judgment); *Paul v. United States*, 140 S. Ct. 342 (2019) (Kavanaugh, J., statement respecting the denial of certiorari).

We need not decide this question because multiple independent reasons compel us to hold the Final Rule to be unlawful. But if more were needed, this issue may well implicate the canon of constitutional avoidance. Under that well-established doctrine, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Hersh v. United States*, 553 F.3d 743, 754-55 (5th Cir. 2008) (quoting *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568, 575 (1988)); *see also Reading Law* at 250.

For many jurists, the question of Congress's delegating legislative power to the Executive in the context of criminal statutes raises serious constitutional concerns. *See Guedes*, 140 S. Ct. at 790 (Gorsuch, J., statement respecting denial of certiorari); *Aposhian*, 989 F.3d at 900 (Tymkovich, C.J., dissenting); *Esquivel-Quintana*, 810 F.3d at 1027 (Sutton, J., concurring in part and dissent-

47a

ing in part).   We do not reach this issue because we do not have to.   But if we did, it would only provide more support for the conclusion that a semi-automatic rifle equipped with a non-mechanical bump stock is not a machinegun for purposes of federal law.

## VII

Having determined that the judgment of the district court must be reversed, we remand this case to the district court to enter judgment for Cargill and to determine the proper scope of relief.   It is well-established that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury."   *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018).   And as an initial matter, vacatur of an agency action is the default rule in this Circuit. *See, e.g.*, *Data Mktg. Partnership, LP v. United States Dept. of Labor*, 45 F.4th 846, 859 (5th Cir. 2022) ("The default rule is that vacatur is the appropriate remedy."); *see also Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation.").   But the parties have not briefed the remedial-scope question, and it may be the case that a more limited remedy is appropriate in these circumstances.   We express no opinion on that question other than to observe that the district court is well-placed to answer the question in the first instance.   We therefore remand this case to the district court with the instruction that it enter judgment for Cargill and determine what remedy—injunctive, declaratory, or otherwise—is appropriate to effectuate that judgment.

48a

## VIII

Many commentators argue that non-mechanical bump stocks contribute to firearm deaths and that the Final Rule is good public policy. We express no opinion on those arguments because it is not our job to determine our nation's public policy. That solemn responsibility lies with the Congress, and our task is confined to deciding cases and controversies, which requires us to apply the law as Congress has written it.[13]

In defining the term machinegun, Congress referred to the mechanism by which the gun's trigger causes bullets to be fired. Policy judgments aside, we are bound to apply that mechanical definition. And applying that definition to a semi-automatic rifle equipped with a non-mechanical bump stock, we conclude that such a weapon is not a machinegun for purposes of the Gun Control Act and National Firearms Act. *Chevron* deference likely has no role here either because the Government waived it or because it does not apply to the Government's interpretation of a statute imposing criminal penalties. Finally, even if the statute were ambiguous—which it is not—the rule of lenity would require that we interpret the statute in Cargill's favor. As Justice Holmes framed it years ago, "it is reasonable that a fair warning

---

[13] The dissenting opinion accuses us of using the rule of lenity to "legalize an instrument of mass murder." *Post* at 61. But it is Congress's responsibility to unambiguously define the scope of criminal conduct. Congress having failed to do so, we deploy lenity to retain the proper allocation of legislative power, not unsettle it. And the dissenting opinion's resort to policy argument only underscores the Judiciary's proper role. It is our responsibility to apply the law as written, regardless of what we think about the law's wisdom or utility.

49a

should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle*, 283 U.S. at 27. We cannot say that the National Firearms Act and Gun Control Act give that fair warning that possession of a non-mechanical bump stock is a crime.

The Final Rule promulgated by the ATF violates the APA. We therefore REVERSE the judgment of the district court and REMAND with instructions to enter judgment for Cargill.

HAYNES, *Circuit Judge*, joined by RICHMAN, *Chief Judge*, concurring in the judgment:

I concur in the judgment only because I reluctantly conclude that the relevant statute is ambiguous such that the rule of lenity favors the citizen in this case.

JAMES C. HO, *Circuit Judge*, joined by RICHMAN, *Chief Judge*, and SOUTHWICK, *Circuit Judge*, concurring in part and concurring in the judgment:

Under the rule of lenity, "[p]enal statutes must be construed strictly." 1 WILLIAM BLACKSTONE, COMMENTARIES *88. "This is a rule of construction . . . as old and well established as law itself." *United States v. Wilson*, 28 F. Cas. 699, 709 (C.C.E.D. Pa. 1830).

Our courts have thus long recognized that "all reasonable doubts concerning [the] meaning [of a penal statute] . . . operate in favor of [the defendant]." *Harrison v. Vose*, 50 U.S. 372, 378 (1850). We apply the rule of lenity where "reasonable doubt persists about a [criminal] statute's intended scope." *Moskal v. United States*, 498 U.S. 103, 108 (1990). When standard principles of statutory interpretation "fail to establish that the Government's position is unambiguously

50a

correct . . . [we] resolve the ambiguity in [the defendant's] favor." *United States v. Granderson*, 511 U.S. 39, 54 (1994).

The rule of lenity rests on "the principle that the power of punishment is vested in the legislative, not in the judicial department." *United States v. Wiltberger*, 18 U.S. 76, 85 (1820) (Marshall, C.J.). The rule also ensures fair notice to citizens: "To make the warning fair, . . . the line should be clear." *McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Holmes, J.).

In sum, it is not enough to conclude that a criminal statute *should* cover a particular act. The statute must *clearly* and *unambiguously* cover the act.

Consider the disturbing problem of designer drugs. The Controlled Substances Act of 1970 prohibits drugs listed on certain schedules. *See Thor v. United States*, 554 F.2d 759, 762-63 (5th Cir. 1977). In response, a line of synthetically produced drugs was created "to mimic the pharmacological effects" of scheduled drugs, while evading the Act. Clayton L. Smith, *The Controlled Substance Analogue Enforcement Act of 1986: The Compromising of Criminalization*, 16 Am. J. Crim. L. 107, 108 (1988).

Designer drugs differed in chemical composition from scheduled drugs. But they were just as lethal. So the same policy justifications for banning scheduled drugs readily applied to designer drugs.

Yet all three branches agreed that existing law did not ban designer drugs. *See, e.g.*, *Controlled Substance Analogs Enforcement Act of 1985: Hearing on S. 1437 Before the S. Comm. on the Judiciary*, 99th Cong. 1st Sess. 2 (1985) (opening statement of Chairman

51a

Strom Thurmond) ("[U]nlawful activity under the Controlled Substances Act is defined with regard to the precise chemical makeup of the substances described by schedules. . . . Make a minor alteration in the molecular structure of an outlawed drug . . . and you have produced a . . . dangerous narcotic that is not illegal."); *id.* at 41-42 (statement of Stephen S. Trott, Assistant Attorney General, Criminal Division, Department of Justice) ("[I]f a particular substance is not included in one of the schedules, it is not unlawful to manufacture or to distribute it . . . despite the potential for abuse. . . . "); *United States v. Gavrilovic*, 551 F.2d 1099, 1106 (8th Cir. 1977) (reversing a conviction where a concededly dangerous narcotic had not been properly added to a schedule).

So a new act of Congress was required to get at the problem of designer drugs. And that's why Congress enacted the Controlled Substance Analogue Enforcement Act of 1986. Pub. L. No. 99-570, §§ 1201-04, 100 Stat. 3207, 3207-13 to 3207-14 (1986). *See also United States v. Muhammad*, 14 F.4th 352, 355 (5th Cir. 2021) ("[T]he Analogue Act is an antidote to statutory evasion: It expands the CSA's coverage to include substances that, while *technically* not on the schedules, mimic those that are.").

Bump stocks present the same basic conundrum as designer drugs. Federal law criminalizes the possession of fully automatic machineguns. *See* 18 U.S.C. § 922(o)(1) (machinegun ban); 26 U.S.C. § 5845(b) (machinegun definition). That prohibition does not apply to semiautomatic weapons. *See* Gun Control Act of 1968, § 201, 82 Stat. 1231 (codified at 26 U.S.C. § 5845(b))

52a

(amending the 1934 federal definition of "machinegun" to omit weapons that shoot "semiautomatically").

But bump stocks now allow semiautomatic weapons to mimic automatic machineguns. By attaching a bump stock to a semiautomatic firearm, the shooter can simulate the experience of firing an automatic machinegun. *See* 83 Fed. Reg. 66,515-16.

Just as designer drugs achieve the same lethality as scheduled drugs, bump stocks allow semiautomatic weapons to achieve the same lethality as fully automatic machineguns. But once again, Congress must take action if it wishes to criminalize bump stocks, just as it did during the 1980s when it came to designer drugs.

That's because federal law defines "machinegun" as a weapon that shoots more than one shot "automatically . . . by a single function of the trigger." 26 U.S.C. § 5845(b). There are competing theories as to whether this language is best construed to cover bump stocks. In my own view, the relevant language is at best ambiguous. That makes this an easy case for invoking the rule of lenity. Accordingly, I agree that we should reverse.

## I.

Federal law defines a machinegun as a "weapon which shoots . . . automatically more than one shot . . . by a single function of the trigger." 26 U.S.C. § 5845(b). The definition also includes "any part designed and intended . . . for use in converting a weapon into a machinegun." *Id.* Violators of the machinegun ban risk up to ten years in federal prison. 18 U.S.C. § 924(a)(2).

53a

I see at least two challenges with reading § 5845(b) to cover bump stocks. To begin with, it's at best ambiguous whether a semiautomatic weapon equipped with a bump stock is indeed capable of shooting more than one shot by "a single function of the trigger." *Id.* And even if I could get past that problem, it's also ambiguous at best whether the weapon does so "automatically." *Id.* So the rule of lenity requires us to reverse.

**A.**

The phrase "single function of the trigger" is not a matter of common parlance. No one has identified an example of this phrase ever being used in any context other than this statute.

So it's a term that requires interpretation. And in this context, the interpretive steps it takes to get from "single function of the trigger" to the criminalization of bump stocks fall short of the fair notice that lenity requires.

What does "single function of the trigger" mean? "[F]unction" means "action." WEBSTER'S NEW INTERNATIONAL DICTIONARY 1019 (2nd ed. 1934). But where does that leave us?

If it means that there is a single action on the trigger from the *shooter's* perspective, then this language might very well apply to bump stocks. That's because a single action on the trigger by the shooter is enough to spray multiple bullets.

But if the phrase means that there is a single action by the trigger from the *weapon's* perspective, then this language would *not* apply to bump stocks. That's because from the weapon's perspective, a single action by the trigger releases just one bullet. *See, e.g., Gun*

54a

*Owners of Am., Inc. v. Garland*, 992 F.3d 446, 469 (6th Cir. 2021) ("the question is whether 'function' is referring to the mechanical process (i.e., the act of the trigger's being depressed, released, and reset) or the human process (i.e., the shooter's pulling, or otherwise acting upon, the trigger)"), *vacated on reh'g en banc*, 2 F.4th 576 (6th Cir. 2021).

I conclude that grammar and syntax are at best inconclusive, and that lenity therefore requires us to side with the citizen over the government.

The problem here is the distinction between what classical grammarians call the "subjective genitive" and the "objective genitive." *See, e.g.*, LAUREL J. BRINTON, THE STRUCTURE OF MODERN ENGLISH: A LINGUISTIC INTRODUCTION 108 (2000) ("The phrase *the shooting of the hunters* is ambiguous between subjective and objective genitive readings because it can mean either 'the hunters shoot X' or 'X shoots the hunters.'"); *see also* THOMAS KERCHEVER ARNOLD, AN ENGLISH GRAMMAR FOR CLASSICAL SCHOOLS 98 (1848); SIDNEY GREENBAUM & RANDOLPH QUIRK, A STUDENT'S GRAMMAR OF THE ENGLISH LANGUAGE 103 (1990).

Take, for example, the phrase "the love of my children." That phrase could mean that my children love me (in other words, my children are the *subject* of love). Or it could mean that I love my children (so my children are the *object* of love).

Only context can clarify whether children are the subject or the object of love. *Compare* EMMA D.E.N. SOUTHWORTH, VICTOR'S TRIUMPH 97 (1874) ("[S]he could not win the love of children.") (subjective genitive), *with* Henry James, *Stephen Dewhurst's Autobiog-*

55a

*raphy* 54 THE ATLANTIC MONTHLY 649, 650 (1884) ("[S]he had a most vivacious love of children.") (objective genitive).

Consider another example: "the fear of the soldiers." Without clarifying context, this could mean that the soldiers are fearful (the soldiers are the subject of fear). Or it could mean that someone else is fearful of the soldiers (the soldiers are the object of fear). *Compare* Jan Palmper *Fear: Soldiers and Emotion in Early Twentieth-Century Russian Military Psychology*, 68 SLAVIC REV. 259, 270 n.38 (2009) ("[T]he fear that officers inspired in soldiers could also cause harm[]. . . . Only just, law-abiding behavior on the part of officers could keep this particular fear of soldiers in check.") (subjective genitive), *with* C. Stanley Smith, *Five Days*, 1927 THE ATLANTIC MONTHLY 836, 841 ("The fact that I also felt absolutely no fear of the soldiers contributed largely to my safety.") (objective genitive).

Naturally, then, this same ambiguity can also exist when a genitive construction modifies the term "function."

For example, the phrase "function of the polls" could refer to what polls do (polls are the subject). *See* A. Stuart, Norman L. Webb & D. Butler, *Public Opinion Polls*, 142 J. ROYAL STAT. SOC'Y 443, 447 (1979) ("The second and most obvious function of polls is that they show the progress of electoral campaigns in a purely informative sense.") (subjective genitive).

Or it could refer to what voters do at the polls (polls are the object). *See* H.W. Warner, *The Republic: Things as They Are at Present, Compared with the*

56a

*Past*, 4 AM. REV. 278, 279 (1849) (early American law-makers established age, residency, and property requirements as "necessary qualifications for the function of the polls") (objective genitive).

By the same token, a "function of the trigger" could mean what the trigger does (the trigger is the subject). Or it could mean what the shooter does to the trigger (the trigger is the object). A "single function of the trigger" could mean that the trigger acts once—or that the shooter acts once on the trigger.

The government's reading prevails if it's clear that the trigger is the object, and the shooter is the implied subject. But there's nothing inherent about the phrase "function of the trigger" that tells us that the trigger is the object rather than the subject.

So grammar alone can't dictate whether we should read the statute from the machine's perspective (subjective genitive) or the shooter's perspective (objective genitive). As the D.C. Circuit explained: "[T]he text is silent on the crucial question of which perspective is relevant. A mechanical perspective . . . might focus on the trigger's release of the hammer, which causes the release of a round. From that perspective, a 'single function of the trigger' yields a single round of fire when a bump-stock device moves the trigger back and forth. By contrast, from the perspective of the shooter's action, the function of pulling the trigger a single time results in repeated shots when a bump-stock device is engaged. From that perspective, then, a 'single function of the trigger' yields multiple rounds of fire." *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 29 (D.C. Cir. 2019).

57a

In the examples provided above, the history or context of a particular phrase sheds light on whether it contains a subjective or objective genitive. Take another example: "The fear of the Lord is the beginning of wisdom." PSALM 111:10. Construed as a subjective genitive, "the fear of the lord" could refer to an anxious aristocrat, afraid of an overweening monarch or unruly populace. But we know that the Bible means something very different—that the wise man fears God.

Unlike "fear of the Lord," a "single function of the trigger" does not offer much by way of history or context. No example of its usage in any other context has been provided by anyone in this litigation. Congress appears to have coined the phrase just for this statute.[1]

---

[1] The plurality claims that its interpretation is supported by context: A neighboring provision, § 5845(c), refers to a "single *pull* of the trigger"—whereas § 5845(b) uses the phrase "single *function* of the trigger." *See ante*, at 20-21. So the plurality infers that the term "pull" must be distinct from the term "function"—if "pull" signifies the shooter's perspective, then "function" must signify the weapon's perspective. *Cf. Gun Owners*, 992 F.3d at 469 ("pull" suggests "shooter's" perspective); *Guedes*, 920 F.3d at 29 (same).

But the dissent would presumably counter with legislative history suggesting that the terms are interchangeable rather than distinct. *See Cargill v. Garland*, 20 F.4th 1004, 1010 (5th Cir. 2021), *reh'g granted*, 37 F.4th 1091 (5th Cir. 2022) (quoting House report statement that the statute defines machinegun as "a weapon designed to shoot more than one shot without reloading and by a single pull of the trigger"); *id.* (statement of Karl T. Frederick, President, National Rifle Association of America) (equating "single pull of the trigger" with "single function of the trigger"). And whatever one may think of legislative history, the Supreme Court has repeatedly looked to it before invoking lenity. *See, e.g., Moskal*, 498 U.S. at 108; *Granderson*, 511 U.S. at 54.

58a

As between construing "single function of the trigger" from the weapon's perspective or the shooter's perspective, then, the statute appears to be in equipoise. And statutory equipoise is a textbook case for lenity.[2]

---

So there's some evidence that the terms are distinct, and some that the terms are interchangeable. The evidence thus appears to be in equipoise—a classic case for lenity.

[2] Both the plurality and the dissent resist the notion of equipoise. They both point to other words in § 5845(b) that arguably favor their respective positions: The plurality invokes the subject of the sentence ("machinegun")—while the dissent relies on a prepositional phrase ("without manual reloading").

Neither inference seems warranted. Neither the plurality nor the dissent cites a rule of grammar that says that a subject or prepositional phrase tells us whether to read a subsequent phrase as a subjective or objective genitive. And I'm aware of none.

For example, the plurality notes that, under § 5845(b), "machinegun means . . . any weapon which shoots . . . automatically more than one shot . . . by a single function of the trigger." 26 U.S.C. § 5845(b). So "[t]he subject of the sentence . . . is machinegun." *Ante*, at 19. Therefore, the plurality argues, it must be the perspective of the *machinegun*, not the *shooter*, that dictates how we read "function of the trigger."

But no rule of grammar supports this inference. Suppose I offer this definition: "*Sugar* means a sweet carbohydrate that enhances the *enjoyment of food*." Naturally, we would read "enjoyment of food" from the perspective of the *eater*, not the *food*—even though sugar is the subject of the sentence, and the sentence never mentions the eater.

The dissent commits a similar error. It claims that § 5845(b) must be read from the shooter's perspective because it defines "machinegun" to mean a weapon that fires multiple shots, "without manual reloading," by a single function of the trigger. 26 U.S.C. § 5845(b). The phrase "without manual reloading" means that no reloading is performed by the *shooter*. So the dissent theorizes that "single function of the trigger" must likewise refer to an action performed by the *shooter*. *See post*, at 57 n.5.

59a

**B.**

There's another ambiguity in the statute. Does a semiautomatic weapon equipped with a bump stock shoot multiple bullets "automatically?" Each side puts forth its competing theory with great force. But neither deals a fatal blow to the other—which is why, once again, lenity compels reversal.

Cargill argues that a bump stock doesn't shoot multiple bullets "automatically" because it requires "constant forward pressure with the non-trigger hand." *Guedes*, 920 F.3d at 44 (Henderson, J., concurring in part and dissenting in part). "Automatic" means "self-acting." OXFORD ENGLISH DICTIONARY at 574 (1933). So Cargill argues that the need for human input means that bump stocks do not shoot automatically, because they do not shoot in a self-acting fashion.

But the government counters that the term "automatic" need not necessarily mean *no* human input. It could just mean *less* human input. And that would make it ambiguous at best whether "automatic" includes or excludes bump stocks.

Consider an automatic sewing machine. With a machine that sews automatically, you don't just push a button—you also move the cloth forward with your hand.

---

But once again, no rule of grammar supports such an inference. Suppose I offer this definition: "A well-trained army means an army that follows orders, *without constant reminding*, due to the *fear of the soldiers*." Naturally, "without constant reminding" means no reminding is done by *officers*, not soldiers. Yet the phrase "fear of the soldiers" obviously refers to a feeling felt by *soldiers*. The soldiers are afraid—not the officers.

60a

This is similar to a bump stock. You don't just pull the trigger with your finger—you also apply pressure with your non-trigger hand. *See Guedes*, 920 F.3d at 30.

Likewise, with an automatic car—one that shifts gears automatically—you still have to "maintain[] enough constant pressure on the gas pedal to reach a speed that triggers a gear shift." *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 906 (6th Cir. 2021) (en banc) (White, J., for an equally divided court).

"[T]he ultimate question," then, "is how much human input is contemplated by the word 'automatically.'" *Id.* But "[t]hat is a question of degree that the statute's text does not definitively answer." *Id.* And because there is no definitive answer, lenity compels reversal.

## II.

The rule of lenity "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Bittner*, 19 F.4th 734, 748 (5th Cir. 2021) (quoting *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality opinion)), *cert. granted*, 142 S. Ct. 2833 (2022). Lenity applies when there "remains a grievous ambiguity or uncertainty," even after the court has examined it using the standard tools of construction. *United States v. Castleman*, 572 U.S. 157, 173 (2014).

Bump stocks may well be indistinguishable from automatic weapons for all practical purposes. But as Chief Justice Marshall recognized two centuries ago in a seminal case on the rule of lenity: "It would be dangerous . . . to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred

61a

character, with those which are enumerated." *Wiltberger*, 18 U.S. at 96.

Consider the facts in *Wiltberger*. A shipmaster had killed a sailor while the vessel was on a river, near its mouth. *Id.* at 77. Surely we would all agree that manslaughter is a criminal act, deserving of punishment. The Court nevertheless unanimously construed a statute that punished manslaughter on the "high seas" not to apply to an identical act on a river. *Id.* at 103-06. The Court noted that it was "extremely improbable" Congress would want to treat upstream manslaughter differently from manslaughter committed downstream, past the river's mouth. *Id.* at 105. "But probability is not a guide which a court, in construing a penal statute, can safely take." *Id.*[3]

---

[3] The dissent says lenity applies only in cases of true equipoise— where there's an "unbreakable tie" between competing interpretations. *Post*, at 56. *See also id.* at 58.

But equipoise is precisely what's presented here. As explained, each side offers conflicting theories as to whether bump stocks fire multiple bullets "automatically" or "by a single function of the trigger." But neither has the goods on the other. So lenity governs.

Moreover, the Supreme Court has long held that lenity requires us to "resolve [] ambiguity" and construe "reasonable doubt" in favor of the accused. *See Granderson*, 511 U.S. at 54; *Moskal*, 498 U.S. at 108. The dissent responds that more recent precedent invokes lenity only in cases of "grievous ambiguity." *Post*, at 56 & n.2. But the Court has never indicated any intention to abrogate its longstanding commitment to lenity in cases of "reasonable doubt."

And for good reason: The Court has historically "link[ed] the high burden of the rule of lenity with the high burden of proving guilt in a criminal trial beyond a reasonable doubt." Daniel Ortner, *The Merciful Corpus: The Rule of Lenity, Ambiguity and Corpus Linguistics*, 25 B.U. PUB. INT. L.J. 101, 109 (2016).

62a

\* \* \*

As a matter of lethality, bump stocks may well be no different from machineguns.   Just as manslaughter on a river is no less deadly than manslaughter at sea.   And designer drugs are no less dangerous than scheduled drugs.   But as a matter of legality, Congress could not ban designer drugs without passing the Analogue Act. Nor could it punish manslaughter on a river without saying so.   Likewise, Congress cannot criminalize bump stocks absent a clear and unambiguous statute.

Members of Congress who strongly oppose bump stocks nevertheless concede that "legislation is the only way to ban bump stocks."   Press Release, Sen. Dianne Feinstein, *Feinstein Statement on Regulation to Ban Bump Stocks* (Mar. 23, 2018).   I agree.[4]

---

The link between legal and factual doubt is not just longstanding —it's logical.   After all, it's just as "grievous" to punish an accused whether there's reasonable doubt as to fact or law.   *See id.*; *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 296, 299 (2012) (lenity reflects "'the tenderness of the law for the rights of individuals,'" *Wiltberger*, 18 U.S. at 95, and applies where a matter is "not beyond reasonable doubt," because "the consequences should be visited on the party more able to avoid and correct the effects of shoddy legislative drafting").

[4]  Thirteen of the sixteen members of our en banc court likewise agree that legislation is the "only way" to ban bump stocks.   *Id.*

The dissent responds by accusing 80% of our court of "legaliz[ing] an instrument of mass murder."   *Post*, at 61.   Yet the dissent does not accuse the Supreme Court of "legaliz[ing]   .   .   . murder"—even though it applied lenity to manslaughter in *Wiltberger*.   To the contrary, the dissent *relies* on *Wiltberger*.   *See id.* at 58 (quoting *Wiltberger*, 18 U.S. at 95).

63a

STEPHEN A. HIGGINSON, *Circuit Judge*, joined by DEN-
NIS and GRAVES, *Circuit Judges*, dissenting:

## I.

For the reasons stated in the panel opinion, *Cargill
v. Garland*, 20 F.4th 1004 (5th Cir. 2021), *reh'g granted*,
37 F.4th 1091 (5th Cir. 2022), I respectfully dissent from
our court's decision that a bump stock is not a ma-
chinegun within the meaning of 18 U.S.C. § 921(a)(24).

## II.

I write further to dissent from our court's use of len-
ity to rewrite this statute.

The Supreme Court has repeatedly instructed that
"the rule of lenity only applies, if, after considering text,
structure, history, and purpose, there remains a *griev-
ous* ambiguity or uncertainty in the statute *such that the
[c]ourt must simply guess* as to what Congress in-
tended." *Maracich v. Spears*, 570 U.S. 48, 76 (2013)

---

Odder still, the dissent also accuses us of creating a "special rule
of lenity for guns," "giving machinegun owners immunity from pros-
ecution that is not shared by other offenders." *Id.* at 57 n.4, 61. I
have no idea what "special rule" the dissent is talking about. I'll
say it again: I would apply the exact same principle to guns as to
drugs or manslaughter.

Finally, the dissent theorizes that, if we apply lenity here, "it is
unclear how Congress could draft [] a [new] statute while avoiding
ambiguity as to what counts as a bump stock." *Post*, at 61. But
what's wrong with the text proposed by Senator Feinstein after the
Las Vegas shooting—which makes it unlawful to possess "a bump-
fire device, or any part, component, device, attachment, or accessory
that is designed or functions to accelerate the rate of fire of a semi-
automatic rifle but not convert the semiautomatic rifle into a ma-
chinegun"? S. 1916, 115th Cong. § 2 (2017). The dissent does not
say.

64a

(emphases added) (cleaned up); *see, e.g.*, *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (similar); *Robers v. United States*, 572 U.S. 639, 646 (2014) (similar); *United States v. Hayes*, 555 U.S. 415, 429 (2009) (similar). Under this standard, the Supreme Court has been clear that we do not invoke lenity just because "multiple, divergent principles of statutory construction" are available, *Lockhart v. United States*, 577 U.S. 347, 361 (2016), "the statute's text, taken alone, permits a narrower construction," *Abramski v. United States*, 573 U.S. 169, 188 n.10 (2014), or "a law merely contains some ambiguity or is difficult to decipher," *Wooden v. United States*, 142 S. Ct. 1063, 1075 (2022) (Kavanaugh, J., concurring). Rather, the Supreme Court lets us deploy lenity to narrow laws only as a last resort when, having tried to make sense of a statute using every other tool, we face an unbreakable tie between different interpretations.[1]

Contrary to this authority, the majority opinion and the lead concurrence apply the rule of lenity to garden-

---

[1] Notwithstanding this Supreme Court precedent, there is robust scholarly debate about how much ambiguity triggers lenity. *See, e.g.*, David S. Romantz, *Reconstructing the Rule of Lenity*, 40 CARDOZO L. REV. 523, 567 (2018) (cataloguing nine tests); Intisar S. Rabb, *The Appellate Rule of Lenity*, 131 HARV. L. REV. F. 179 (2018) (conducting empirical study of lenity cases); Shon Hopwood, *Restoring the Historical Rule of Lenity as a Canon*, 95 N.Y.U. L. Rev. 918 (2020) (attacking the modern approach). This debate has crossed over to sitting Supreme Court Justices, who are free to explore whether they might change the law that binds us. *Compare Shular v. United States*, 140 S. Ct. 779, 788 (2020) (Kavanaugh, J., concurring), *and Wooden*, 142 S. Ct. at 1075 (Kavanaugh, J., concurring), *with Wooden*, 142 S. Ct. at 1084 (Gorsuch, J., concurring in the judgment) (questioning the "grievous" ambiguity standard).

65a

variety ambiguity.[2]   In doing so, today's ruling usurps Congress's power to define what conduct is subject to criminal sanction and creates grave ambiguity about the scope of federal criminal law.

Under the majority's rule, the defendant wins by default whenever the government fails to prove that a statute unambiguously criminalizes the defendant's conduct.   The majority holds that § 921(a)(24) is "unambiguous," but claims that if the statute *were* ambiguous, it would invoke the rule of lenity.[3]   In making this assertion, the majority assumes that the statute would necessarily be *so* ambiguous that "all traditional tools of statutory construction" would "fail to provide meaningful guidance."   Yet the majority does not explain how the tools upon which it relied to interpret the statute—dictionaries, grammar, and corpus linguistics—would be useless to resolve an interpretive debate if the statute

---

[2]  In this respect, today's ruling departs from our many cases that follow binding Supreme Court law.   *See, e.g.*, *Gonzalez v. CoreCivic, Inc.*, 986 F.3d 536, 539 (5th Cir. 2021) (Ho, J.) (affirming that the rule of lenity "has force only where a law is grievously ambiguous, meaning that the court can make no more than a guess as to what the statute means" (cleaned up)).   However, the recent trend in our circuit, culminating here, has been to lower the bar for lenity beneath the floor presently set by the Supreme Court.   *See, e.g.*, *United States v. Hamilton*, 46 F.4th 389, 397 n.2 (5th Cir. 2022) (Elrod, J.) (applying lenity to "resolve all reasonable doubts about the meaning of [the criminal statute] in [the defendant's] favor" and asserting that lenity applies where "there is some doubt about the meaning" of the statute).

[3]  The only other court to find that bump stocks are not machineguns made a similar mistake.   *See United States v. Alkazahg*, 81 M.J. 764, 784 (N-M. Ct. Crim. App. 2021) (asserting that defendant would prevail thanks to lenity if the court's "statutory analysis [were] incorrect and the ambiguity could not be resolved").

66a

were ambiguous. So the majority rests on an unstated and unsupported leap: ambiguous statutes are always grievously ambiguous. In effect, this means the rule of lenity would apply to decide any ambiguity in Cargill's favor.[4]

The lead concurrence adopts an equally low threshold for lenity. Unlike the majority, the concurrence concludes that § 921(a)(24) *is* ambiguous. But instead of relying on familiar techniques to resolve the ambiguity, the concurrence merely asserts that this is "an easy case for invoking the rule of lenity." The concurrence first invokes lenity because it cannot decide whether "single function of the trigger" means that "the trigger acts once" or "the shooter acts once on the trigger," and so "the statute appears to be in equipoise." This dilemma is of the concurrence's own making. The concurrence contrives an impossible task by isolating the phrase "single function of the trigger" from the rest of the provision.[5] Further, the concurrence refuses to ex-

---

[4] The majority insists that this rule is limited to "this statute." But by devising a special rule of lenity for guns, the majority substitutes its own policy preferences for Congress's.

[5] Notably, the concurrence ignores the phrase "without manual reloading," which immediately precedes "by a single function of the trigger" and refers to the action of a shooter (implied subject) on a gun (object). *See* 26 U.S.C. § 5845(b). It does so because "no rule of grammar" would compel us to read the statute "from the shooter's perspective." But the grammar is clear: a shooter is the implied subject of the sentence. Even if this conclusion were not apparent from context, we do not decide what statutes mean by drawing inferences from the absence of a grammatical postulate—we use common sense. *See United States v. Castleman*, 572 U.S. 157, 183 (2014) (Scalia, J., concurring in part and concurring in the judgment); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (Scalia, J.). Here, the concurrence's reading has the

67a

plain why it could not weigh relevant evidence, including legislative history and District Judge Ezra's inferences drawn from expert testimony at trial, *see Cargill*, 20 F.4th at 1010, 1013, to determine whether the "mechanistic" interpretation prevails.

The lead concurrence next invokes lenity because the text does not "definitive[ly] answer" the question of whether the statutory term "automatically" means "no human input," not "less human input." But just because both Cargill and the government "put[] forth [their] competing theories with great force" does not mean we are left to guess at and then invalidate what Congress intended. *Maracich*, 570 U.S. at 76 (cleaned up).

More fundamentally, our court's new lenity regime violates separation-of-powers principles. Article I gives Congress, "not the [c]ourt," the power to "define a crime, and ordain its punishment." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820). As the Supreme Court has resolved, when properly limited to *grievous* ambiguity, lenity furthers this design. By breaking interpretive ties for the defendant where no other tool yields an answer, this canon keeps us from accidentally legislating crimes from the bench. But lenity is the enemy of Article I when applied to any ambiguity that might arise during statutory interpretation and that could be resolved using other interpretive tools. This is because statutory language can be ambiguous enough to bear multiple interpretations—even here, a "mechanistic" one—yet still evince intent to sanction specific conduct. *Compare Hayes*, 555 U.S. at 429 (ac-

---

strange effect of anthropomorphizing the gun and eliding the shooter from the statute.

68a

knowledging that a statute was "not a model of the care-
ful drafter's art" but declining to apply lenity where
"text, context, purpose, and what little there is of draft-
ing history all point in the same direction"), *and United
States v. Palomares*, 52 F.4th 640, 647 (5th Cir. 2022)
(declining to apply lenity where "one approach [stood]
prominently above the other interpretations"), *with
Ladner v. United States*, 358 U.S. 169, 178 (1958) (ap-
plying lenity where the choice between interpretations
would "be based on no more than a guess as to what Con-
gress intended"); *cf.* Einer Elhauge, *Preference-Elicit-
ing Statutory Default Rules*, 102 COLUM. L. REV. 2162,
2196 (2002) (In the criminal law context, "judicial reso-
lution of statutory ambiguities does not tread on the leg-
islative role, but rather executes the legislative instruc-
tions as best as judges can."). Invoking lenity to avoid
all ambiguity thwarts the meaning of the text and sub-
stitutes our judgment for the People's about what
counts as a crime.[6]

Because our court holds that we have the power to
narrow federal criminal law where ambiguity appears,
today's ruling, which conflicts with how every other cir-
cuit has interpreted § 921(a)(24), calls into question the

---

[6] Such an expansive rule of lenity also "compels judges to abdicate
the judicial power without constitutional sanction." *Baldwin v.
United States*, 140 S. Ct. 690, 691 (2020) (Thomas, J., dissenting from
denial of certiorari). The Article III judicial power "requires a
court to exercise its independent judgment in interpreting and ex-
pounding upon the laws" and "include[s] the power to resolve . . .
ambiguities." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 119
(2015) (Thomas, J., concurring in the judgment). Therefore, when
lenity is used as a get-out-of-interpretation-free card—here, to avoid
passing on the legality of machineguns—it is especially inconsistent
with our constitutional role.

69a

range of conduct subject to criminal sanction.[7]    Among other recent decisions, we may have wrongly held that criminal defendants are ineligible for the First Step Act's "safety valve" provision, 18 U.S.C. § 3553(f), if they fail to meet any one of the statute's three requirements, *see Palomares*, 52 F.4th at 647, and that 26 U.S.C. § 7202 criminalizes the willful failure to "*either* truthfully account for taxes *or* pay them over," *United States v. Sertich*, 879 F.3d 558, 562 (5th Cir. 2018), because those statutes are not unambiguous.    Moreover, given the ambiguities the concurrence perceives in "single function of the trigger" and "automatically," it is probable that other machineguns cannot be outlawed under § 921(a)(24)—even guns that fire multiple bullets when the shooter holds down the trigger.    After all, the concurrence says that it's plausible that "automatically" means "no human input," and the pressure needed to depress a trigger is plausibly human input within the meaning of the statute.[8]

---

[7] Of course, most criminal statutes are drafted by state legislatures, responding to imminent and present threats to public safety. Prohibitions on dangerous weapons are myriad.    Many ban machineguns and define them, unambiguously I would say, along similar lines as Congress did in 1934.    *See, e.g.*, TEX. PENAL CODE § 46.01(9).

[8] For example, devices called "auto-sears" that allow semiautomatic weapons to fire multiple rounds while the trigger is pulled are increasingly accessible to criminals.    *See* Alain Stephens & Keegan Hamilton, *The Return of the Machine Gun*, THE TRACE (Mar. 24, 2022).    Even though these devices gravely threaten public safety and law enforcement, *see* Michelle Homer & Melissa Correa, *'This Has to Stop': 19 Houston-Area Suspects Charged in Federal Crackdown on Illegal Gun Switches*, KHOU (Feb. 24, 2022); Florian Martin, *The Man Who Shot and Killed an HPD Officer Last Week Used an Illegally Modified Handgun, Bodycam Footage Shows*,

70a

The concurrence argues that Congress could pass an "Analogue Act" that would explicitly go device by device, mechanistically, and define bump stocks as machineguns. This would work, the concurrence hypothesizes, because Congress passed a similar statute in the controlled substances context to regulate chemicals that were analogues to drugs named in an earlier act. *See* 21 U.S.C. §§ 802(32)(A), 813, 841(a)(1); *McFadden v. United States*, 576 U.S. 186, 188 (2015). Setting aside the obvious differences between guns and drugs—including the fact that a drug can be described with a molecular formula and a gun cannot—the concurrence is mistaken. Under our court's new lenity regime, it is unclear how Congress could draft such a statute while avoiding ambiguity as to what counts as a bump stock. As I explained, any ambiguity in the statute could be exploited to evade liability because those ambiguities must be construed in favor of defendants.

Indeed, after our court's ruling today, it is not clear that the Controlled Substance Analogue Enforcement Act of 1986 is even operable in practice. In relevant part, this statute defines a "controlled substance analogue" as a substance "the chemical structure of which is *substantially similar* to the chemical structure of a controlled substance in schedule I or II." 21 U.S.C. § 802(32)(A)(i) (emphasis added). Whether two substances have a "substantially similar" chemical structure may, in many cases, be ambiguous such that lenity would shield a manufacturer, distributor, or possessor of the analogue. This is not the result Congress intended.

---

HOUS. PUB. MEDIA (Oct. 13, 2021), it is uncertain after today's ruling whether federal law can reach them.

71a

### III.

Today, our court extends lenity, once a rule of last resort, to rewrite a vital public safety statute banning machineguns since 1934.  In conflict with three other courts of appeals, our court employs its new lenity regime to carve out from federal firearms regulation the bump stock—a device that helped the Las Vegas shooter fire over a thousand rounds during an eleven-minute-long attack, at times shooting about nine bullets per second, killing at least 58 people and wounding hundreds more.  *See* Larry Buchanan et al., *What Is a Bump Stock and How Does It Work?*, N.Y. TIMES (updated Mar. 28, 2019).  Therefore, our court uses lenity to legalize an instrument of mass murder.  This is evident from our court's attempt to confine its new lenity regime only to this statute, giving machinegun owners immunity from prosecution that is not shared by other offenders under the federal code.

For those reasons and the reasons stated in the panel opinion, I respectfully dissent.

72a

**APPENDIX B**

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

————

No. 20-51016

MICHAEL CARGILL, PLAINTIFF-APPELLANT

*v.*

MERRICK GARLAND, U.S. ATTORNEY GENERAL;
UNITED STATES DEPARTMENT OF JUSTICE;
REGINA LOMBARDO, IN HER OFFICIAL CAPACITY AS
ACTING DIRECTOR OF THE BUREAU OF ALCOHOL,
TOBACCO, FIREARMS, AND EXPLOSIVES; BUREAU OF
ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,
DEFENDANTS-APPELLEES

————

[Filed:    Dec. 14, 2021]

————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:19-CV-349

————

Before DENNIS, HIGGINSON, and COSTA, *Circuit
Judges.*

STEPHEN A. HIGGINSON, *Circuit Judge*:

On October 1, 2017, a gunman firing several semiau-
tomatic rifles equipped with bump stocks killed 58 peo-
ple and wounded 500 more in Las Vegas.   In the after-
math of this tragedy, the Bureau of Alcohol, Tobacco,
Firearms and Explosives ("ATF") promulgated a rule
(the "Bump Stock Rule" or "Rule") stating that bump

73a

stocks are "machinegun[s]" for purposes of the National Firearms Act ("NFA") and the federal statutory bar on the possession or sale of new machine guns.[1]  *Bump-Stock-Type Devices*, 83 Fed. Reg. 66,514 (Dec. 26, 2018); *see also* 18 U.S.C. §§ 922(o)(1), 921(a)(23); 26 U.S.C. § 5845(b).   Plaintiff-Appellant Michael Cargill has challenged the Rule, arguing that it contradicts the plain language of the statute, that it exceeds ATF's statutory authority, and that it violates the separation of powers. After a trial, the district court rejected Cargill's claims, concluding in a 75-page order that the Rule "properly classifies a bump stock as a 'machinegun' within the statutory definition."   Because we agree with the district court that bump stocks qualify as machine guns under the best interpretation of the statute, we AFFIRM.[2]

---

[1]  Except when quoting sources, we use the two-word spelling of "machine gun."

[2]  Three other circuits have also rejected challenges to the Bump Stock Rule.   In April 2019, the D.C. Circuit denied a motion for a preliminary injunction against the Rule, concluding that the statutory definition of "machinegun" is ambiguous and that the Rule is entitled to *Chevron* deference.   *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1 (D.C. Cir. 2019) (per curiam).   One judge dissented, arguing that the Rule contradicts the statute's plain language.   *Id.* at 35 (Henderson, J., dissenting). The Supreme Court denied certiorari, 140 S. Ct. 789 (2020), though Justice Gorsuch issued a statement arguing that the Rule is not entitled to *Chevron* deference.   *Id.* at 789-91 (Gorsuch, J., statement regarding denial of certiorari)．   In May 2020, the Tenth Circuit denied another motion to preliminarily enjoin the Rule, for similar reasons as the D.C. Circuit.   *Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020).   Four months later, the Tenth Circuit vacated that opinion and granted a rehearing en banc, 973 F.3d 1151 (10th Cir. 2020) (en banc), but it subsequently reversed course, vacating the order granting rehearing en banc and reinstating the original panel opinion.

74a

## I.

## A.

Federal law generally makes it "unlawful for any person to transfer or possess a machinegun." 18 U.S.C. § 922(o)(1). The federal machine gun ban incorporates the NFA's definition of "machinegun," 18 U.S.C. § 921(a)(23), which reads as follows:

The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

---

*Aposhian v. Wilkinson*, 989 F.3d 890 (10th Cir. 2021) (en banc). Five judges dissented from the decision to vacate the en banc order. *Id.* at 891 (Tymkovich, C.J. dissenting, joined by Hartz, Holmes, Eid, and Carson, JJ.). The plaintiff in that case has filed a petition for certiorari in the Supreme Court. Petition for Writ of Certiorari, *Aposhian v. Garland*, No. 21-159 (U.S. Aug. 4, 2021). Finally, in March 2021, a Sixth Circuit panel granted a preliminary injunction against the Rule, holding that the Rule is not entitled to *Chevron* deference and is not the best interpretation of the NFA. *Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446, 450 (6th Cir. 2021). However, the Sixth Circuit vacated that decision, 2 F.4th 576 (6th Cir. 2021) (en banc), and an evenly divided en banc court affirmed the district court's judgment upholding the Rule. No. 19-1298, — F.4th —, 2021 WL 5755300 (6th Cir. Dec. 3, 2021) (en banc); *see Gun Owners of Am. v. Barr*, 363 F. Supp. 3d 823, 826 (W.D. Mich. 2019).

75a

26 U.S.C. § 5845(b).

Congress has vested in the Attorney General authority to prescribe rules and regulations necessary to enforce the NFA and the federal machine gun ban. *See* 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a). The Attorney General has delegated this responsibility to ATF. *See* 28 C.F.R. § 0.130(a)(1)-(2).

### B.

As the district court found, a "bump stock" is "an accessory attached to a firearm to increase its rate of fire, to make it easier for somebody to fire a weapon faster." More specifically, bump stocks are devices that "harness the force of recoil to enable a weapon to fire multiple rounds when, while keeping the trigger finger stationary, the shooter pushes forward with the non-shooting hand." These devices generally consist of "a sliding shoulder stock molded or otherwise attached to a grip," "a 'trigger ledge,' on which the shooter places his finger," and "a detachable rectangular receiver module that goes in the receiver well of the bump stock's handle to guide the recoil of the weapon when fired." The "firing sequence" of a semiautomatic rifle equipped with a bump stock "begins when the shooter presses forward on the firearm to initially engage the trigger finger." The gun then "slides back and forth[,] and its recoil energy *bumps* the trigger finger into the trigger to continue firing until the shooter stops pushing forward with his non-shooting hand or the weapon runs out of ammunition or malfunctions." (emphasis added). Thus, "when a bump stock is used as intended, the shooter pushes forward to engage the trigger finger with the trigger, which causes a single trigger pull that initiates a firing sequence that continues to fire as long as the

76a

shooter continues to push forward." *See also* 83 Fed. Reg. at 66,516 ("Shooters use bump-stock-type devices with semiautomatic firearms to accelerate the firearms' cyclic firing rate to mimic automatic fire.").

Prior to the 2017 mass shooting in Las Vegas, ATF had maintained that bump stocks that did not use internal springs, such as the device used in the Las Vegas shooting, were not machine guns for purposes of federal law.    83 Fed. Reg. at 66,516.    However, after the Las Vegas shooting, ATF decided to reconsider that position, and it issued an advance notice of proposed rulemaking in December 2017.    *Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices*, 82 Fed. Reg. 60,929 (Dec. 26, 2017). Shortly thereafter, then-President Donald Trump issued a memorandum instructing the Department of Justice "to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns." *Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices*, 83 Fed. Reg. 7,949, 7,949 (Feb. 20, 2018).    ATF issued a notice of proposed rulemaking in March 2018, *Bump-Stock Devices*, 83 Fed. Reg. 13,442 (Mar. 29, 2018), and, after receiving more than 186,000 comments, promulgated a final rule in December 2018.    83 Fed. Reg. at 66,514, 66,519.[3]

---

[3] The Bump Stock Rule was signed by Acting Attorney General Matthew G. Whitaker.    *Id.* at 66,554.    Subsequently, parties challenging the rule argued that Whitaker had not been validly serving as Acting Attorney General. *Bump-Stock-Type Devices*, 84 Fed. Reg. 9,239, 9,240 (March 14, 2019).    To resolve any uncertainty about the Rule's legitimacy, newly-sworn-in Attorney General William Barr issued a statement in March 2019 saying that he had eval-

77a

The Bump Stock Rule interprets the NFA's above-quoted definition of "machinegun." *See* 26 U.S.C. § 5845(b). The Rule states:

> For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions.

83 Fed. Reg. at 66,553 (codified at 27 C.F.R. §§ 447.11, 478.11, 479.11). Based on this interpretation of the terms "automatically" and "single function of the trigger," the Rule concludes that the "term 'machinegun' includes a bump-stock-type device," since bump stocks enable "a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter." *Id.* at 66,553-54.

By its own terms, the Rule became "effective" on March 26, 2019, ninety days after its promulgation. *Id.* at 66,514. The Rule explains that "individuals are subject to criminal liability only for possessing bump-stock-type devices *after* the effective date of regulation," and it instructs bump stock owners to either "undertake destruction of the devices" or "abandon [them] at the nearest ATF office." *Id.* at 66,525, 66,530.

---

uated "the rulemaking record" and "personally come to the conclusion that it is appropriate to ratify and affirm the [Rule]." *Id.*

78a

C.

Following the issuance of the Bump Stock Rule, Michael Cargill surrendered two bump stocks to ATF. He then sued ATF under the Administrative Procedure Act and various constitutional provisions, seeking a declaratory judgment and permanent injunction preventing the enforcement of the Bump Stock Rule against him and others similarly situated, along with the return of his bump stocks.

After holding a bench trial, the district court denied Cargill's requested relief on all counts.   The court first determined that ATF had statutory authority to issue the Bump Stock Rule and that the Rule did not violate the constitutional principles of non-delegation and separation of powers.   The court then concluded that the Bump Stock Rule adopts the "correct" interpretation of the terms "automatically" and "single function of the trigger."   Accordingly, the court held that the Rule "properly classifies a bump stock as a 'machinegun' within the statutory definition."   Cargill timely filed this appeal.

II.

We first consider the statutory interpretation issue. Recall that, for purposes of federal law, "[t]he term 'machinegun' means any weapon which shoots   .   .   .   automatically more than one shot, without manual reloading, by a single function of the trigger," including "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun."   26 U.S.C. § 5845(b).   Cargill argues that the Bump Stock Rule's conclusion that bump stocks qualify as "machinegun[s]"

79a

under this definition contradicts the statute's unambiguous terms. Cargill further argues that even if the statute is ambiguous, the rule of lenity requires the court to resolve any ambiguity in his favor. The district court rejected these arguments, concluding that the "Rule adopts the proper interpretation of 'machinegun' by including bump stock devices" and that "the rule of lenity does not apply." We agree with the district court's conclusions.[4]

### A.

Cargill argues that bump stocks unambiguously are not "machinegun[s]" under the above statutory definition because semiautomatic firearms equipped with bump stocks (1) do not shoot "more than one shot . . . by a single function of the trigger" and (2) do not shoot "automatically." We consider each of these points in turn.

------

[4] Cargill also argues that if the statute is ambiguous, the Bump Stock Rule is not entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), reasoning primarily that *Chevron* does not apply to cases involving criminal statutes and that ATF explicitly waived *Chevron* in the district court. Because we conclude that bump stocks are "machinegun[s]" under the best interpretation of the statute, we do not address whether the Rule is entitled to deference. *See Edelman v. Lynchburg Coll.*, 535 U.S. 106, 114 (2002) (explaining that "there is no occasion to defer and no point in asking what kind of deference, or how much" would apply in cases where an agency has adopted "the position we would adopt even if there were no formal rule and we were interpreting the statute from scratch").

80a

1.

Cargill argues that bump stock-equipped semiautomatic rifles do not shoot "more than one shot . . . by a single function of the trigger" because the trigger of such weapons must mechanically "reset" before the gun can "fire the next shot." Cargill thus appears to interpret the phrase "single function of the trigger" to mean "a single mechanical act of the trigger" or perhaps "a single movement of the trigger." On the other hand, the Bump Stock Rule provides that "'single function of the trigger' means a single pull of the trigger and analogous motions." 83 Fed. Reg. at 66,553.

The Rule's interpretation of the statutory phrase proves compelling. Both the Supreme Court and this court have replaced the word "function" with "pull" when paraphrasing the NFA's definition of "machinegun." S*ee Staples v. United States*, 511 U.S. 600, 602 n.1 (1994) (observing that the NFA treats a weapon that "fires repeatedly with a single pull of the trigger" as a machinegun, in contrast to a "weapon that fires only one shot with each pull of the trigger"); *United States v. Anderson*, 885 F.2d 1248, 1250 (5th Cir. 1989) (en banc) (explaining that "fully automatic pistols . . . qualify as 'machine guns'" under the NFA because "they will fire more than one round of ammunition in response to a single pull of the trigger").[5] Indeed, at the time the statute was enacted, the two terms were used almost in-

---

[5] *See also Guedes v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 356 F. Supp. 3d 109, 130 (D.D.C.), *aff'd*, 920 F.3d 1 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 789 (2020) ("Tellingly, courts have instinctively reached for the word 'pull' when discussing the statutory definition of 'machinegun.'" (citing *Staples*, 511 U.S. at 602 n.1; *United States v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977)).

81a

terchangeably in the context of firearms. *See* H.R. Rep. No. 73-1780, at 2 (1934) (explaining that the NFA "contains the usual definition of machine gun as a weapon designed to shoot more than one shot without reloading and by a single pull of the trigger"); *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. On Ways & Means*, 73d Cong. 40 (1934) [hereinafter *NFA Hearings*] (statement of Karl T. Frederick, President, National Rifle Association of America) ("A gun . . . which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun."). Accordingly, in a case involving a predecessor rule to the Bump Stock Rule, the Eleventh Circuit expressly held that ATF's "interpretation . . . that the phrase 'single function of the trigger' means a 'single pull of the trigger' is consonant with the statute." *Akins v. United States*, 312 F. App'x 197, 200 (11th Cir. 2009) (unpublished) (citing *Staples*, 511 U.S. at 602 n.1; *NFA Hearings* at 40). This caselaw and contemporary usage reflect a simple fact undergirding the Rule's interpretation of the statute—in ordinary English, firearm triggers typically "function" by means of a shooter's "pull."[6]

The Chief Judge of the Tenth Circuit makes perhaps the strongest case that the NFA defines "machinegun" in terms of a trigger's mechanical acts. Writing in dis-

---

[6] *See, e.g.*, OLIVER WENDELL HOLMES, JR., THE COMMON LAW: LECTURE IV 149-50 (1881) (explaining that "[t]he ordinarily intelligent and prudent member of the community would foresee the possibility of danger from pointing a gun which he had not inspected into a crowd, and pulling the trigger, although it was said to be unloaded").

82a

sent, he argues that the "statute's plain language makes clear the 'function' must be '*of the trigger*.'    The statute speaks only to how the trigger acts, making no mention of the shooter."    *Aposhian v. Wilkinson*, 989 F.3d 890, 895 (10th Cir. 2021) (Tymkovich, C.J., dissenting from vacation of order granting rehearing en banc) (citation omitted).    He continues:

> The trigger on [a semiautomatic rifle equipped with a bump stock] must necessarily "pull" backwards and release the rifle's hammer every time that the rifle discharges.    The rifle cannot fire a second round until both the trigger and hammer reset.    Every shot requires the trigger to go through this full process again.    The fact that a bump stock accelerates this process does not change the underlying fact that it requires multiple functions of the trigger to mimic a machine gun.

*Id.* (cleaned up).

We considered a similarly mechanistic interpretation of § 5854(b) in *United States v. Camp*.    That case involved a firearm that operated as follows:

> When an added switch behind the original trigger was pulled, it supplied electrical power to a motor connected to the bottom of a fishing reel that had been placed inside the weapon's trigger guard; the motor caused the reel to rotate; and that rotation caused the original trigger to function in rapid succession.

343 F.3d 743, 744 (5th Cir. 2003).    The gunowner argued that because the "original trigger  .  .  .  functioned each time the rifle was fired, the rifle, as modified, did not become a machine gun."    *Id.* at 745.    "The

83a

switch," he averred, "is merely a legal 'trigger activator.'" *Id.* However, we held that because the modified weapon "required only one action—pulling the switch [the gunowner] installed—to fire multiple shots," the weapon "shoot[s] automatically more than one shot . . . by a *single* function of the trigger." *Id.* (third alteration in original) (quoting 26 U.S.C. § 5845(b)). To hold otherwise, we explained, "would allow transforming firearms into machine guns, so long as the original trigger was not destroyed." *Id.*

Our court thus rejected a mechanistic interpretation of § 5845(b) in *Camp*. We likewise decline to adopt a mechanistic reading of the statute, for several reasons in addition to the precedent set by *Camp*. As an initial matter, the mechanistic interpretation of the NFA twists the statutory text, effectively rewriting the statute to make "function" a verb that has "trigger" as its subject—that is, rewriting the statute so that it defines a "machinegun" as a weapon which shoots more than one shot "every time the trigger functions" rather than "by a single function of the trigger." Moreover, interpreting the NFA mechanistically defies common sense. As one district court has observed, there is no reason why "Congress would have zeroed in on the mechanistic movement of the trigger in seeking to regulate automatic weapons," given that the "ill sought to be captured by this definition was the ability to drastically increase a weapon's rate of fire, not the precise mechanism by which that capability is achieved." *Aposhian v. Barr*, 374 F. Supp. 3d 1145, 1152 (D. Utah 2019), *aff'd*, 958 F.3d 969 (10th Cir. 2020), *petition for cert. filed sub nom. Aposhian v. Garland*, No. 21-159 (U.S. Aug. 4, 2021). Congress likely chose the term "function" not to emphasize the mechanical working of the trigger but rather

84a

because it has a broader meaning than "pull," in order "to forestall attempts by weapon manufacturers or others to implement triggers that need not be pulled, thereby evading the statute's reach." *Id.*[7] Finally, the mechanistic interpretation of the statute does not account for the above-discussed arguments relating to prior judicial interpretations and ordinary usage. For these reasons, ATF's interpretation of the statute is the best interpretation. The phrase "single function of the trigger," as used in the NFA, means "a single pull of the trigger and analogous motions."

Accordingly, Cargill's argument that semiautomatic firearms equipped with bump stocks do not shoot "more than one shot . . . by a single function of the trigger" fails. As explained above, the district court found that "when a bump stock is used as intended, the shooter pushes forward to engage the trigger finger with the trigger, which causes a single trigger pull that initiates a firing sequence that continues to fire as long as the shooter continues to push forward."[8] Or in the words

---

[7] To that end, ATF defined "single function of the trigger" as "a single pull of the trigger *and analogous motions*," 83 Fed. Reg. at 66,553 (emphasis added), recognizing "that there are other methods of initiating an automatic firing sequence that do not require a pull." *Id.* at 66,515. ATF encourages gun manufacturers to submit novel weapons and devices to the agency so that the agency can inform manufacturers in advance of production whether it considers the weapon or device to be a machine gun. *See* ATF, U.S. Dep't of Justice, *National Firearms Act Handbook* 41 (Apr. 2009).

[8] Importantly, after initiating the firing sequence in this manner, the "shooter does not have to pull rearward to continue firing as long as he keeps his finger on the trigger ledge." Indeed, the district court quoted an expert as testifying that "the trigger finger 'could be replaced by a post and would function the same way.'"

85a

of the Rule, "when a shooter who has affixed a bump-stock-type device to a semiautomatic firearm pulls the trigger, that movement initiates a firing sequence that produces more than one shot."   83 Fed. Reg. at 66,519. Because bump stocks thus allow a shooter to shoot more than one shot by a single pull of the trigger, they allow a shooter to shoot "more than one shot   .  .  .   by a single function of the trigger."   26 U.S.C. § 5845(b).

2.

Cargill further argues that because the shooter must "push the barrel shroud forward with the non-trigger hand into the trigger against the gun's recoil after every shot," semiautomatic weapons equipped with bump stocks do not fire "automatically."   Cargill thus appears to interpret the term "automatically" to mean "completely without manual input."   On the other hand, the Bump Stock Rule provides that the term "automatically," as used in the statutory definition of "machinegun," "means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger."   83 Fed. Reg. at 66,553.

Once again, the Rule offers a compelling interpretation of the statute.   "We often look to dictionary definitions for help in discerning a word's ordinary meaning." *Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020).   According to one leading dictionary from 1934, the year the NFA was enacted, "automatically" is the adverbial form of "automatic," which in turn means "[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation."   WEBSTER'S NEW INTERNATIONAL DICTIONARY 187 (2d ed. 1934).   Another dic-

86a

tionary from the time defines "automatic" as "[s]elf-acting under conditions fixed for it, going of itself." OXFORD ENGLISH DICTIONARY 574 (1933). Relying on these definitions, the Seventh Circuit has explained that for purposes of the NFA, "the adverb 'automatically' . . . delineates how the discharge of multiple rounds from a weapon occurs: as the result of a self-acting mechanism" which "is set in motion by a single function of the trigger and is accomplished without manual reloading." *United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009). As a nearly word-for-word copy of the dictionary definition that accords with past judicial interpretation, the Rule's interpretation of "automatically" is the best interpretation of that term.[9]

The Chief Judge of the Tenth Circuit again makes the strongest case against the Rule's interpretation of the statute. He argues that it is a mistake to "abstract[] 'automatically' from the rest of the statutory language." *Aposhian*, 989 F.3d at 896 (Tymkovich, C.J., dissenting). After all, "[t]he statute is unambiguous about what makes the firearm shoot automatically: the function of the trigger." *Id.* Accordingly, "[i]f a single function of the trigger *and then some other input* is required to make the firearm shoot automatically, we are not talking about a 'machinegun' as defined in § 5845(b)." *Id.* And, he explains, bump stocks require this extra input:

> [I]f a shooter pulls the trigger of a semiautomatic rifle equipped with a non-mechanical bump stock without doing anything else, the rifle will fire just one shot. . . . To make the firearm "shoot automati-

---

[9] Indeed, the Rule explicitly relied on these dictionary definitions and the Seventh Circuit's *Olofson* opinion when interpreting "automatically." *See* 83 Fed. Reg. at 66,519.

87a

cally more than one shot", the shooter must also be pulling forward on the barrel of the gun. Because a bump stock requires this extra physical input, it does not fall within the statutory requirement that the weapon shoot "automatically . . . by a single function of the trigger."

*Id.* (citations omitted).

Though not unreasonable on its face, the claim that a weapon does not fire "automatically" if it requires any manual input from the shooter beyond a single pull of the trigger in order to fire more than one shot ultimately proves too much. True, a shooter firing a semiautomatic firearm equipped with a bump stock generally must maintain "constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle." 83 Fed. Reg. at 66,516. However, as the district court explained, a prototypical machine gun requires the shooter to "keep constant pressure on the trigger with his shooting hand's trigger finger." Cargill offers no reason why firearms that require the shooter to maintain pressure on the trigger function "automatically" but firearms that require the shooter to maintain pressure on the barrel of the gun do not. Accordingly, we reject this interpretation of the statute. A firearm functions "automatically" as long as it "function[s] as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger," 83 Fed. Reg. at 66,553, regardless of whether a shooter must maintain pressure on the weapon while firing.

Recall that the district court found that after a shooter pulls the trigger of a bump stock-equipped semiautomatic rifle to initiate the weapon's firing sequence,

88a

the gun "slides back and forth[,] and its recoil energy
bumps the trigger finger into the trigger to continue fir-
ing until the shooter stops pushing forward with his non-
shooting hand or the weapon runs out of ammunition or
malfunctions." The district court further found, based
on expert testimony, that "even though the shooter's fin-
ger disengages and reengages with the trigger during
the bump firing process, the sequence set in motion by
the initial forward pressure causing a trigger pull con-
tinues. Multiple rounds fire because '[t]he weapon re-
coils faster than you can react.'" Or as the Rule itself
explains, a bump stock "harness[es] the recoil energy of
the semi-automatic firearm to which it is affixed so that
the trigger resets and continues firing without addi-
tional physical manipulation of the trigger by the
shooter." 83 Fed. Reg. at 66,553-54. For these rea-
sons, semiautomatic firearms equipped with bump
stocks shoot "as the result of a self-acting or self-
regulating mechanism that allows the firing of multiple
rounds through a single function of the trigger"—in
other words, they shoot "automatically" for purposes of
the statute. 26 U.S.C. § 5845(b).

B.

Cargill argues that even if the statutory text is am-
biguous, ATF's interpretation of the NFA is invalid be-
cause the court must resolve any ambiguity in this crim-
inal statute in his favor under the rule of lenity. *See
Yates v. United States*, 574 U.S. 528, 547-48 (2015)
("[A]mbiguity concerning the ambit of criminal statutes
should be resolved in favor of lenity."). However, "the
rule of lenity only applies if, after considering text,
structure, history, and purpose, there remains a griev-
ous ambiguity or uncertainty in the statute such that the

89a

[c]ourt must simply guess as to what Congress intended." *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (quoting *Barber v. Thomas*, 560 U.S. 474, 488 (2010)). Here, for the reasons explained above, the traditional tools of statutory interpretation make it clear that the Bump Stock Rule's interpretation of the NFA's definition of "machinegun" is the best interpretation of the statute.  Because no "grievous ambiguity or uncertainty" remains, *id.*, the rule of lenity does not apply to this case.[10]

\* \* \*

A bump stock is "a part designed and intended" to enable a person armed with a semiautomatic rifle to "shoot[] . . . automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b).  Accordingly, we agree with the district court that the Bump Stock Rule properly classifies bump stocks as "machinegun[s]" for purposes of federal law.  *Id.*; *see also* 18 U.S.C. § 921(a)(23).[11]

_____

[10] Though the district court concluded that "the traditional tools of statutory interpretation yield unambiguous meanings" for the disputed terms, we hold only that the statute does not contain the kind of grievous ambiguity that causes the rule of lenity to apply.

[11] Though we conclude that the Bump Stock Rule offers the best interpretation of the NFA's definition of "machinegun," Congress may wish to further clarify whether various novel devices qualify as machine guns for purposes of federal law.   In accordance with the statutory opinion transmission project, our Opinion Clerk will notify Congress that this opinion "bears on technical matters of statutory construction."   *See* Robert A. Katzmann & Russell R. Wheeler, *A Mechanism for "Statutory Housekeeping": Appellate Courts Working with Congress*, 9 J. App. Prac. & Process 131 (2007) (describing the history and purpose of the statutory opinion transmis-

90a

III.

Cargill argues that ATF exceeded its statutory authority by issuing the Bump Stock Rule. Cargill further argues that even if the agency had statutory authority to issue the Rule, the Rule violates the constitutional principle of separation of powers. The district court concluded that Congress had delegated authority to ATF to issue a rule like the Bump Stock Rule and that this Congressional delegation does not violate the separation of powers. We do not address these issues. As explained above, the Bump Stock Rule's interpretation of the NFA's definition of "machinegun" is the best interpretation of the statute. Accordingly, resolution of these issues will not affect the outcome of the case— either way, bump stocks are "machinegun[s]" and thus illegal under federal law. 18 U.S.C. § 922(o)(1). And because Cargill's ability to own a bump stock would not change even if his claims that ATF exceeded its statutory authority and that the Rule violates the separation of powers were vindicated, Cargill has no standing to pursue these claims in federal court.[12] *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998) (explaining that, in order to have standing, plaintiffs must "show injury to 'a particular right of their own, as distinguished from the public's interest in the administration of the law'" (quoting *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 125 (1940))); *California v. Texas*, 141 S. Ct. 2104, 2112

---

sion project); Marin K. Levy & Tejas N. Narechania, *Interbranch Information Sharing: Examining the Statutory Opinion Transmission Project*, 108 Cal. L. Rev. 917, 921 (2020) (encouraging "federal appellate judges to send more opinions to Congress").

[12] Cargill does not argue that Congress cannot outlaw bump stocks.

91a

(2021) ("We do not reach these questions of the Act's va-
lidity, however, for Texas and the other plaintiffs in this
suit lack the standing necessary to raise them.").

IV.

For the foregoing reasons, we AFFIRM the judg-
ment of the district court.

92a

APPENDIX C

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

———————

No. 1:19-CV-349-DAE

MICHAEL CARGILL, PLAINTIFF

*v.*

WILLIAM P. BARR,
IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF
THE UNITED STATES, ET AL., DEFENDANTS

———————

Filed:   Nov. 23, 2020

———————

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

———————

Plaintiff Michael Cargill ("Plaintiff") seeks injunctive relief to enjoin Defendants Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), William Barr, in his official capacity as Attorney General of the United States ("AG Barr"), the United States Department of Justice ("DOJ"), Regina Lombardo,[1] in her official capacity as Acting Director of ATF ("Lombardo") (collectively "Defendants") from enforcing their Final Rule, *Bump-Stock-Type Devices*, 83 Fed. Reg. 66514 (Dec. 26, 2018) ("the

---

[1] Plaintiff's original complaint listed former Acting Director of ATF Thomas Brandon as a Defendant instead of Lombardo.   (Dkt. # 1 at 1.)   By operation of Fed. R. Civ. P. 25(d), Lombardo automatically replaced Brandon as a Defendant in this action when she succeeded him in this role.

93a

Final Rule"). A bench trial was held in this case on September 9, 2020. Having considered the pleadings, evidence, and written and oral arguments of counsel, the Court makes the following findings of fact and conclusions of law, denying Plaintiff's requested relief on all counts.

Plaintiff filed this action on March 25, 2019.[2] In support of his petition for injunctive relief, Plaintiff argues that: (1) the Final Rule is a legislative rule that ATF lacks the authority to promulgate (Counts IV, VII, VIII); (2) Defendants violated principles of non-delegation and/or separation of powers principles by issuing the Final Rule (Counts I, II, III, VIII); (3) the Final Rule's interpretations of terms within the statutory definition of "machinegun," which includes bump stocks and bump stock-type devices, are unreasonable and conflict with the statute (Counts I, V, VIII); and (4) Defendants violated the Administrative Procedures Act ("APA") in promulgating the Final Rule (Counts V, VI, VII, VIII).

After a status conference on February 13, 2020 (Dkt. # 31), the parties submitted proposed findings of fact and conclusions of law on April 3, 2020 (Dkts. ## 33, 34) in advance of the bench trial in this case, and Plaintiff revised his proposal on June 22, 2020. (Dkt. # 39.) The parties submitted their trial briefs on August 28, 2020. (Dkts. ## 45, 46.)

On September 9, 2020, the Court held a bench trial in this case. Caleb Kruckenberg, Esq., and Mark Chenoweth, Esq., appeared at the trial on behalf of Plaintiff. Eric Soskin, Esq., Matthew Glover, Esq., and Christo-

---

[2] The case was transferred to the undersigned on October 23, 2019. (Dkt. # 23.)

94a

pher Bates, Esq., appeared at the trial on behalf of Defendants.   At trial, Plaintiff did not call any witnesses but introduced eleven (11) exhibits.   (Dkt. # 54 (and attachments).)   Defendants called one in-person witness, David A. Smith, Firearms Enforcement Officer for the Firearms & Ammunition Technology Division ("FATD") of ATF, and introduced forty-five (45) exhibits, with Government Exhibit Two ("Exh. G-2") admitted for demonstrative purposes only.   (Id.)   After trial, the parties submitted written post-trial briefs in lieu of closing oral arguments.   (Dkts. ## 70, 71.)

The Court has considered the record evidence submitted, made determinations as to relevance and materiality, assessed the credibility of the witness and evidence, and ascertained the probative significance of the evidence presented.   Upon consideration of the above, the Court finds the following facts by a preponderance of the evidence, and, in applying the applicable law to such factual findings, makes the following conclusions of law. To the extent any findings of fact as stated may also be deemed to be conclusions of law, they shall also be considered conclusions of law; similarly, to the extent any conclusions of law as stated may be deemed findings of fact, they shall also be considered findings of fact.   See Compaq Computer Corp. & Subsidiaries v. C.I.R., 277 F.3d 778, 781 (5th Cir. 2001).

## I. FINDINGS OF FACT

### The Parties

**1.**   Plaintiff Michael Cargill is a natural person and resident of the State of Texas.   (Dkt. # 54-2, Exh. P-1 ("Stipulated Facts"), ¶ 1.)

95a

**2.** Plaintiff is a law-abiding person and has no disqualification that would prevent him from lawfully owning or operating a firearm and related accessories.   (Id. ¶ 2.)

**3.** Defendant William Barr ("AG Barr"), Attorney General of the United States, is the head of the United States Department of Justice.   (Dkt. # 1 ¶ 3; Dkt. # 11 ¶ 3.)

**4.** AG Barr is sued in his official capacity.   (Dkt. # 1 ¶ 4; Dkt. #11 ¶ 4.)

**5.** Defendant United States Department of Justice ("DOJ") is an executive agency of the United States, which is partially responsible for administering and enforcing the National Firearms Act ("the NFA") and Gun Control Act ("the GCA").   (Dkt. # 1 ¶ 5; Dkt. # 11 ¶ 5.)

**6.** AG Barr and DOJ are responsible for overseeing the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").   See 28 C.F.R. § 0.130(a)(1).

**7.** Defendant Regina Lombardo is the Acting Director of the Bureau of Alcohol, Firearms, Tobacco, and Explosives.   (Dkt. # 1 ¶ 6; Dkt. # 11 ¶ 6.)[3]

**8.** Lombardo is sued in her official capacity.   (Dkt. # 1 ¶ 7; Dkt. # 11 ¶ 7.)

**9.** Defendant ATF is an agency of the United States partially responsible for administering and enforcing the NFA and the GCA.   (Dkt. # 1 ¶ 8; Dkt. # 11 ¶ 8.)

---

[3] See supra Note 1.

96a

**Jurisdiction and Venue**

**10.**   The Court has federal question jurisdiction pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

**11.**   Venue for this action is proper in the Western District of Texas pursuant to 5 U.S.C. § 703 and 28 U.S.C. §§ 1391(b)(2), (e)(1)(C) because Plaintiff resides in this judicial district, a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and because the property at issue in this action is situated in this judicial district.   (Dkt. # 1 ¶ 11; Dkt. # 11 ¶ 11.)

**Statutory Framework:   The NFA, GCA, and FOPA**

**12.**   In 1934, Congress passed the National Firearms Act ("the NFA"), Pub. L. No. 73-474, 48 Stat. 1236 (June 26, 1934), originally codified at 26 U.S.C. §§ 2720-2733 (1939), now codified as amended at 26 U.S.C. §§ 5801-5872.

**13.**   The NFA criminalized possession or transfer of an unregistered firearm, while also prohibiting the registration of firearms otherwise banned by law.   See 26 U.S.C. §§ 5812(a).

**14.**   The NFA defined "machinegun" as a specific type of "firearm."   National Firearms Act § 1(b).

**15.**   The original proposed definition of "machinegun" included "any weapon designed to shoot automatically, or semi-automatically, 12 or more shots without reloading." Hearing on H.R. 9066, House Ways and Means Comm., 73rd Cong., 6 (1934) (Testimony of Homer S. Cummings, Attorney General of the United States).

**16.**   In hearings prior to adoption of the NFA, the House of Representatives received testimony that a gun

97a

"which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machinegun," whereas "[o]ther guns [that] require a separate pull of the trigger for every shot fired . . . are not properly designated as machineguns." Hearing on H.R. 9066, 73rd Cong., 2nd Sess., at 40 (1934) (statement of Karl T. Frederick, President of the National Rifle Association of America).

17. In a report on the legislation that became the NFA, the House Committee on Ways and Means stated that the bill "contains the usual definition of machinegun as a weapon designed to shoot more than one shot without reloading and by a single pull of the trigger." H.R. Rep. No. 73-1780, at 2 (1934).

18. When enacted in 1934, the final statutory definition of "machinegun" under the NFA excluded the 12-shot threshold originally proposed, but still included a prohibition on weapons "designed to shoot . . . semi-automatically." National Firearms Act § 1(b).

19. In 1968, Congress passed the Gun Control Act ("the GCA"). Pub. L. No. 90-618, 82 Stat. 1214 (Oct. 22, 1968); see 18 U.S.C. § 921 et seq.

20. The GCA was enacted less than four months after the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197 (June 19, 1968), in which Congress made findings that "the high incidence of crime in the United States threatens the peace, security, and general welfare of the Nation and its citizens," and that gun control laws and other measures were warranted "[t]o prevent crime and to insure the greater safety of the people" through "law enforcement efforts [that] must

98a

be better coordinated, intensified, and made more effective at all levels of government."    Id.

**21.**   A Senate report on the legislation that became the GCA indicates that the law was passed to "regulate more effectively interstate commerce in firearms" to reduce crime and misuse, to "assist the States and their political subdivisions to enforce their firearms control laws," and to "help combat   . . .   the incidence of serious crime."   S. Rep. No. 89-1866, at 1 (1966).

**22.**   The GCA deleted the phrase "or semiautomatically" from the statutory definition of "machinegun," but otherwise expanded the definition to include "parts designed and intended for use in converting a weapon into a machinegun."   Gun Control Act, tit. II, § 201 (codified at 26 U.S.C. § 5845(b)).

**23.**   In 1986, Congress amended the GCA by enacting the Firearm Owners Protection Act ("the FOPA"). Pub. L. No. 99-308, 100 Stat. 449 (May 19, 1986).

**24.**   The FOPA added 18 U.S.C. § 922(o) to the GCA, which reads:

(1)   Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

(2)   This subsection does not apply with respect to—

(A)   a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

(B)   any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

99a

**25.**  Violation of 18 U.S.C. § 922(o) is a felony punishable by up to ten (10) years imprisonment.   See 18 U.S.C. § 924(a)(2).

**26.**  The FOPA was prospective only, in that its criminal sanctions did "not apply with respect to" "any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect."  18 U.S.C. § 922(o).

**27.**  A House report indicates that the FOPA was intended in part "to strengthen the [GCA] to enhance the ability of law enforcement to fight violent crime."  H.R. Rep. No. 99-495, at 1, 1986 U.S.C.C.A.N. at 1327.   See H.R. Rep. No. 99-495, at 2, 7 (1986), reprinted in 1986 U.S.C.C.A.N. 1327, 1328, 1333.

**28.**  The same report states that 18 U.S.C. § 922(o) was included in the FOPA because of its "benefits for law enforcement."   Id.   The legislative history of the FOPA further describes "the need for more effective protection of law enforcement officers from the proliferation of machineguns."  H.R. Rep. No. 99-495, at 4.

**29.**  As defined by Congress, under both the GCA and NFA, the term "machinegun" now means:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.   The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be as-

100a

sembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b); see also 18 U.S.C. § 921(23) ("The term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act.").

**30.** The United States Code uses the uncommon spelling "machinegun." The two-word spelling "machine gun" is the synonymous, common term. See Guedes v. ATF, 356 F. Supp. 3d 109, 122 n.2 (D.D.C. 2019) ("Guedes I").

**31.** The President is also empowered by the Arms Export Control Act of 1976, 22 U.S.C. § 2778, to limit the import and export of certain firearms. This law restricts the import and export of "machineguns" by reference to both the GCA and the NFA. 27 C.F.R. § 447.2(a); see also 27 C.F.R. § 447.21 (U.S. Munitions Import List, Category I(b) ("Machineguns, submachineguns, machine pistols and fully automatic rifles")).

**Delegations of Statutory Authority**

**32.** With respect to the NFA, Congress provided that the Secretary of the Treasury was tasked with "the administration and enforcement" of the statute, while ATF was tasked with issuing certain "rulings and interpretations" related to the NFA's requirements. 26 U.S.C. § 7801(a)(2)(B).

**33.** Congress also granted the Secretary of the Treasury the authority to "prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." 26 U.S.C. § 7805(a).

101a

**34.** ATF was under the supervision of the Department of Treasury and Secretary of the Treasury prior to 2002, <u>see</u> 26 U.S.C. § 7805(a), but 26 U.S.C. § 7801(a)(2)(A) provides that "[t]he administration and enforcement of the following provisions of this title shall be performed by or under the supervision of the Attorney General and the term 'Secretary' or 'Secretary of the Treasury' shall, when applied to those provisions, mean the Attorney General . . . (i) Chapter 53[;] (ii) Chapters 61 through 80, to the extent such chapters relate to the enforcement and administration of [Chapter 53]." 26 U.S.C. § 7801(a)(2)(A).

**35.** The Attorney General is now responsible for "the administration and enforcement" of the NFA. <u>See</u> 26 U.S.C. §§ 7801(a)(2)(A)(i)-(ii).

**36.** With respect to the GCA, Congress granted the Attorney General the authority to "prescribe only such rules and regulations as are necessary to carry out the provisions of" the GCA. 18 U.S.C. § 926(a).

**37.** This authority also previously belonged to the Secretary of the Treasury, but now belongs to the Attorney General. *See* Pub. L. 107-296, Title XI, § 1112(f)(6), Nov. 25, 2002, 116 Stat. 2276 (transferring Secretary's authority to the Attorney General).

**38.** The Attorney General has delegated his authority under the GCA and the NFA to ATF. 28 C.F.R. §§ 0.130(a)(1)-(3).

**39.** In particular, 28 C.F.R. § 0.130(a) provides that "[s]ubject to the direction of the Attorney General and the Deputy Attorney General, the Director of ATF shall: (a) Investigate, administer, and enforce the laws related to alcohol, tobacco, firearms, explosives, and arson, and

102a

perform other duties as assigned by the Attorney General, including exercising the functions and powers of the Attorney General under [provisions including the NFA and GCA]."   28 C.F.R. § 0.130(a).

**Expert Testimony of**
**David A. Smith:   Bump Firing and Bump Stocks**

40.   At trial, Defendants called David A. Smith, a Firearms Enforcement Officer with ATF's Firearms and Technology Division ("FATD") in Martinsburg, West Virginia, to testify "as an expert in the field of firearm mechanics and operations."   (Dkt. # 57, Trial Transcript, at [25:7-25:13].)   Plaintiff did not object to Smith's qualifications as an expert in this field, and the Court, finding Smith qualified as an expert, received his testimony as expert testimony.   (Id. at [39:17- 39:22].)   Smith testified "to give a technical explanation of how bump fire systems work," and "how semi-automatic firearms and automatic firearms work."   (Id. at [40:17-40:20].)

41.   "A bump stock is an accessory attached to a firearm to increase its rate of fire, to make it easier for somebody to fire a weapon faster."   (Id. at [44:1- 44:3].)   Bump stocks harness the force of recoil to enable a weapon to fire multiple rounds when, while keeping the trigger finger stationary, the shooter pushes forward with the non-shooting hand.   (Id. at 84:2-84:9].)   A bump stock works because "[t]he weapon recoils faster than you can react."   (Id. at [84:3-84:4].)   Smith explained that

> part of how the bump fire system works is that you are attempting to continually press forward, but the recoil impulse overcomes your ability to press for-

103a

ward, moves the firearm back inside the stock and mentally you're doing nothing but pressing forward so it brings it back in contact with your trigger finger and fires again.

(Id. at [83:4-83:9].)

**42.** Bump stocks are parts designed to modify semi-automatic long guns.   83 Fed. Reg. 66516; *see* Dkt. # 54-5, Exh. G-8, AR000716, https://www.nytimes.com/inter-active/2017/10/04/us/bump-stock-las-vegas-gun.html (last visited Nov. 13, 2020).   They are manufactured with a sliding shoulder stock molded or otherwise attached to a grip that includes a "trigger ledge," on which the shooter places his finger.   (Dkt. # 54-8, Exh. G-8, AR000126-AR000132, AR000133.)   These devices also typically have a detachable rectangular receiver module that goes in the receiver well of the bump stock's handle to guide the recoil of the weapon when fired.   (Id. at AR000160-AR000166.)

**43.** The firing sequence begins when the shooter presses forward on the firearm to initially engage the trigger finger.   (Dkt. # 57 at [82:25-83:3].)   When this happens, the rifle slides back and forth and its recoil energy bumps the trigger finger into the trigger to continue firing until the shooter stops pushing forward with his non-shooting hand or the weapon runs out of ammunition or malfunctions.   (See Dkt. # 54-5, Exh. G-8, AR000716, https://www.nytimes.com/interactive/2017/10/04/us/bump-stock-las-vegas-gun.html (last visited Nov. 13, 2020).)   The shooter does not have to pull rearward to continue firing as long as he keeps his finger on the trigger ledge.   (See Dkt. # 57 at [80:22-81:6].) In fact, Smith testified that the trigger finger "could be replaced by a post and would function the same way."

104a

(Id. at [56:18-56:20].)    Therefore, when a bump stock is used as intended, the shooter pushes forward to engage the trigger finger with the trigger, which causes a single trigger pull that initiates a firing sequence that continues to fire as long as the shooter continues to push forward. (Dkt. # 54-5, Exh. G-8, AR000716; 83 Fed. Reg. 66519; Aposhian v. Barr, 374 F. Supp. 3d 1145, 1152-53 (D. Utah 2019) ("Aposhian I").)

44. By comparison, manufactured automatic fire-arms continue to fire if "you continue to keep your finger down on the trigger."    (Id. at [81:22-82:5].)    These weapons also stop firing if the firearm runs out of ammu-nition or malfunctions.    (See id.)    "So, basically the pressing forward on the [bump stock-equipped semi-au-tomatic weapon] is the equivalent of pulling the trigger on the [weapon] in full automatic."    (Id. at [83:4-83:7].) If the shooter stops pressing forward with a bump stock-equipped firearm or stops pulling the trigger with a fully automatic firearm, firing ceases.    (Id.)

45. Smith explained that installing a bump stock on an AR-type firearm requires removing the pistol grip and stock assembly to replace them with the bump fire system (bump stock part).    (Id.at [44:4-44:16].)    Ac-cording to Smith, this transformation is "fairly simple" for an individual weapon owner to accomplish without professional assistance.    (Id.at [44:17-44:20].)

46. Smith has test fired weapons equipped with bump stock devices, including the Slide Fire bump stock device Plaintiff possessed.    (Id. at [42:11- 42:24].)    To expand his understanding of bump stocks, Smith also re-viewed materials from the Administrative Record for ATF and website for the United States Patent and Trademark Office ("PTO").    (Id. at [42:14-42:18].)

105a

Smith was not involved in the issuance of the Final Rule. (Id. at [43:5-43:7].)

**47.** On cross-examination, Smith testified that, even with his extensive experience, firing a weapon equipped with a bump stock did not come all that naturally, and required practice "as you would learn [how to use] any mechanical device."   (Id. at [85:11-85:24].)

**48.** The recoil-harness fire method employed by bump stock devices is colloquially called "bump firing" and, if the shooter has "physically practiced it enough," this method can be achieved with other devices (like a belt loop) or with no device at all.   (Dkt. # 54-8, Exh. G-22, AR000134; Dkt. # 57 at [85:25-86:6, 87:2-87:4].) Smith testified that, while the shooter is still "not pulling the trigger between each shot" in these cases, "[i]t is much more difficult to bump fire a weapon without a stock or without some additional accessory compared to firing with a bump-stock."   (Id. at [87:12-87:15, 89:25-90:4].)

**49.** Without bump firing, a semi-automatic weapon will go through its cycle of operations and fire a shot just once.   (Dkt. # 57 at [46:15-46:16].)   This means that, "[o]nce the firing is initiated [through one of a number of actions, the weapon] has a self-regulating mechanism that allows it to extract the spent cartridge, eject it, load the new cartridge and either cock the hammer or charge the firing pin system and then it stops."   (Id. at [46:8-46:14].)

**50.** "A semi-automatic rifle can typically fire as fast as the shooter can pull with their trigger finger."   (Dkt. # 57 at [47:21-47:22].)   Smith testified that a shooter like Jerry Miculek, who "is known for having one of the

106a

fastest trigger fingers in the world," still has "his trigger finger going back and forth for every single shot" when rapidly firing a semi-automatic weapon. ( Id. at [47:21-48:7].) When ATF solicited comments before issuing the Final Rule, some commenters argued that there was no meaningful distinction between Miculek's fingers and bump stock devices because they both increased the rate of fire of a semi-automatic weapon. (See, e.g., Dkt. # 54-10, Exh. G-26, Comment from Tyler Capobres, AR002200 ("Jerry Miculek is a professional shooter, who can accurately fire nearly as fast as a bumpfire stock [*sic*] with just his finger. . . . Are you going to ban/regulate his fingers?").)

**51.** As Smith explained, it is not the rate of fire that separates semi-automatic firearms from automatic ones. (Dkt. # 57 at [53:9-53:23].) Rather, "[a]n automatic firearm is a weapon which, when the firing cycle of operations is initiated[,] . . . however that cycle of operations is initiated, [it] has some self-regulating mechanism to assist with that cycle of operation" to "continue that cycle of operations until something changes, either that initiation sequence is stopped or the weapon malfunctions or runs out of ammunition." ( Id.)

**52.** This characterization echoes that in the Final Rule, which defines "automatically" in 26 U.S.C. § 5845(b) to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single [pull of the trigger or analogous motion]." 83 Fed. Reg. 66515.

**Past Regulation of Bump Stocks and Related Devices**

**53.** ATF allows manufacturers and owners to solicit the agency's view regarding the correct classification of

107a

a firearm, accessory, or other item. (See Dkt. # 54-5, Exh. G-12, NFA Handbook, at 35.) In response to such requests, ATF may provide a classification letter indicating its current position on a particular device. (Id.) The NFA Handbook specifically notes that "classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulations." (Id.)

54. These classifications are performed by the Firearms Technology Industry Services Branch ("FTISB"), formerly known as the Firearms Technology Branch ("FTB"), a division within ATF's FATD. (Dkt. # 1 ¶¶ 32-33, Dkt. # 11 ¶¶ 32-33.)

55. In many cases, FTB declined to make a classification without first test-firing a device. (See, e.g., Dkt. # 54-6, Exh. G-19, AR000084; Dkt. # 54-2, Exh. P-4, AR000095; Dkt. # 54-8, Exh. G-22, AR000188; Dkt. # 54-9, Exh. G-22, AR000210, AR000212, AR000228, AR000231, AR000233.)

56. In one letter dated April 5, 2007, Richard Vasquez, then-Assistant Chief of FTB, opined that "FTB cannot make a classification on pictures, diagrams, or theory" and suggested the requester submit a prototype for evaluation. (Dkt. # 54-2, Exh. P-4, AR000095-AR000096 (emphasis in original).)

57. In 2002 and 2004, Florida inventor William Akins asked ATF to determine whether the Akins Accelerator, a bump stock that "uses an internal spring and the force of recoil to reposition and refire the rifle," would be classified as a machinegun under the NFA. (Dkt. # 54-5, Exh. G-18, AR000007-AR000021; see Dkt. # 54-7, Exh.

108a

G-20, AR000494-AR000511; Dkt. # 54-7, Exh. G-21, AR000534-AR000537.)

**58.** The firearm's trigger reset between each shot during the operation of the Akins Accelerator.   (See Dkt. # 54-5, Exh. G-18, AR000007-AR000008; Dkt. # 54-7, Exh. G-20, AR000507-AR000509.)

**59.** The Akins Accelerator contained an internal spring that channeled the recoil energy to move the trigger back and forth.   (*See* Dkt. # 54-5, Exh. G-18, AR000010,   AR000015; Dkt. # 54-6, Exh. G-19, AR000076, AR000008; Dkt. # 54-7, Exh. G-20, AR000498, AR000509.)

**60.** ATF tested a prototype of the Akins Accelerator and initially concluded it did not constitute a machinegun.   (Dkt. # 54-5, Exh. G-18, AR000019-AR000020; see Dkt. # 54-7, Exh. G-20, AR000494-AR000511; Dkt. # 54-7, Exh. G-21, AR000534-AR000537; see Akins v. United States, 82 Fed. Cl. 619, 621 (Ct. Cl. 2008).)

**61.** ATF subsequently reversed its view on November 22, 2006, and reclassified the Akins Accelerator as a "machinegun." (Dkt. # 54-6, Exh. G-19, AR000076-AR000083; see Dkt. # 54-7, Exh. G-20, AR000494-AR000511, AR000534-AR000537.)

**62.** On December 13, 2006, ATF issued a policy statement asserting that the portion of the definition of "machinegun" applying to "a part or parts designed and intended for use in converting a weapon into a machinegun . . .  includes a device that, when activated by a single pull of the trigger, initiates an automatic firing cycle that continues until the finger is released or the ammunition supply is exhausted."   (Dkt. # 54-3, Exh. G-3, ATF Rul-

109a

ing 2006-2, AR005599-AR005601; Dkt. # 54-2, Exh. P-5, AR000081-AR000083.)

**63.** Between 2008 and 2017, ATF received many classification requests seeking determinations regarding whether other bump stocks were also properly classified as machineguns. (See Dkt.#54-8,Exh. G-22, AR000105-AR000205;    Dkt. # 54-9, Exh. G-22, AR000206-AR000278.)

**64.** During this period, ATF determined that several proposed bump stocks were not machineguns because, unlike the Akins Accelerator, they did not have internal springs or similar mechanical parts to channel recoil energy. (See, e.g., Dkt. # 54-8, Exh. G-22, AR000104-AR000110; AR000111-AR000115; AR000126-AR000132; AR000137-AR000144; AR000157-AR000159; AR000160-AR000165; AR000167-AR000170; AR000171-AR000174; AR000179-AR000187; AR000191-AR000197; AR000201-AR000205;Dkt. # 54-9, Exh. G-22, AR000206-AR000209; AR000210-AR000211;AR000218- AR000227; AR000242-AR000249; AR000258-AR000262; AR000275-AR000278; see also Dkt. # 54-8, Exh. G-22, AR000145-AR000147; AR000198-AR000200.)

**65.** During this same period, ATF also concluded that some proposed bump stock devices were machineguns because, in ATF's view, they relied on mechanical parts to channel recoil energy. (See, e.g., Dkt. # 54-8, Exh. G-22, AR000119-AR000125; AR000149-AR000156.)

**66.** One manufacturer submitting a classification request during this period was Slide Fire. In 2010, ATF informed Slide Fire that a bump stock submitted for classification by Slide Fire was a firearm part not regulated

110a

under the GCA or NFA, and not a machinegun.   (Dkt. # 54-2, Exh. P-3, AR000126-AR000130; Dkt. # 54-2, Exh. P-6, AR000324-AR000329.)

**67.**  In its patent application, Slide Fire stated that "[t]he shoulder stock and pistol grip and finger rest [of the bump stock] are fixed together as a monolithic handle unit that, in use, is held tight to the user's body."   (Dkt. # 54-5, Exh. G-13, AR000382.)   Slide Fire also stated that this unit (including the user's trigger finger) "remain[s] relatively stationary as  . . .  pulled" in the bump firing mode.   (Id. at AR000385.)

**68.**  Beginning in 2010, Slide Fire made its bump stocks commercially available in the United States.   See 83 Fed. Reg. 66546-47.

**69.**  Another manufacturer submitting a classification request to ATF between 2008 and 2017 was Bump Fire Systems.   ATF determined that a bump stock submitted for classification by Bump Fire Systems was not a machinegun because the "device is incapable of initiating an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted."   (Dkt. # 54-8, Exh. G-22, AR000160-AR000167.)

### Development of the Final Rule Following Las Vegas Shooting

**70.**  On October 1, 2017, a gunman armed with more than two dozen rifles fired "several hundred rounds of ammunition in a short period of time [into a crowd of concertgoers in Las Vegas, Nevada], killing 58 people and wounding approximately 500."   83 Fed. Reg. 66516.

**71.**  Investigators recovered fourteen firearms equipped with Slide Fire bump stocks from the hotel

111a

room from which the shooter carried out his attack ("the Las Vegas shooting"). (See Dkt. # 54-10, Exh. G-24, AR001027-AR001043.)

**72.** On October 2, 2017, ATF Acting Director Thomas Brandon sent an email to a subordinate, asking "are these [bump stocks] 'ATF approved' as advertised?" (Dkt. # 54-2, Exh. P-6, AR000323.)

**73.** Later that day Acting Director Brandon received a reply that said, "They are approved as advertised as long as an individual doesn't perform additional modifications to the firearm." (Id. at AR000330.)

**74.** Members of Congress and members of the public also inquired about the regulatory status of bump stocks following the Las Vegas shooting. (See Dkt. # 54-2, Exh. P-7, AR001094; see also 83 Fed. Reg. 66516.)

**75.** On October 4, 2017, Representative David Cicilline proposed H.R. 3947, "The Automatic Gunfire Prevention Act," which would have amended the GCA to prohibit any "trigger crank, a bump-fire device, or any part, combination of parts, component, device, attachment, or accessory that is designed or functions to accelerate the rate of fire of a semiautomatic rifle but not convert the semiautomatic rifle into a machinegun." (Dkt. # 1 ¶ 88; Dkt. # 11 ¶ 88.)

**76.** H.R. 3947 was never advanced in the House of Representatives and lapsed with the conclusion of the 115th Congress. (Dkt. # 1 ¶ 89; Dkt. # 11 ¶ 89.)

**77.** Also on October 4, 2017, Senator Dianne Feinstein proposed S. 1916, which was identical to H.R. 3947 and never received a vote in the Senate. (Dkt. # 1 ¶ 90; Dkt. # 11 ¶ 90.)

112a

78. On October 5, 2017, the Chief Counsel for ATF sent a proposed memorandum entitled, "Legality of 'Bump-Fire' Rifle Stocks" to the Office of the Attorney General of the United States, which described ATF's prior interpretation as applied to bump stocks. (Dkt. # 54-7, Exh. G-21, AR000534.)

79. The memorandum noted that the "key factor" ATF looked to "in making the determination that these 'bump-fire' devices did not fall within the statutory machinegun definition was whether the device artificially enhanced the rate of fire by using a mechanical feature, as opposed to facilitating a shooter's ability to physically pull the trigger at a higher rate than would be possible without the device." (Id.)

80. The memorandum also noted that ATF had previously concluded that a bump stock device "that relied on the shooter to apply forward pressure on the fore-end of the firearm . . . wasn't a machinegun because [ATF then reasoned] it was incapable of initiating an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted." (Id. at AR000536 (internal quotations omitted).)

81. On October 6, 2017, Jim Cavanaugh, then a "Law Enforcement Analyst" for NBC and MSNBC, sent Acting Director Brandon an email outlining his "outside view . . . on Bump Stocks." (Dkt. # 54-2, Exh. P-8, AR000685.) In this email, Cavanaugh noted that, with bump stocks, "[t]he trigger is only pulled once, by human action" and "recommend[ed] an overruling of the prior decision[s]," arguing that Acting Director Brandon could "do it fast and it is the right thing to do." (Id.) Cavanaugh cautioned against, in his view, "let[ting] the

113a

technical experts take [Brandon] down the rabbit hole." (Id.)

82.  Acting Director Brandon responded to this email later that day, writing, in full, "Thanks, Jim.  At FTB now.  Came to shoot it myself.  I'm very concerned about public safety and share your view.  Have a nice day, Tom."  (Id.)

83.  Acting Director Brandon's calendar for that day indicates his presence at ATF's National Training Center in Martinsburg, West Virginia, but the Court finds no evidence in the Administrative Record regarding whether Acting Director Brandon, or anyone affiliated with ATF, actually test-fired or physically examined a bump stock device that day or since.   (Id. at AR000686.)

84.  On October 10, 2017, Representative Carlos Curbelo proposed H.R. 3999, which would have amended the GCA.  (Dkt. # 1 ¶ 91; Dkt. # 11 ¶ 91.)  This bill would have added a prohibition to the GCA for "any part or combination of parts that is designed and functions to increase the rate of fire of a semiautomatic rifle but does not convert the semiautomatic rifle into a machinegun." (Dkt. # 1 ¶ 92; Dkt. # 11 ¶ 92.)

85.  H.R. 3999 was never advanced in the House and lapsed with the conclusion of the 115th Congress.   (Dkt. # 1 ¶ 93; Dkt. # 11 ¶ 93.)

86.  The DOJ issued an advance notice of proposed rulemaking ("ANPRM") in the Federal Register on December 26, 2017.   (See Dkt. # 54-10, Exh. G-35, AR000773-AR000776, Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices, 82 Fed. Reg. 60929 (Dec. 26, 2017).)

114a

87.  The ANPRM solicited comments concerning the market for bump stocks, asking manufacturers, consumers, and retailers to share information about, *inter alia*, the cost of bump stocks, the number of sales, the cost of manufacturing, and the potential effect of a rulemaking prohibiting bump stocks.  (Id.)

88.  Public comment on the ANPRM concluded on January 25, 2018.  (See id.; https://www.regulations.gov/document?D=ATF-2018-0001-0001  (last visited Nov. 13, 2020).)  The DOJ received 115,916 comments on the ANPRM.  (Id.)

89.  ANPRM commenter Bernard Owens stated in a comment that bump stocks "help reduce the learning curve for [bump firing]," "are used to better control aim while bump firing," "are used to better control the number of shots fired when bump-firing," and have the "primary purpose[]" of "enabl[ing] firing 2 or 3 shots very quickly with good accuracy."  (Dkt. # 54-5, Exh. G-10, AR001526; see https://www.regulations.gov/document?D=ATF-2018-0001-1385 (last visited Nov. 13, 2020).)

90.  ANPRM commenter Nathan Johnson stated in a comment that bump stocks are "an aesthetically and ergonomically pleasing replacement for numerous methods" of bump firing.  (Dkt. # 54-5, Exh. G-16, AR001664; see https://www.regulations.gov/document?D=ATF-2018-0001-20294 (last visited Nov. 13, 2020).)

91.  In this process, Acting Director Brandon considered a *New York Times* online graphic to be a "great" tool for "understanding bump stocks."  (See Dkt. # 54-5, Exh. G-8, AR000716, https://www.nytimes.com/interactive/2017/10/04/us/bump-stock-lasvegasgun.html (last

115a

visited Nov. 13, 2020).)  That online graphic accurately depicts the mechanical operation of a bump stock.

**92.**  On February 20, 2018, President Donald Trump issued a memorandum to the Attorney General concerning bump stocks, which was published in the Federal Register.  (Dkt. # 54-5, Exh. G-11, AR000790-AR000791, 83 Fed. Reg. 7949 ("President's Memo").)

**93.**  The President's Memo directed DOJ "to dedicate all available resources to complete the review of the comments received, and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns."  (Id.)

**94.**  On March 16, 2018, Acting Director Brandon answered questions before the Senate Judiciary Committee.  (See Dkt. # 54-2, Exh. P-7, AR001094.)  In response to a question about the authority to ban bump stocks from Senator Richard Blumenthal, Acting Director Brandon explained ATF's decision process by responding, in full:

> Senator, when I first was with the tragedy on October 1st and dealing with bump stocks, internally within ATF from our technical experts, firearms experts, and our lawyers [the theory] was that they didn't fall within the [GCA and the NFA].

> I have kept an open mind in the interest of public safety from the letters I received from both Republicans and Democrats, and to be candid with you, I went outside and over to DOJ and I said, "I don't want us to have tunnel vision."

> And I'm being told one thing.  And so, the Attorney General tasked the team to look at it.  Since that time, the - our experts [*sic*], working with the DOJ ex-

116a

perts, have led to the advancements from an advanced notice of proposed rulemaking now to a notice of proposed rulemaking that is currently sitting at the Office of Management and Budget.

(Dkt. # 54-2, Exh. P-7, AR001094.)

**95.** On March 29, 2018, DOJ published a Notice of Proposed Rulemaking ("NPRM") establishing changes to the regulations in 27 C.F.R. §§ 447.11, 478.11, and 479.11 to re-interpret the terms "single function of the trigger" and "automatically" within the federal definition of "machinegun" in 26 U.S.C. § 5845(b).   (Dkt. # 54-10, Exh. G-30, AR001238-AR001240, 83 Fed. Reg. 13442 (Mar. 29, 2018), https://www.regulations.gov/document?D=ATF-2018-0002-0001 (last visited Nov. 13, 2020.)   The NPRM received 193,297 comments.   Id.

**The Final Rule and Bump Stocks**

**96.** On December 26, 2018, DOJ published in the Federal Register a final rule entitled *Bump Stock Type Devices*.   See 83 Fed. Reg. 66514 (Dec. 26, 2019) ("The Final Rule").

**97.** The Final Rule was promulgated by the Attorney General, DOJ, and ATF.   Id. at 66514, 66554.

**98.** The Final Rule acknowledged the role of Presidential direction in the Final Rule's adoption, including from the President's Memo.   Id. at 66516-17.

**99.** The Final Rule sets forth the DOJ's understanding of the terms "automatically" and "single function of the trigger."   Id.

**100.** The Final Rule states that the phrase "single function of the trigger" means a "single pull of the trigger and analogous motions."   Id. at 66515, 66553.

117a

**101.** The Final Rule states that the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot" means "functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger."   Id. at 66518-19, 66553-54.

**102.** The Final Rule instructed individuals who purchased bump stocks prior to its implementation that they could destroy the devices themselves or abandon them at their local ATF office prior to the effective date of the Final Rule, March 26, 2019.   83 Fed. Reg. 66514, 66530.

**103.** Most firearms operate through the pull of a shooter's finger on a curved trigger.   See United States v. Jokel, 969 F.2d 132, 134-35 (5th Cir. 1992); United States v. Carter, 465 F.3d 658, 664-65 (6th Cir. 2006).

**104.** "Pull the trigger" is the commonly accepted terminology for the method by which firearms are usually operated.   See "trigger," n.1., OED Online, https://www.oed.com/view/Entry/206003; Webster's New World Dictionary 1177 (3d ed. 1988); Guedes I, 356 F. Supp. 3d at 130.

**105.** "Automatically" is the adverbial form of "automatic," which, when the NFA was enacted in 1934, was defined to mean "having a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation."   (Dkt. # 54-10, Exh. G-33, Webster's New International Dictionary 187 (2d ed. 1934).)

**Plaintiff and the Final Rule**

**106.** In April 2018, Plaintiff purchased two Slide Fire bump stock devices, which had been approved for sale by

118a

ATF, for use in recreational shooting and targeting practice.    (Dkt. # 54-2 ¶ 3.)

107.  Plaintiff owned those two Slide Fire bump stocks until he surrendered them to ATF on March 25, 2019, in compliance with the Final Rule.    (Id. ¶ 4.)

108.  ATF agreed to preserve Plaintiff's bump stocks while this lawsuit is pending.    (Dkt. # 1 ¶ 124; Dkt. # 11 ¶ 124.)

109.  ATF has preserved Plaintiff's Slide Fire devices pending the outcome of this lawsuit.    (Dkt. # 54-2 ¶ 5.)

110.  In this suit, Plaintiff seeks the return of his bump stock devices, as well as a declaratory judgment and permanent injunction preventing the enforcement of the Final Rule against him and others similarly situated within the Court's jurisdiction.    (Dkt. # 1 ¶ 251; Dkt. # 39 ¶¶ 325-327.)

## II.    CONCLUSIONS OF LAW

### A.    Whether Plaintiff has standing to bring this case

111.  Under Article III of the U.S. Constitution, federal courts only have jurisdiction to decide cases and controversies.    Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60 (1992).    Accordingly, the party invoking federal jurisdiction—in this case, Plaintiff—must prove three elements to establish standing:    injury in fact, causation, and redressability.    Id. at 561.    Plaintiff claims he "has continued and will continue to suffer harm in the form of a violation of his constitutional rights, a deprivation of his property, and potential criminal prosecution.    (Dkt. # 1 ¶ 250.)    As explained below, the Court finds Plaintiff has met the standing bar for his claim of property deprivation and, therefore, does not

119a

unnecessarily reach his other asserted grounds for standing.

112. First, Plaintiff must have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent." Id. at 560. An "invasion of a legally protected interest" supplies Plaintiff with the requisite personal stake in the outcome of this case. Deutsch v. Annis Enterprises, Inc., 882 F.3d 169, 173 (5th Cir. 2018). Because Plaintiff was required to surrender his bump stock devices to ATF on March 25, 2019 to comply with the Final Rule, he has met this element. (Dkt. # 1 ¶ 2.) Second, Plaintiff must show a "causal connection between the injury and the conduct complained of." Lujan, 504 U.S. at 560. Plaintiff has sufficiently traced this property deprivation injury to Defendants' issuance of the Final Rule by accurately noting that the Final Rule "direct[ed] him to destroy or surrender his Slide Fire devices before March 26, 2019." (Dkt. # 1 ¶¶ 122, 124; see 83 Fed. Reg. 66547).) Third, Plaintiff must show that it is likely—not merely speculative—that his injury "will be redressed by a favorable decision." Lujan, 504 U.S. at 561. If Plaintiff were to succeed in this case and obtain a permanent injunction against the Final Rule's enforcement, the Court could redress Plaintiff's harm by ordering ATF to return Plaintiff's devices. Accordingly, Plaintiff has met his constitutional burden to prove standing.

113. "Even if a plaintiff establishes Article III standing, [the Court] may consider whether prudential standing principles nonetheless counsel against hearing the plaintiff's claims." Cibolo Waste, Inc. v. City of San Antonio, 718 F.3d 469, 474 (5th Cir. 2013). "For a plaintiff to have prudential standing under the APA, 'the interest

120a

sought to be protected by the complainant [must be] arguably within the zone of interest to be protected or regulated by the statute in . . . question.'" Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 488 (1998) (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970)). "Whether a plaintiff comes within 'the zone of interests' is an issue that requires [the Court] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Lexmark Int'l Inc. v. Static Control Components, Inc., 572 U.S. 118, 127 (2014). The APA permits suits by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. In this case, Plaintiff was forced to surrender or destroy his own property in response to the issuance of the Final Rule. (Dkt. # 1 ¶¶ 52, 122, 124.) Accordingly, Plaintiff's arguments are not "generalized grievance[s]" or attempts to "rais[e] another person's legal rights." Cibolo Waste, 718 F.3d at 474. There are no prudential limitations preventing the Court from deciding this case.

**114.** Plaintiff can seek injunctive relief if "continuing, present adverse effects" accompany his allegation of past injury. Lyons v. City of Los Angeles, 461 U.S. 95, 102 (1983). Plaintiff alleges that he has suffered and "will continue to suffer harm in the form of a violation of his constitutional rights, a deprivation of his property, and potential criminal prosecution. (Dkt. # 1 ¶ 250.) Because the Final Rule does not permit ATF—who has retained Plaintiff's devices while this suit is pending—to lawfully return Plaintiff's devices, Plaintiff has met this requirement. (See id. ¶¶ 5, 52, 122, 124; 83 Fed. Reg.

121a

66515, 66539 (requiring current bump stock owners to destroy or "abandon" their devices at their local ATF field office by March 26, 2019 and prohibiting possession after that date).)

**115.** For the reasons above, Plaintiff has a direct interest in the outcome of this case and standing to pursue it.

**B.  Whether the Final Rule was validly issued pursuant to appropriately delegated authority from Congress**

### 1.  Whether the Final Rule was a legislative or interpretive rule

**116.** Agency statements usually fall into one of two types: legislative or interpretive. <u>Perez v. Mortg. Bankers Ass'n</u>, 575 U.S. 92, 96-97 (2015). Legislative—or substantive—rules are issued pursuant to statutory authority and have the force and effect of law. <u>PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.</u>, 139 S. Ct. 2051, 2055 (2019). These rules also "affect individual rights" and "create new law." <u>Davidson v. Glickman</u>, 169 F.3d 996, 999 (5th Cir. 1999). By contrast, interpretive rules simply "advise the public of [an] agency's construction of the statutes and rules which it administers." <u>Perez</u>, 575 U.S. at 96-97 (quoting <u>Shalala v. Guernsey Memorial Hosp.</u>, 514 U.S. 87, 99 (1995)). Interpretive rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process." <u>Shalala</u>, 514 U.S. at 99.

**117.** The Court is not bound by an agency's choice of label for its action. <u>U.S. Dep't of Labor v. Kast Metals Corp.</u>, 744 F.2d 1145, 1149 (5th Cir. 1984). Instead, it must first look to whether an agency "intended" to speak

122a

with the force of law when classifying a rule as legislative or interpretive.   See Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2122 (2016).   To uncover this intent, the Court examines the "language actually used by the agency."   Cmty. Nutrition Inst. v. Young, 818 F.2d 943, 946 (D.C. Cir. 1987).   Second, the Court sees "whether the agency has published the rule in the Code of Federal Regulations."   Am. Mining Cong. v. Mine Safety & Health Admin., 995 F.2d 1106, 1109 (D.C. Cir. 1993).   Third, the Court must determine "whether the agency has explicitly invoked its general legislative authority."   Id.; see Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 920 F.3d 1, 18-19 (D.C. Cir. 2019) ("Guedes II").   Fourth, courts in the Fifth Circuit must consider whether the rule will "produce [] significant effects on private interests."   Gulf Restoration Network v. McCarthy, 783 F.3d 227, 236 (5th Cir. 2015).   Finally, if a court finds an express invocation of the Chevron framework in the rule, the rule is likely legislative because Chevron deference can only apply to legislative rules.   See Guedes II, 920 F.3d at 18-19.

118. Defendants intended the Final Rule to speak with the force of law.   As the D.C. Circuit noted, the Final Rule "unequivocally bespeaks an effort by [Defendants] to adjust the legal rights and obligations of bump-stock owners—i.e., to act with the force of law."   Id. at 18.   The prospective, binding language in the Final Rule makes this intent clear.   Id.   For instance, the Final Rule states that bump stocks "*will be prohibited when* this rule becomes effective."   83 Fed. Reg. 66514 (emphasis added).   Defendants went out of their way to clarify that—before the Final Rule's effective date—any person "currently in possession of a bump-stock-type device *is not acting unlawfully*."   Id. at 66523 (emphasis

123a

added).   The Final Rule also provides guidance for how individuals can comply "*to avoid violating* 18 U.S.C. § 922(o)" and emphasizes that it will "criminalize *only future conduct, not past possession*" of bump-stock-type devices.   Id. at 66525, 66530.[4]

**119.** Second, the Final Rule's "publication in the Code of Federal Regulations also indicates that it is a legislative rule." Guedes II, 920 F.3d at 19 (citing Am. Mining Cong., 995 F.3d at 1112).   Publication in the Code of Federal Regulations ("the CFR") is statutorily limited to rules with "general applicability and legal effect."   44 U.S.C. § 1510.   Because the Final Rule purports to amend three definitional sections of the CFR (27 C.F.R. §§ 447.11, 478.11, and 479.11), this factor also suggests the Final Rule is legislative.   See Guedes II, 920 F.3d at 19.

**120.** Third, "the agency has explicitly invoked its general legislative authority" from two sources.   Id.   The Final Rule cites 18 U.S.C. § 926(a) and 26 U.S.C. § 7805(a)[5] in support of Defendants' ability to promulgate the Final Rule.   83 Fed. Reg. 66515.   Under section 926(a), the Attorney General has the power to "prescribe only such rules and regulations as are necessary to carry out the provisions of [the GCA]."   18 U.S.C. § 926(a).

---

[4]  For this reason, the Court also rejects Plaintiff's challenge that the Final Rule violates the Administrative Procedure Act for its "retroactive effect."   (Dkt. # 1 ¶ 249.)

[5]  The Final Rule also cites 26 U.S.C. § 7801(a)(2)(A), which clarifies that the authority in section 7805(a) related to the NFA belongs to the Attorney General, rather than the Secretary of the Treasury.   26 U.S.C. § 7801(a)(2)(A).   For the sake of brevity, the Court simply refers to this combined authority as an invocation of Defendants' authority under section 7805(a).

124a

Section 7805(a) grants the Attorney General authority to "prescribe all needful rules and regulations for the enforcement of [the NFA]." 26 U.S.C § 7805(a); see Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (transferring NFA enforcement power from the Secretary of the Treasury to the Attorney General without altering the language still present in section 7805).

121. Fourth, the Final Rule "impose[s] obligations [and] produce[s] . . . significant effects on private interests." Gulf Restoration Network, 783 F.3d at 236 (distinguishing rulemaking from an unreviewable enforcement decision). The D.C. Circuit has reasoned that "[t]he most important factor in differentiating between binding and nonbinding actions is the actual legal effect (or lack thereof) of the agency action in question." *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015) ("Huerta"). "Agency action that creates new rights or imposes new obligations on regulated parties or narrowly limits administrative discretion constitutes a legislative rule." Id. Defendants estimate that the Final Rule will have an economic impact of $102.5 million by voiding the sale of as many as 520,000 bump-stock devices. 83 Fed. Reg. 66547. This adjustment imposes the type of "significant effect[] on private interests" characteristic of legislative rules. See Gulf Restoration Network, 783 F.3d at 236; see Huerta, 785 F.3d at 717.

122. ATF further demonstrated the legislative character of the Final Rule by explicitly invoking the framework of Chevron U.S.A., Inc. v. Nat. Res. Def. Council, 467 U.S. 837 (1984) because interpretive rules "enjoy no *Chevron* status as a class." United States v. Mead

125a

*Corp.*, 533 U.S. 218, 232 (2001); 83 Fed. Reg. 66527.    For all these reasons, the Final Rule is a legislative rule.

### 2. Whether the Final Rule is *ultra vires* as a legislative rule issued pursuant to 18 U.S.C. § 926(a) and 26 U.S.C. § 7805(a)

**123.**  Defendants first invoked 18 U.S.C. § 926(a) as delegated authority to issue a legislative rule like the Final Rule.    83 Fed. Reg. 66515.    That statute authorizes the Attorney General to "prescribe only such rules and regulations as are necessary to carry out the provisions of [the GCA]."    18 U.S.C. § 926(a).    Defendants then invoked 26 U.S.C. § 7805(a) for the authority to "prescribe all needful rules and regulations for the enforcement of [the NFA]."    26 U.S.C. § 7805(a).

**124.**  Plaintiff characterizes the delegation under 18 U.S.C. § 926(a) as "implementing authority."    (Dkt. # 39 ¶ 263.)    He argues that "Congress withheld a different type of legislative rulemaking authority," instead providing a limited delegation for implementation. (Id.)    By contrast, the D.C. Circuit found this delegation to be "a general conferral of rulemaking authority" that clearly included the authority to issue legislative rules that fill gaps in the statutory definition of "machinegun" like the Final Rule does.    Guedes II, 720 F.3d at 20-21.

**125.**  Like Plaintiff, Defendants contend—in this litigation and in related cases on appeal—that every court which has examined the delegations cited in the Final Rule has read the delegations too broadly.    (Dkt. # 59 at 16; see Br. for the Respondents in Opp. at 14, 25, Guedes v. ATF, cert. denied, No. 19-296 ("Guedes III") (Dec. 4, 2019); Br. for Appellees at 40-41, Aposhian v. Barr, No. 19-4036 (10th Cir. Aug. 26, 2019) ("Aposhian

126a

II").)  Defendants agree with Plaintiff that "the narrow statutory delegation on which the [Final Rule] relies does not provide the Attorney General the authority" to issue legislative rules with criminal consequences. (Dkt. # 59 at 16.)

126.  In Texas v. United States, 497 F.3d 491 (5th Cir. 2007), the Fifth Circuit emphasized that "[a]gency authority may not be lightly presumed" or implied *sub silentio*.  Id. at 502 (citing Michigan v. E.P.A., 268 F.3d 1075, 1082 (D.C. Cir. 2001)).  On the other hand, "[i]n this circuit, [courts] apply Chevron to an agency's interpretation of its own statutory jurisdiction."  City of Arlington, Tex. v. F.C.C., 668 F.3d 229, 248 (5th Cir. 2012). Normally, that means that courts in the Fifth Circuit must begin with "the traditional tools of statutory construction" and, if the scope of the delegation is ambiguous, afford deference to an agency's reasonable interpretation of its authority.  Id.; Texas, 497 F.3d at 503; see generally Chevron, 467 U.S. at 842-43.

127.  At the same time, when an agency abandons its interpretation of a statute, that interpretation no longer deserves deference.  Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 480 (1992).[6]  The Supreme Court has noted that "it would be quite inappropriate to defer to an interpretation which has been abandoned by the policymaking agency itself."  Id.  Therefore, although the Final Rule is a legislative rule for which Defendants invoked their authority under 18 U.S.C. § 926(a) and 26

---

[6]  In the Final Rule, ATF abandoned its prior determinations regarding the status of bump stocks.  See 83 Fed. Reg. 66531.  The principle in Estate of Cowart explains why those prior determinations are not entitled to Chevron deference, while the new interpretation may or may not be (see Part II.C below).

127a

U.S.C. § 7805, the Court examines the delegations under these statutes without the deferential thumb of *Chevron* on the scale. See id.

**128.** The parties are correct that section 926(a) could have delegated broader authority to Defendants. But see Guedes I, 356 F. Supp. 3d at 128. Nevertheless—like every other court to have considered the issue—the Court still concludes that section 926(a) is a *broad enough* delegation for ATF to issue a legislative rule that fills gaps in the definition of "machinegun" under the GCA. "Because [section 926(a)] authorizes the [Attorney General] to promulgate those regulations which are 'necessary,' it almost inevitably confers some measure of discretion to determine what regulations are in fact 'necessary.'" Nat'l Rifle Ass'n v. Brady, 914 F.2d 475, 479 (4th Cir. 1990) (Wilkinson, J.). Filling gaps for how to apply the terms within the statutory definition of "machinegun" to bump stocks is within the scope of this "measure of discretion" under section 926(a). See id.; see also Demko v. United States, 44 Fed. Cl. 83, 99 (1999) (recognizing ATF's authority to classify a shotgun as a "destructive device" under another provision of the GCA); 83 Fed. Reg. 66527.

**129.** The Court also agrees with the courts in Guedes I, Guedes II, Aposhian I, and Aposhian II[7] that 26

_____

[7] The Court is aware that the Panel's decision in Aposhian II has been vacated pending a rehearing *en banc* by the Tenth Circuit. See Aposhian v. Barr, 973 F.3d 1151, 1151 (10th Cir. Sept. 4, 2020) ("Aposhian III"). Accordingly, when the Court cites to this vacated decision in these Findings of Fact and Conclusions of Law, it does so by relying on the reasoning behind these parts of the Aposhian II court's determination—which, in each case, finds support outside the

128a

U.S.C. § 7805 provides Defendants the authority to issue a legislative rule like the Final Rule. In <u>Guedes II</u>, the D.C. Circuit noted that the Supreme Court has characterized section 7805 as an "express congressional authorization[] to engage in the process of rulemaking" that served as "a very good indicator of delegation meriting <u>Chevron</u> treatment" (which is necessarily a delegation authorizing legislative rulemaking). <u>Guedes II</u>, 920 F.3d at 20-21 (quoting <u>Mayo Found. For Med. Educ. & Research v. United States</u>, 562 U.S. 44, 57 (2011)).

**130.** Accordingly, Defendants issued the Final Rule pursuant to valid delegated authority and the Final Rule is not *ultra vires*.

### 3. Whether Defendants violated principles of non-delegation and/or separation of powers in this case

**131.** Under Article I of the U.S. Constitution, "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

---

Tenth Circuit—rather than on that case's holding itself. <u>See, e.g.</u>, <u>Guedes II</u>, 720 F.3d 1 (D.C. Cir. 2019).

Accordingly, should the Tenth Circuit's *en banc* decision support Plaintiff's view of the Final Rule, the Court would still find that Defendants shall prevail in this case. <u>Cf.</u> <u>Whole Woman's Health v. Smith</u>, 338 F. Supp. 3d 606, 624-25 (W.D. Tex. 2018) (Ezra, J.) (ruling opposite to the Seventh Circuit's subsequently-reversed decision in <u>Planned Parenthood of Indiana and Kentucky, Inc. v. Comm'r of Indiana State Dep't of Health</u>, 888 F.3d 300, 309 (7th Cir. 2018), regarding an Indiana fetal tissue remains law virtually identical to that of Texas); <u>Box v. Planned Parenthood of Indiana and Kentucky, Inc.</u>, 139 S. Ct. 1780, 1782 (2019) (reversing the Seventh Circuit's determination—not relied on by the undersigned—that a state's asserted interest in "the humane and dignified disposal of human remans" was illegitimate on its face).

129a

Yet, Congress can delegate some authority to the Executive Branch (or independent agencies) to engage in rulemaking without violating principles of non-delegation, even where such rulemaking may lead to criminal consequences.  See Loving v. United States, 517 U.S. 748, 768 (1996) (documenting the Supreme Court's history of "uphold[ing] delegations whereby the Executive or an independent agency defines by regulation what conduct will be criminal").   Plaintiff's reliance on United States v. Eaton, 144 U.S. 677 (1892) is inapposite, as that case has been severely limited since the Supreme Court reached that decision more than a century ago. See, e.g., United States v. Howard, 352 U.S. 212, 216-17 (1957) ("[Eaton] turned on its special facts  . . .  [and] has not been construed to state a fixed principle that a regulation can never be a 'law' for purposes of criminal prosecutions.").   Because executive actors (like Defendants) may issue rules that lead to criminal consequences, there is no separation of powers issue with the Final Rule.   Loving, 517 U.S. at 768.

132.  The Final Rule also comports with non-delegation principles.   "[T]he Constitution does not 'deny[] to the Congress necessary resources of flexibility and practicality to perform its function[s].'"   Gundy v. United States, 139 S. Ct. 2116, 2123 (2019) (quoting Yakus v. United States, 321 U.S. 414, 425 (1944)).   The Supreme Court has "held, time and again, that a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'"   Id., 139 S. Ct. at 2123 (quoting J.W. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 409 (1928)).

130a

**133.** The Supreme Court "has made clear" that the standards for compliance with non-delegation principles "are not demanding." _Gundy_, 139 U.S. at 2129. In fact, "[o]nly twice in this country's history [has the Supreme Court] found a delegation excessive." Id.

**134.** The Final Rule explains the criminal consequences of bump stock ownership by fleshing out the definitions of "single function of the trigger" and "automatically" within 26 U.S.C. § 5845(b). See 83 Fed. Reg. 66515. By not defining those terms explicitly in the statute, Congress implicitly delegated the authority to clarify those terms. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159 (2000); see also Aposhian I, 374 F. Supp. 3d at 1151 (citing Chevron, 467 U.S. at 844 (recognizing the need for "the making of rules [by agencies] to fill any gap left, implicitly or explicitly, by Congress").

**135.** As explained in Part II.B.2, Defendants acted within the scope of delegated authority by issuing this legislative rule. See Brady, 914 F.2d at 479 (explaining the scope of 18 U.S.C. § 926(a)); Guedes II, 920 F.3d at 20-21 (finding the Final Rule within the scope of 26 U.S.C. § 7805). The delegations of authority supporting the Final Rule also do not violate non-delegation principles because 18 U.S.C. § 926(a) only permits the Attorney General to "prescribe such rules and regulations as are necessary to carry out the provisions of [the GCA]" and 26 U.S.C. § 7805 provides similar authority for "all needful rules and regulations for the enforcement of [the NFA]." 18 U.S.C. § 926(a); 26 U.S.C. § 7805(a). Given that the Supreme Court has "over and over upheld even very broad delegations," like ones requiring an agency merely "to regulate in the 'public interest,'" the delega-

131a

tions underlying the Final Rule certainly pass the "intel-ligible principle" test.   Gundy, 139 U.S. at 2129 (citing Nat'l Broadcasting Co. v. United States, 319 U.S. 190, 216 (1943)).

**136.**   Therefore, the Court is not convinced by either Plaintiff's separation of powers argument or his non-del-egation argument.

**C.   Whether Defendants' current interpretations are entitled to deference under Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837**

**1.   Whether Chevron deference can be—and, in this case, has been—waived**

**137.**   In their trial briefs, Defendants avoid relying on Chevron deference to support their interpretation of "machinegun" in the Final Rule.   (Dkt. # 46 at 24; Dkt. # 59 at 17.)   However, the Supreme Court's decision in Chevron is binding precedent that, when applicable, the Court is not permitted to ignore.   At the same time, it is less clear whether Chevron deference applies when the lawyers for both sides avoid raising it in litigation.   See SoundExchange, Inc. v. Copyright Royalty BD., 904 F.3d 41, 54 (D.C. Cir. 2018); Global Tel*Link v. F.C.C., 866 F.3d 397, 417 (D.C. Cir. 2017).   While courts should gen-erally reach only those arguments that the parties pre-sent, some argue that *Chevron* represents an interpre-tive framework that binds courts regardless of the argu-ments raised by the parties.   United States v. Sineneng-Smith, 140 S. Ct. 1575, 1578-79 (2020); *see, e.g.*, Anya Bernstein, Who is Chevron For?, Yale J. Reg.: Notice & Comment (Aug. 24, 2017), https://perma.cc/ 3UP6-AJQB (last visited Nov. 13, 2020).

132a

**138.** Both circuits that have considered similar challenges to the Final Rule have wrestled with the role of *Chevron* deference in the case. In Guedes II, Judges Srinivasan and Millett of the D.C. Circuit concluded that "an agency's lawyers . . . cannot waive *Chevron* if the underlying agency action 'manifests its engagement in the kind of interpretive exercise to which review under Chevron generally applies.'" Guedes II, 920 F.3d at 23 (quoting SoundExchange, 904 F.3d at 54). Judge Henderson dissented from this portion of the decision, preferring to "leave for another day whether the Government can 'waive' Chevron review." Id. at 41 n.10 (Henderson, J., concurring in part and dissenting in part); see also Global Tel*Link, 866 F.3d at 417 (declining to decide whether Chevron deference applied when no party raised the issue).

**139.** While granting a rehearing *en banc*, the Tenth Circuit asked litigants for supplemental briefing on whether "Chevron step-two deference depend[s] on one or both parties invoking it, i.e., can it be waived." Aposhian v. Barr, 973 F.3d 1151, 1151 (10th Cir. Sept. 4, 2020) ("Aposhian III") (granting petition to rehear Aposhian II *en banc*).

**140.** For its part, the Supreme Court has built a backstop to Chevron applicability by noting that "it would be quite inappropriate to defer to an interpretation which has been abandoned by the policymaking agency itself." Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 480 (1992). In a statement regarding the denial of certiorari in Guedes III, Justice Gorsuch further noted that the Supreme Court "has often declined to apply Chevron deference when the government fails to invoke it." 140 S. Ct. at 790. For example, in Epic Systems Corp. v.

133a

Lewis, 138 S. Ct. 1612 (2018), the Supreme Court found Chevron deference inappropriate where "the Executive seems of two minds" about the result it prefers.   Id. at 1630 (noting conflict between briefs submitted by the Solicitor General and National Labor Relations Board); see also Baldwin v. United States, 140 S. Ct. 690, 693 (2020) (Thomas, J., dissenting from denial of certiorari) (disfavoring deference when an agency's interpretation "has not been uniform").   An interpretation that "conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view."   INS v. Cardoza-Fonseca, 480 U.S. 421, 446 n.30 (1987) (internal quotations omitted).

141.   Here, the conflict regarding the role of Chevron comes from the explicit invocation of the Chevron framework in the Final Rule by Defendants (see 83 Fed. Reg. 66527) and the deliberate avoidance of the framework by *counsel for* Defendants (and Plaintiff) in their briefs. (See Dkt. # 57 at [27:12-27:13].)   Whether a divergence between the Final Rule and arguments made in defense of the Final Rule can result in a Chevron waiver is an open question the Court need not decide today.   See Guedes II, 920 F.3d at 41 n.10 (Henderson, J. concurring in part, dissenting in part).   As explained below, it is irrelevant whether counsel for Defendants could waive reliance on Chevron deference in the abstract or in this case because Chevron does not apply to criminal statutes.   See United States v. Apel, 571 U.S. 359, 369 (2014).

### 2.   Whether Chevron deference applies to agency interpretations of criminal statutes

142.   Nevertheless, Chevron deference is still inapplicable in this case because "the law before [the Court] car-

134a

ries the possibility of criminal sanctions." <u>Guedes III</u>, 140 S. Ct. at 790. As Justice Gorsuch noted in a statement regarding the Supreme Court's denial of certiorari in <u>Guedes III</u>, <u>Chevron</u> deference "has no role to play when liberty is at stake." <u>Id.</u> The Supreme Court has "never held that the Government's reading of a criminal statute is entitled to any deference." <u>Apel</u>, 571 U.S. at 369; <u>see also</u> <u>Abramski v. United States</u>, 573 U.S. 169, 191 (2014) ("[C]riminal laws are for courts, not for the Government, to construe"); <u>but</u> <u>see</u> <u>United States v. O"Hagan</u>, 521 U.S. 642, 673-77 (1997) (deferring to an SEC interpretation of a criminal statute); <u>Babbitt v. Sweet Home Chapter of Cmties. for a Great Ore.</u>, 515 U.S. 687, 703 (1995) (applying "some degree of deference" to regulations interpreting parts of the Endangered Species Act that provide for criminal penalties). With Justice Gorsuch's guidance in mind, the Court will rely solely on "the traditional tools of statutory construction" to determine whether the Final Rule adopts the correct interpretation of the definition of "machinegun" as applied to bump-stock type devices. <u>Texas</u>, 497 F.3d at 503. In other words, the Court will place no "thumb on the scale in favor of the government." <u>Guedes III</u>, 140 S. Ct. at 790.

**143.** Notably, the Supreme Court has cautioned against wading into deference determinations when the Court determines that an agency rule adopts "not only a reasonable [position], but the position that [the Court] would adopt even if there were no formal rule and [the Court] were interpreting the statute from scratch." <u>Edelman v. Lynchburg College</u>, 535 U.S. 106, 114 (2002); <u>see, e.g.</u>, <u>Aposhian I</u>, 374 F. Supp. 3d at 1151 ("The court need not confront the deference dilemma here because the Final Rule's clarifying definitions reflect the best in-

135a

terpretation of the statute."). As discussed below, the
Court independently finds that the Final Rule adopts the
proper interpretation of "machinegun" by including
bump stock devices, so there really is no occasion to ap-
ply the deference afforded under <u>Chevron</u> step-two in
this case. <u>See</u> <u>Kisor v. Wilkie</u>, 139 S. Ct. 2400, 2415
(2019) ("If uncertainty does not exist, there is no plausi-
ble reason for deference."); <u>Aposhian I</u>, 374 F. Supp. 3d
at 1151.

**D. Whether a bump stock is properly considered a
"machinegun" under 26 U.S.C. § 5845(b)**

**144.** Defendants posit that the best reading of the
statutory definition of "machinegun" includes bump
stocks like Mr. Cargill's two Slide Fire devices. A "ma-
chinegun" is defined statutorily as:

> any weapon which shoots, is designed to shoot, or can
> be readily restored to shoot, automatically more than
> one shot, without manual reloading, by a single func-
> tion of the trigger. The term shall also include the
> frame or receiver of any such weapon, any part de-
> signed and intended solely and exclusively, or combi-
> nation of parts designed and intended, for use in con-
> verting a weapon into a machinegun, and any combi-
> nation of parts from which a machinegun can be as-
> sembled if such parts are in the possession or under
> the control of a person.

26 U.S.C. § 5845(b); <u>see also</u> 18 U.S.C. § 921(23) ("The
term 'machinegun' has the same meaning given such
term in section 5845(b) of the National Firearms Act.").

**145.** In the Final Rule, Defendants amend three
regulatory definitions of "machinegun" at 27 C.F.R.
§§ 447.11, 478.11 and 479.11. The Final Rule sets the

136a

definition of "machinegun" in each provision to mean any weapon

> which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.   The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.   For purposes of this definition, the term 'automatically' as it modifies 'shoots, is designed to shoot, or can be readily restored to shoot,' means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and 'single function of the trigger' means a single pull of the trigger and analogous motions.   The term 'machinegun' includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

83 Fed. Reg. 66553-54.

**146.** From the interpretation above, there are two definitions at issue in this case.   First, the Final Rule defines "single function of the trigger" as a "single pull of the trigger and analogous motions."   Id.   Second, the Final Rule defines "automatically" as "functioning as

137a

the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger." Id.

**147.** Courts "interpret the words [of a statute] consistent with their ordinary meaning at the time Congress enacted the statute." Wisconsin Central Ltd. v. United States, 138 S. Ct. 2067, 2070 (2018).

**148.** Plaintiff argues that, because members in both houses of Congress proposed—but did not enact—legislation explicitly criminalizing bump stock possession before Defendants issued the Final Rule pursuant to existing authority, existing law must not prohibit bump stock possession. (Dkt. # 39 ¶¶ 135-37, 194-97.) Unenacted legislative proposals and views of individual legislators from a later Congress, however, present "a particularly dangerous ground on which to rest an interpretation of a prior statute." Pension Benefit Guaranty Corp. v. LTV Corp., 496 U.S. 633, 650 (1990). "Failed legislative proposals" provide no insight into the intentions of a previous Congress "because several equally tenable inferences can be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." See United States v. Craft, 535 U.S. 274, 287 (2002) (quoting Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 187 (1994)).

**149.** Accordingly, below the Court addresses Defendants' interpretations of "single function of the trigger" and "automatically" according to their "ordinary meaning at the time Congress enacted the statute," and without considering the unreliable evidence of legislative history of unenacted proposals. See Wisc. Central Ltd., 138 S. Ct. at 2070. Because the traditional tools of stat-

138a

utory interpretation yield unambiguous meanings for these terms, the rule of lenity does not apply.   See Yates v. United States, 574 U.S. 528, 547-48 (2015).

>    **1. Whether the Final Rule adopts the proper reading of "single function of the trigger" in 26 U.S.C. § 5485(b)**

**150.**  First, as the court in *Aposhian I* determined, the phrase "single function of the trigger" is best interpreted to mean "a single pull of the trigger and analogous motions."   Aposhian I, 374 F. Supp. 3d at 1151.   The Aposhian I court called this definition the "shooter-focused interpretation" (as opposed to the "mechanically-focused interpretation").   Id. at 1151-52.   It seems likely Congress chose the word "'function' to forestall attempts by weapon manufacturers or others to implement triggers that need not be pulled, thereby evading the statute's reach."   Id. at 1152.   In other words, Congress chose a broader term than the obvious alternative (pull).   Consistent with the broad word choice of "function," the Final Rule includes the phrase "and analogous motions" after "single pull of the trigger."   83 Fed. Reg. 66518.

**151.**  Given that most firearms "function" by the pull of a trigger, courts have "instinctively reached for the word 'pull' when discussing the statutory definition of machinegun."   Guedes I, 356 F. Supp. 3d at 130 (citing United States v. Staples, 511 U.S. 600, 602 n.1 (1994); United States v. Oakes, 564 F.2d 384, 388 (10th Cir. 1977)).   The Supreme Court has described a machinegun as "a weapon that fires repeatedly with a single pull of the trigger."   Staples, 511 U.S. at 602 n.1.   In Oakes, the Tenth Circuit equated "a single function of

139a

the trigger" with "the shooter . . . fully pulling the
trigger." <u>Oakes</u>, 564 F.2d at 388.

**152.** Defendants also provided evidence that "pull"
has meant "function" in this ordinary use since before the
NFA was passed until at least after the FOPA was
passed. <u>See, e.g.</u>, Dwight D. Eisenhower, Address to
the American Society of Newspaper Editors (Apr. 17,
1958), <u>in</u> Public Papers of the Presidents of the United
States (1958) ("It is far more important to be able to hit
the target than it is to haggle over who makes a weapon
or who pulls a trigger"); Webster's New World Diction-
ary 1177 (3d ed. 1988) (defining "Russian roulette" as in-
volving "aim[ing] a gun . . . and pull[ing] the trig-
ger"); Nightline: Biting the Bullet at the NRA [Na-
tional Rifle Association] (ABC television broadcast, June
8, 1990) (NRA President Joe Foss: "[semi-automatic]
guns are like any other gun . . . they're a single-shot,
every time you pull the trigger it shoots"); <u>see</u> <u>also</u> Oliver
Wendell Holmes, Jr., The Common Law: Lecture IV
(1881) (an ordinary person "would foresee the possibility
of danger from pointing a gun which he had not inspected
into a crowd, and pulling the trigger, although it was said
to be unloaded").

**153.** Accordingly, the Court finds that the Final
Rule's definition of "single function of the trigger" to
mean "a single pull of the trigger and analogous motions"
is the correct interpretation. <u>See</u> <u>Aposhian I</u>, 374
F. Supp. 3d at 1151-52.

140a

**2. Whether the Final Rule adopts the proper reading of "automatically" in 26 U.S.C. § 5485(b)**

154.  Second, also like the <u>Aposhian I</u> court found, the Final Rule endorses the correct reading of "automatically" within section 5845(b) by interpreting it to mean "the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger." <u>Aposhian I</u>, 374 F. Supp. 3d at 1153.  As that court found, the "interpretive language is borrowed, nearly word-for-word, from dictionary definitions contemporaneous to the NFA's enactment." <u>Id.</u> at 1152.

155.  Courts "often look to dictionary definitions for help" in determining the ordinary meaning of a statutory term. <u>Cascabel Cattle Co. v. United States</u>, 955 F.3d 445, 451 (5th Cir. 2020); <u>see generally</u> A. Raymond Randolph, <u>Dictionaries, Plain Meaning, and Context in Statutory Interpretation</u>, 17 Harv. J.L. & Pub. Pol'y 71 (1994).  Webster's definition for "automatic" ("having a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation") from the same year Congress passed the NFA nearly mirrors the regulatory definition in the Final Rule. (Dkt. # 54-11, Exh. G-41, Webster's New International Dictionary, Second Edition 187 (1934); <u>see also</u> Dkt. # 54-11, Exh. G-42, "automatic," 1 Oxford English Dict. 574 (1933) ("self-acting under conditions fixed for it, going of itself").)

156.  Defendants point out that, in <u>United States v. Olofson</u>, 563 F.3d 652 (7th Cir. 2009), the Seventh Circuit similarly concluded that "automatically . . . delineates how the discharge of multiple rounds from a weapon

141a

occurs:   as the result of a self-acting mechanism   . . .
set in motion by a single function of the trigger and   . . .
accomplished without manual reloading."   Id. at 658;
(Dkt. # 54-5, Exh. G-7, AR004477-AR004478.)

**157.** Plaintiff, on the other hand, makes two argu-
ments that these regulatory definitions are improper in-
terpretations of the statutory definition of "automati-
cally."   (Dkt. # 39 ¶¶ 282-283.)   First, he contends that
"additional physical manipulation of the trigger" occurs
with bump firing because the trigger "re-engage[s]" be-
tween shots.   (Id. ¶ 282.)   Second, he argues that the
Final Rule "disregards the other physical manipulation
bump firing requires" from retaining forward pressure
with the non-trigger hand.   (Id. ¶ 283.)   Judge Hender-
son, in dissent, found the second argument particularly
persuasive in Guedes II, 940 F.3d at 44 (Henderson, J.,
concurring in part and dissenting in part) ("The statu-
tory definition of 'machinegun' does not include a firearm
that shoots more than one round 'automatically' by a sin-
gle pull of the trigger **AND THEN SOME** (that is, by 'con-
stant forward pressure with the non-trigger hand').").

**158.** Nevertheless, Plaintiff's arguments are of no
avail.   As Defendants persuasively point out, "the move-
ment of the weapon back and forth between shots while
the trigger finger remains stationary on the trigger
ledge *is* the result of an automatic, 'self-acting or self-
regulating mechanism.'"   (Dkt. # 46 at 14 (quoting 83
Fed. Reg. 66553).)   Therefore, even though the
shooter's finger disengages and re-engages with the trig-
ger during the bump firing process, the sequence set in
motion by the initial forward pressure causing a trigger
pull continues.   Multiple rounds fire because "[t]he

142a

weapon recoils faster than you can react."  (Id. at [84:3-84:4].)

**159.**  Defendants also respond convincingly to Plaintiff's argument that, because the shooter must maintain constant forward pressure on the fore-grip or barrel shroud to continue firing, the recoil-propelled process is not "automatic."  (See Dkt. # 46 at 14.)  There is no dispute that fully automatic weapons—those that discharge multiple rounds if "you continue to keep your finger down on the trigger"—shoot "automatically."  (Dkt. # 57 at [81:22-82:5].)  The difference between such weapons and semi-automatic weapons equipped with bump stocks is that—for the latter—the shooter must maintain constant forward pressure with his non-shooting hand and keep his trigger finger stationary, rather than keep constant pressure on the trigger with his shooting hand's trigger finger.  (Id. at [82:5-83:9].)

**160.**  As they relate to the statutory definition, there is no meaningful difference between these two actions. Smith testified that, for firing with a bump stock, "mentally, you're doing nothing but pressing forward."  (Id. at [84:7-84:8].)  In both cases, maintaining pressure in one direction allows shooting to continue from a "self-acting or self-regulating mechanism" until that pressure is released, or the firearm runs out of ammunition or malfunctions.  83 Fed. Reg. 66553.  Like in Aposhian I, the Court finds this similarity—that a shooter can continue firing by just maintaining pressure on the weapon—more accurately reflects the line Congress drew with the term "automatically" than would a distinction based on the strict mechanical workings within the weapon.  See Aposhian I, 374 F. Supp. 3d at 1152-53; National Fire-

143a

arms Act: Hearings Before the Committee on Ways and Means 73rd Cong. 40 (1934).

161. Therefore, as a near-copy of the dictionary definition that "accords with past judicial interpretation," the definition of "automatically" in the Final Rule is the proper interpretation of that term in section 5845(b). Aposhian I, 374 F. Supp. 3d at 1152 (citing Olofson, 563 F.3d at 658). This is especially true considering how fully automatic weapons function by comparison. (Id. at [82:5-83:9].)

> **3. Whether applying these interpretations, the Final Rule properly placed bump stocks within the statutory definition of "machinegun" in 26 U.S.C. § 5485(b)**

162. Applying the definitions of these two terms in the Final Rule to bump stocks makes it clear that a bump stock fits the statutory definition of a "machinegun," as seen in section 5845(b). Congress expanded the definition of "machinegun" in 26 U.S.C. § 5845(b) by adding any part or parts "designed and intended solely and exclusively" to "convert[] a weapon into a machinegun." 26 U.S.C. § 5845(b). The Fifth Circuit has held that semi-automatic weapons outfitted with parts that change the firing capabilities are "machineguns." United States v. Camp, 343 F.3d 743, 744-45 (5th Cir. 2003).

163. Plaintiff contends that bump firing with a bump stock involves separate "functions" of "pulling and releasing the trigger," just as ATF incorrectly used to believe. (See, e.g., Dkt. # 54-8, Exh. G-22, AR000138.) As explained above, the word "function" was interchangeable for "pull" in most cases. See 83 Fed. Reg. 66518 (citing testimony of then-president of the National

144a

Rifle Association, National Firearms Act: Hearings Before the Committee on Ways and Means, H.R. 9066, 73rd Cong., 2nd Sess., at 40 (1934)).   And, if anything, the use of the word "function" instead of "pull" was intended to *expand* the definition of "machinegun."   83 Fed. Reg. 66518 n.1 (citing <u>Camp</u>, 343 F.3d at 745 ("To construe 'trigger' to mean only a small lever moved by a finger would be to impute to Congress the intent to restrict the term to apply only to one kind of trigger, albeit a very common kind.   The language [in 18 U.S.C. § 922(o)] implies no intent to so restrict the meaning.") (internal quotations omitted)).

**164.** The Court agrees with Defendants that a shooter's finger unconsciously disconnecting from the trigger does not constitute multiple "pulls" of the trigger.   (<u>See</u> Dkt. # 57 at [84:3-84:4].)   In fact, "pull" is defined to mean

> to exert upon (something) a force which tends to draw, drag, or snatch it towards oneself, or away from its present position (whether or not movement takes place as a result); to drag or tug.

"Pull, v." OED Online, Oxford University Press, December 2018, https://www.oed.com/view/Entry/154 317?rskey=QI8tWH (last visited Nov. 13, 2020).   Applying this definition, the trigger mechanically resetting as recoil pushes the bump stock-equipped weapon back and forth does not constitute multiple "pulls" of the trigger while the shooter maintains constant forward pressure.   The dictionary definition focuses on a person's intent to "pull" something by noting that a pull results "whether or not movement takes place as a result."   <u>See id.</u>

145a

165. Like other courts interpreting the Final Rule, the Court finds the "shooter-focused interpretation" of the statute is the proper reading. See Aposhian I, 374 F. Supp. 3d at 1151 (stating that a "shooter-focused interpretation" of the statute is the "best" way to read the statute); Guedes I, 356 F. Supp. 3d at 130 (recognizing that the Final Rule understands machineguns from "the perspective of the shooter"); Aposhian II, 958 F.3d at 988 (rejecting argument that the Final Rule improperly adopts a "trigger finger" focus in its definition of the statute). It does not matter that the trigger mechanically resets to "function" again when the shooter only takes one "function" to initiate the firing of multiple rounds. The continuous exertion of forward pressure on the fore-end of the gun while "[t]he weapon recoils faster than you can react" is a "single pull of the trigger [or] analogous motion" just the same as continuing to hold the trigger of a fully automatic weapon is. (Dkt. # 57 at [84:3-84:4].)

166. Therefore, the Final Rule properly classifies a bump stock as a "machinegun" within the statutory definition codified at 26 U.S.C. § 5845(b) and 18 U.S.C. § 921(23).

### 4. Whether the Final Rule drew a reasonable line between bump stock devices and other methods of bump firing

167. Plaintiff contests Defendants' decision to classify a bump stock device as a "machinegun" while excluding semi-automatic rifles themselves or other items that enable bump firing, like belt loops from the definition. (Dkt. # 39 ¶¶ 279-80.) As the Final Rule noted in response to similar comments, bump firing without a bump stock is not accomplished by a "self-acting or self-

146a

regulating mechanism." 83 Fed. Reg. 66532-33. The belt loop method of bump firing "relies on the shooter—not a device—to harness the recoil energy" to continuously engage the trigger. Id. at 66533. Not to mention, unlike a bump stock, a belt loop is not "designed and intended . . . for use in converting a weapon into a machinegun." 26 U.S.C. § 5845(b). Plaintiff seems to even concede this distinction by characterizing a bump stock in his closing argument as "just a tool for a particular shooting technique." (Dkt. # 58 at 15.)

168. The fact that bump stock devices permit replacing the trigger finger with a post if the shooter just keeps pushing forward also distinguishes these devices from the other methods of bump firing. (See Dkt. # 57 at [82:25-83:3].) This conclusion is supported by Smith's testimony at trial that bump firing without a bump stock is "much more difficult." (Dkt. # 57 at [87:12-87:15, 89:25-90:4].)

169. In any case, Plaintiff does not assert a specific cause of action for why this distinction should invalidate the Final Rule. (See Dkt. # 1; Dkt. # 39 ¶¶ 279- 80.) Assuming Plaintiff challenges this distinction under the Administrative Procedure Act, Defendants would only need to demonstrate that they "clearly thought about [these] objections and provided reasoned replies." Guedes I, 356 F. Supp. 3d at 135 (citing City of Portland v. EPA, 507 F.3d 706, 714 (D.C. Cir. 2007)). Defendants' response in the Final Rule more than meets that burden.

170. Accordingly, Defendants reasonably concluded that "belt loops, unlike bump stocks, do not transform semiautomatic weapons into statutory 'machineguns.'" Guedes II, 920 F.3d at 32.

147a

### E.   Whether ATF's actions violate the Administrative Procedure Act

**171.**  Plaintiff argues that the Final Rule should be enjoined for violating 5 U.S.C. §§ 706(2)(A) and/or (C), parts of the Administrative Procedure Act ("APA"). (Dkt. # 1 ¶¶ 182-240.)    For the reasons described below, the Court rejects Plaintiff's APA challenges under both provisions.

### 1.   Whether Defendants' actions were "arbitrary and capricious" or "otherwise not in accordance with law" in violation of 5 U.S.C. § 706(2)(A)

**172.**  Under section 706(2)(A) of the APA, the Court must "set aside agency action, findings, and conclusions found to be  .  .  .  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).   Agency action violates this provision of the APA

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).   The Court "may not substitute its own judgment for that of the agency," but must require "substantial evidence in the record" to support the agency decision.   Texas Oil & Gas Ass'n v. U.S. E.P.A., 161 F.3d 923, 933-34 (5th Cir. 1998).   "The central purpose of arbitrary or capricious review is to assure

148a

that the agency has engaged in 'reasoned decisionmaking.'"  Guedes II, 920 F.3d at 34 (quoting State Farm, 463 U.S. at 52).

### a. Whether ATF considered inappropriate factors in formulating the Final Rule

**173.** Plaintiff challenges Defendants' consideration of "overtly political factors" in adopting the Final Rule. (Dkt. # 39 ¶¶ 303, 306, 309.)   "All would agree that [Defendants] enacted [the Final Rule] in response to the urging of the President, Members of Congress, and others, as part of an immediate and widespread outcry in the wake of the 2017 mass shooting in Las Vegas."  Guedes II, 920 F.3d at 34 (internal quotations omitted).   The Final Rule itself cites a memorandum from President Trump to then-Attorney General Jeff Sessions "direct[ing] the Department of Justice 'as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns.'"  83 Fed. Reg. 66516-17 (quoting Dkt. # 54-5, Exh. G-11, AR000790-AR000791 ("President's Memo")).   Notably, the President's Memo instructed DOJ to "follow the rule of law and . . . the procedures the law prescribes," including the APA.  (Id.)

**174.** Agencies do not act arbitrarily when they consider political factors.   "Presidential administrations are elected to make policy."  Guedes II, 920 F.3d at 34; see also FCC v. Fox Television Stations, 556 U.S. 502, 523 (2009) (Scalia, J.). "As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration."  Nat'l Ass'n of Home Builders v. EPA, 682 F.3d 1032, 1043 (D.C. Cir. 2012) (quoting State Farm, 463 U.S. at 59

149a

(Rehnquist, J., concurring in part and dissenting in part). Transparent consideration of political factors has long been permissible under the APA. See, e.g., ATX, Inc. v. U.S. Dep't of Transp., 41 F.3d 1522, 1528 (D.C. Cir. 1994).

**175.** Here, Defendants transparently considered political input when changing their interpretations of terms within the statutory definition of "machinegun" in section 5845(b). Because political factors are not excluded from permissible considerations in the statutory delegations to Defendants, Defendants were entitled to consider the political input in formulating the Final Rule.

### b. Whether ATF adequately explained its departure from prior interpretations of the statutory definition of "machinegun"

**176.** The Fifth Circuit has recognized that agencies may re-evaluate their past actions "even when the agency 'offered no new evidence to support its decision.'" Clean Water Action v. EPA, 936 F.3d 308, 315 (quoting Nat'l Ass'n of Home Builders v. EPA, 682 F.3d 1032, 1038 (D.C. Cir. 2012)). Notwithstanding the fact that the change in the Final Rule is merely a re-evaluation of a past legal determination, the Las Vegas shooting itself *is* "new evidence" that sparked action from Executive actors ranging from the President to Defendants, themselves. See id.

**177.** The Supreme Court has held that the APA "makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action." Fox, 556 U.S. at 515. When changing course, an agency must simply "provide reasoned explanation for its action." Id. Under the APA, the rele-

150a

vant inquiry is not whether the Court is satisfied "that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better" while engaging in a conscious change of course.    Id.

**178.**  The Final Rule includes a description of ATF's previous interpretation:    that a bump stock did not constitute a "machinegun" because ATF "relied on the mistaken premise that the need for 'shooter input' (i.e. maintenance of pressure) for firing with bump-stock-type devices mean[t] that such devices d[id] not enable 'automatic' firing."  83 Fed. Reg. 66531.   In this same statement, the Final Rule identifies the error in prior agency classification decisions and subsequently rectified the interpretation as applied to bump stocks.    See *id*.

**179.**  By clearly identifying the agency's departure from past interpretations and identifying appropriate reasons for the new interpretation, Defendants' actions withstand  Plaintiff's  challenge  under  5  U.S.C. § 706(2)(A).

c. **Whether the Final Rule reflects agency expertise and resulted from a thorough consideration of relevant evidence**

**180.**  Plaintiff argues that the "change in position was entirely political" and not rooted in agency expertise. (Dkt. # 39 ¶ 306.)   This is not true.   Together, Defendants ATF and DOJ properly relied on their expertise in the areas of firearms regulation to "reconsider and rectify" prior classification decisions regarding bump stocks.   83 Fed. Reg. 66516.   The Final Rule corrects a

151a

legal interpretation of a statute as applied to bump stocks, which is within the expertise of the DOJ and ATF. See 26 U.S.C. § 7801(a)(2)(A) ("The administration and enforcement [of the NFA] shall be performed by or under the supervision of the Attorney General."); 18 U.S.C. § 926(a) (empowering the Attorney General to "prescribe . . . such rules and regulations as are necessary to carry out the provisions [of the GCA]."); 28 C.F.R. § 0.130(a) ("Subject to the direction of the Attorney General and the Deputy Attorney General, the Director of ATF shall (a) Investigate, administer, and enforce the laws related to alcohol, tobacco, firearms, explosives, and arson, and perform other duties as assigned by the Attorney General.").

181.  Plaintiff next argues that the change in the Final Rule "was plainly not spurred by any new factual analysis."  (Dkt. # 39 ¶ 307.)   However, Defendants are free to rely "on a reevaluation of which policy would be better in light of the facts."   National Ass'n of Home Builders, 682 F.3d at 1038.   The Supreme Court has "ma[de] clear that this kind of reevaluation is well within an agency's discretion."   Fox, 556 U.S. at 514-15.

182.  Then Plaintiff contends, without citing statutory authority, that "[c]lassification rulings can *only* be issued after a physical examination of a device."  (Dkt. # 39 ¶ 307; see Dkt. # 54-2, Exh. P-4, AR000095.)   Even if physical examination were a requirement, *re*-examination would not be necessary in this case.   Both sides agree that "neither the mechanism of bump stocks in general, nor [that of] the Slide Fire in particular, changed since their [previous] approval."   (Id. ¶ 311; Dkt. # 46 at 28.)   Defendants did not need to re-exam-

152a

ine physical bump stocks to update their legal analysis of the same facts in the Final Rule.

**183.**    Finally, Plaintiff argues that Defendants inadequately considered comments from Former Assistant Chief and Acting Chief of FTB, Rick Vasquez, and President of the ATF Association, Michael R. Bouchard. (Dkt. # 39 ¶ 310.)    But the Administrative Record indicates that Defendants "kept an open mind throughout the notice-and-comment process and final formulation of the [Final Rule]."    (See Dkt. # 54-2, Exh. P-7, AR001094; Guedes II, 920 F.3d at 34 (citing Air Transp. Ass'n of Am. v. Nat'l Mediation Bd., 663 F.3d 476, 487-88 (D.C. Cir. 2011)).)    Because the Court agrees with Defendants' legal conclusions and reasoning in the Final Rule, it follows that the Court finds that Defendants have "articulate[d] a satisfactory explanation for [their] actions."    State Farm, 463 U.S. at 43.

**184.**    Because Defendants relied on their expertise in issuing the Final Rule and merely re-evaluated existing factual evidence "in light of the philosophy of the administration" and the Las Vegas shooting, the Final Rule is not arbitrary, capricious, or "otherwise not in accordance with law" in violation of 5 U.S.C. § 706(2)(A).    (See Dkt. # 54-2, Exh. P-7, AR001094.)    From a review of the reasoning in the Final Rule, the Court finds that Defendants have engaged in the necessary "reasoned decision-making."    See State Farm, 463 U.S. at 52.

### 2.    Whether Defendants exceeded their statutory authority in violation of 5 U.S.C. § 706(2)(C)

**185.**    As explained in Part II.B.2 above, the Final Rule is not *ultra vires*.    Applying the same reasoning, De-

153a

fendants did not exceed their statutory authority in issuing the Final Rule.

## CONCLUSION

For the reasons stated above, the Court finds that Plaintiff is not entitled to the relief requested on any of the stated counts.   The Final Rule is a validly issued legislative rule that does not violate principles of non-delegation or separation of powers.   Even without reliance on <u>Chevron</u> step-two deference, the Court finds Defendants' interpretations of the terms "single function of the trigger" and "automatically" in the statutory definition of "machinegun" properly include bump stocks within that definition.   The Final Rule complied with the requirements of the Administrative Procedure Act.

This order constitutes final judgment in this case, and the case is hereby **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

**DATED:**   Austin, Texas, Nov. 23, 2020

/s/   <u>DAVID ALAN EZRA</u>
David Alan Ezra
Senior United States District

154a

**APPENDIX D**

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

―――――

No. 20-51016

MICHAEL CARGILL, PLAINTIFF-APPELLANT

*v.*

MERRICK GARLAND, U.S. ATTORNEY GENERAL;
UNITED STATES DEPARTMENT OF JUSTICE;
REGINA LOMBARDO, IN HER OFFICIAL CAPACITY AS
ACTING DIRECTOR OF THE BUREAU OF ALCOHOL,
TOBACCO, FIREARMS, AND EXPLOSIVES; BUREAU OF
ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,
DEFENDANTS-APPELLEES

―――――

Filed:   June 23, 2022

―――――

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:19-CV-349

―――――

**ON PETITION FOR REHEARING EN BANC**

―――――

Before RICHMAN, *Chief Judge*, and JONES, SMITH, STEWART, DENNIS, ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, COSTA, WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM, and WILSON, *Circuit Judges*.

PER CURIAM:

A member of the court having requested a poll on the petition for rehearing en banc, and a majority of the cir-

155a

cuit judges in regular active service and not disqualified having voted in favor,

IT IS ORDERED that this cause shall be reheard by the court en banc with oral argument on a date hereafter to be fixed.   The Clerk will specify a briefing schedule for the filing of supplemental briefs.   Pursuant to 5th Circuit Rule 41.3, the panel opinion in this case dated December 14, 2021, is VACATED.

156a

**APPENDIX E**

1.  18 U.S.C. 921(a)(24) provides:

(24)  The term "machinegun" has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)).

2.  18 U.S.C. 922(*o*) provides:

(*o*)(1)  Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

(2)  This subsection does not apply with respect to—

(A)  a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

(B)  any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

3.  26 U.S.C. 5845(b) provides:

**(b)  Machinegun**

The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.   The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and ex-

157a

clusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

4.   27 C.F.R. 447.11 provides in pertinent part:

**Meaning of terms.**

*Machinegun.*   A "machinegun", "machine pistol", "submachinegun", or "automatic rifle" is a firearm which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.   The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.   For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions.   The term "machinegun" includes a bump-stock-type device, *i.e.*, a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues

158a

firing without additional physical manipulation of the trigger by the shooter.

5.  27 C.F.R. 478.11 provides in pertinent part:

**Meaning of terms.**

*Machine gun.*  Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person.  For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machine gun" includes a bump-stock-type device, *i.e.*, a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

159a

6.   27 C.F.R. 479.11 provides in pertinent part:

**Meaning of terms.**

*Machine gun.*   Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.   The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person.   For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machine gun" includes a bump-stock-type device, *i.e.*, a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.